UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>　　　　Defendants. | Case No. 13-cv-03826-EMC<br><br>Case No. 14-cv-5200-EMC<br><br>Case No. 15-cv-0262-EMC |
| IN RE UBER FCRA LITIGATION | **ORDER RE PLAINTIFFS' MOTIONS TO ENJOIN UBER'S COMMUNICATIONS WITH CLASS AND PUTATIVE CLASS MEMBERS AND ENFORCEMENT OF DECEMBER 11, 2015 ARBITRATION AGREEMENT** |
| HAKAN YUCESOY, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>　　　　Defendants | *O'Connor* Docket No. 405<br><br>*In re Uber FCRA Litigation* Docket No. 127<br><br>*Yucesoy* Docket No. 127 |

## I.　INTRODUCTION

On December 9, 2015, this Court issued an order certifying a subclass of Uber drivers who signed arbitration agreements in 2014 and 2015, having found that the arbitration agreements were not unenforceable. Two days later, on December 11, 2015, Uber issued a new arbitration agreement (hereafter, December 2015 Agreement) to all Uber drivers, including members of the certified subclasses. The new agreement purports to require nearly all claims to be arbitrated and

waive the driver's right to bring suit or participate in class action litigation, unless they opted out of the arbitration agreement.

Following the issuance of this new arbitration agreement, Plaintiffs in *O'Connor v. Uber Technologies, Inc.*, *In re Uber FCRA Litigation*, and *Yucesoy v. Uber Technologies, Inc.* filed separate motions to enjoin the December 2015 Agreement, and to enjoin any further communications by Uber with the class and putative class members. Plaintiffs in each of these cases contend that the arbitration agreement is an unauthorized communication designed to undermine or discourage participation in these and other pending cases against Uber. *See O'Connor*, Docket No. 405 (*O'Connor* Mot.) at 1; *Yucesoy*, Docket No. 145 (*Yucesoy* Mot.) at 2; *In re Uber FCRA Litigation*, Docket No. 127 (*FCRA* Mot.) at 1.[1]

Plaintiffs' motion came on for hearing before the Court on December 17, 2015. Having considered the parties' moving and response papers, as well as the oral argument of counsel, the Court hereby **GRANTS**, in part, Plaintiffs' motion.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 23(d), district courts have "'the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation.'" *O'Connor v. Uber Techs., Inc.*, Case No. 13-cv-3826, 2013 WL 6407583, at *4 (N.D. Cal. Dec. 6, 2013) (quoting *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S. Ct. 74 (2011)). The district court has a duty and broad authority to control communications even with putative class members before certification, and to enter appropriate orders governing the conduct of counsel and the parties. *Id.* (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)); *see also In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) ("A court has supervisory authority over a defendant's communications with putative class members."); *Camp v.*

---

[1] There are also driver cases pending against Uber in other courts. *See Ogumokun v. Uber Technologies, Inc.*, Case No. 15-CV-06143 (E.D.N.Y.); *Sena v. Uber Technologies, Inc.*, Case No. 15-cv-2418-DLR (D. Ariz.); *Varon v. Uber Technologies, Inc.*, Case No. 15-cv-3650-MJG (Md.); *Dinofa v. Uber Technologies, Inc.*, Case No. 15-cv-6121 (E.D. Penn.); *Micheletti v. Uber Technologies, Inc.*, Case No. 15-cv-1001 (W.D. Tex.); *Fisher v. Uber Technologies, Inc.*, Case No. 15-cv-01787 (W.D. Wash.).

1  *Alexander*, 300 F.R.D. 617, 626 (N.D. Cal. 2014) (invalidating opt-out and ordering issuance of
2  court-drafted corrective notice where the defendants improperly solicited opt-out declarations
3  from putative class members); *Guifu Li v. A Perfect Day Franchise*, 270 F.R.D. 509, 518-19 (N.D.
4  Cal. 2010) (same).

5  In exercising its authority to limit class communications pursuant to Rule 23(d), a finding
6  of actual misconduct is not required. Instead:

> an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Gulf Oil Co.*, 452 U.S. at 101-02. The key question, therefore, is "whether there is 'potential interference' with the rights of the parties in a class action." *O'Connor*, 2013 WL 6407583, at *5.

This Court previously required drivers be given additional opportunity to opt out of the 2013 agreement and enjoined further issuance of arbitration agreements absent revision to notice and procedures. The Court permitted the issuance of new arbitration agreements with an improved opt-out option and a more thorough explanation of how the arbitration agreement affects participation in existing litigation. *Id.* at *7. However, there have been significant developments since the order of December 6, 2013, including the filing of multiple cases asserting a variety of rights, the denial of Uber's motion for summary judgment in *O'Connor*, certification of a class and claims in *O'Connor*, the ruling that the arbitration classes in the 2013, 2014 and 2015 agreements are not enforceable, and the setting of the *O'Connor* case for trial. These events increase the complexity of the legal landscape surrounding the Uber litigation, and may have an impact on drivers' evaluation of the benefits of arbitration versus litigation. For instance, despite the fact that the Court has held unenforceable the 2013, 2014, and 2015 arbitration agreements, drivers who failed to opt out of those agreements may still believe they are required to arbitrate and thus pay little heed to the opt out provisions of the new arbitration agreement. Also, drivers

3

may give greater credence to litigation over arbitration in view of the progression of the *O'Connor* case and the problematic nature of some of the arbitration provisions. Because the legal landscape has become materially more complicated for the drivers, it is imperative that drivers be given clarity, and that the ability of drivers to opt out at this juncture be clear and non-cumbersome, in order to protect the rights of both the certified class and the putative class members.

Uber contends that it does not intend to invoke the new agreement against the members of the certified class as to certified claims up to the date of class certification; however, the new arbitration agreement does not reflect this limitation. *See O'Connor* Docket No. 410 (Opp.) at 4; Exh. A at § 15.3. Not only is the new Agreement misleading in this regard, there is evidence that it has in fact led to considerable confusion among the drivers. *See O'Connor* Docket No. 415 (Liss-Riordan Dec.) at ¶ 3. Moreover, it is clear that the December 2015 Agreement is a direct response to the Court's rulings in the ongoing class action litigation (and Uber does not dispute otherwise, *see O'Connor* Docket No. 408, Exh. B at 1), which in turn will have the practical effect of limiting the ability of a putative class member to participate in the class action before this Court. There can be little doubt that the purpose of the new Agreement is not purely an isolated business decision but one which is informed by Uber's litigation strategy. This potential interference with the rights of the parties in pending litigation against Uber warrants the Court's exercise of its power under Rule 23(d) to ensure that existing and putative class members are given adequate information to determine whether they should opt out of the December 2015 Agreement. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009) (affirming district court's corrective notice and extension of the opt-out period to "unwind the confusion" caused by plaintiffs' attorney's unilateral communication with putative class members to procure post-certification opt-outs); *Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 922-23 (11th Cir. 2014) (finding that the district court's decision to not enforce arbitration agreements against any plaintiff who signed an arbitration agreement under coercive circumstances was "not an abuse of its considerable discretion to manage this collective action" and citing similar decisions in Rule 23 class action cases).

The Court finds that with respect to the certified class members in *O'Connor*, the

1  arbitration of the December 2015 Agreement is ineffective as to certified claims, up to the date of
2  certification (December 9, 2015). This confirms Uber's now stated intent, as stated in its filings
3  with this Court, statements to the press, and at the hearing on this matter (though not stated in the
4  new Agreement and cover letter). *See* Uber Opp. at 4; Docket No. 408, Exh. B at 2. This finding
5  is without prejudice to any later request by Plaintiffs to expand the class, *i.e.*, the addition of
6  drivers who were not certified by the Court (*e.g.*, drivers who work for third party transportation
7  companies) should the *O'Connor* Plaintiffs successfully appeal the Court's class certification
8  orders, or drivers who signed up for Uber after December 9, 2015 (the current end date of the
9  certified class) if the June 2016 trial is continued (thus potentially warranting a temporal
10 expansion of the class). In addition, Uber is to engage in no further communications with the
11 certified class that is reasonably likely to affect the prosecution and adjudication of the *O'Connor*
12 class action or engender confusion in respect thereto, except with approval of class counsel or the
13 Court. This prohibition extends specifically to promulgation of any future arbitration agreements
14 to certified class members purporting to affect claims asserted in *O'Connor*.

15 As to the putative class members in *Yucesoy*, *In re Uber FCRA Litigation*, and *Del Rio v.*
16 *Uber* (Case No. 15-cv-03667-EMC), as well as those excluded from the current certified class in
17 *O'Connor* but whose rights may be appealed, Plaintiffs argue that the Court should prohibit Uber
18 from sending any other arbitration agreements in the future. However, Plaintiffs cite no authority
19 that a company may be barred from implementing *any* arbitration agreement, even if the
20 arbitration agreement contains robust notice and opt out provisions. Such a broad remedy would
21 conflict with the directive of *Gulf Oil Co.* that any limitation on communications be "carefully
22 drawn." 452 U.S. at 102. Instead, the courts have invalidated arbitration agreements where *e.g.*,
23 they failed to advise putative class members about the lawsuit or did not offer a reasonable opt-out
24 opportunity. *See Jiminez v. Menzies Aviation, Inc.*, Case No. 15-cv-2392-WHO, 2015 WL
25 4914727, at *6 (N.D. Cal. Aug. 17, 2015) ("counsel for Menzies argued that finding the ADR
26 Policy unenforceable under these circumstances would effectively bar a company from adopting
27 an arbitration agreement so long as its employees are putative members in a pending class action.
28 That is not accurate. The ADR Policy is unenforceable against the putative class because the

1  manner in which it was issued constituted improper class communication. Had Menzies informed
2  putative class members of the ADR Policy's impact on their class rights and provided clear opt-
3  out opportunities, the potential for abuse and coercive behavior would likely have been
4  ameliorated."); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 252-54
5  (invalidating arbitration agreements where the arbitration agreement was added to cardholder
6  agreements after litigation began, but did not notify cardholders about the ongoing litigation);
7  *Balasanyan v. Nordstrom, Inc.*, No. 11-cv-2609-JM-WMC, 2012 WL 760566, at *3-4 (S.D. Cal.
8  Mar. 8, 2012) (invalidating arbitration agreements that were introduced during the pendency of
9  litigation with no notice and no opt-out clause). The Court thus disagrees with Plaintiffs that Uber
10 should be barred from sending any arbitration agreements in the future. However, it will require
11 the following changes and corrective notice to be made in order to ensure the rights of the putative
12 class members are reasonably protected.

13 First, Uber must revise the notice provision within the arbitration agreement to identify all
14 the class actions that have been filed in this Court on behalf of the putative class members (*i.e.*,
15 *O'Connor*, *Yucesoy*, *In re Uber FCRA Litigation*, and *Del Rio*). The notice should summarize the
16 nature of the claims in each of these cases, and with respect to the *O'Connor* case, explain that the
17 case is scheduled to proceed to trial on behalf of the certified class, and who is and is not included
18 in the class. The *O'Connor* class counsel's contact information should also be corrected to reflect
19 their current address. Counsel for each of the other related cases shall be identified along with
20 their current address.

21 Second, Uber shall not enforce the arbitration provision contained in the December 2015
22 Agreement until it provides all putative class members who received that Agreement with a new
23 cover letter[2] and renewed opportunity to opt out. This is necessary because of the complexity of
24 the current legal landscape surrounding the Uber litigation discussed above, which is compounded
25 by the lengthy nature of the arbitration provisions found on pages 16 to 23 of the new agreement
26 which is accessible only by hyperlink. *See* Docket No. 406 at 32-55 (e-mail notice providing a

---

[2] The prior cover letter is at Docket No. 406 at 32-33.

6

1  link to the agreement). The corrective cover letter must be accessible without having to click a
2  link or open any attachments. For instance, the cover letter may be in the body of an e-mail sent
3  directly to the driver or on the prompt screen of the Uber application when the application requires
4  a transportation provider or driver to confirm that he or she agrees to the updated license or service
5  agreement.[3] The corrective cover letter must be succinct (*i.e.* one (1) page) and explain that there
6  is an arbitration clause and afford recipients of a renewed opportunity to opt out within thirty (30)
7  days; it should inform recipients that a decision not to opt out will prevent the driver from
8  participating in ongoing class actions. Furthermore, while the Court is not requiring an
9  affirmative opt-in as requested by Plaintiffs, the corrective cover letter itself must include an easily
10 accessible opt-out function (*e.g.*, a hyperlink that brings up a pre-addressed e-mail and not require
11 the recipient to draft an email from scratch). Absent these clarifications, putative class members
12 face a complex legal landscape and an opt out provision not easily found and invoked; balanced
13 against this is the fact that these requirements imposed little burden on Uber.
14     For all future drivers, the notice and agreement shall conform to the requirements imposed
15 herein during the pendency of Uber driver cases pending in this Court.
16     The foregoing directive is narrowly tailored as required under *Gulf Oil* and is based on
17 factual findings discussed herein.

### III.   CONCLUSION

19     In sum:
20     (1) The Court does not rule on the enforceability of the terms of the December 2015
21 Agreement, nor will it prohibit Uber from sending out any arbitration agreements in the future
22 (except as to the *O'Connor* certified class).
23     (2) Uber's efforts to seek drivers' consent to the arbitration provision in the December
24 2015 Agreement during the pendency of the ongoing class action lawsuits is potentially
25 misleading and threatens to interfere with the rights of both certified and putative class members.
26 This Court shall therefore exercise its discretion and authority to control communications to the

---

[3] *See, e.g.*, *O'Connor* Docket No. 347 (Colman Dec.), Exh. G.

7

certified *O'Connor* class and the putative class in *Yucesoy*, *In re Uber FCRA Litigation*, and *Del Rio*, pursuant to Rule 23(d), as follows:

(a) The December 2015 arbitration agreement shall have no effect on the rights of certified class members to pursue the claims subject of the certification in *O'Connor v. Uber*.

(b) The arbitration provision of the 2015 Agreement may not be enforced until a revised cover letter and arbitration agreement which conform to the above directives is issued. The parties shall meet and confer within ten (10) days of this Order to discuss and stipulate to the appropriate form, content, and procedures of the revised arbitration provision and corrective cover letter, consistent with this Order. If the parties are unable to agree, they shall notify the Court by submitting their respective proposed notices and procedures within fourteen (14) days of this Order.

(c) During the pendency of Uber driver cases before this Court, all cover letters, notices and arbitration provisions given to new or prospective drivers must conform with the requirements herein, and be approved.

This order disposes of *O'Connor* Docket No. 405, *In re Uber FCRA Litigation* Docket No. 127, and *Yucesoy* Docket No. 127.

**IT IS SO ORDERED**.

Dated: December 23, 2015

_____
EDWARD M. CHEN
United States District Judge