UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>    Defendants.<br><br>HAKAN YUCESOY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>    Defendants | Case No. 13-cv-03826-EMC<br><br>Case No. 15-cv-00262-EMC<br><br>**ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>*O'Connor*, Docket No. 518<br>*Yucesoy*, Docket No. 206 |

## I.    INTRODUCTION

Plaintiffs brought the instant class action and putative class action against Defendant Uber Technologies, Inc., alleging that Uber misclassifies drivers as independent contractors rather than employees. *O'Connor v. Uber Techs., Inc.*, Case No. 13-cv-3826-EMC, Docket No. 330 (Second Amended Complaint) (SAC) at ¶ 3; *Yucesoy v. Uber Techs., Inc.*, Case No. 15-cv-262-EMC, Docket No. 198 (Fourth Amended Complaint) at ¶ 2. After nearly three years of hard-fought litigation,[1] the parties reached a settlement on the eve of the *O'Connor* trial. *O'Connor*, Docket

---

[1] Plaintiffs note that in the *O'Connor* litigation, "[t]here have been 23 substantive motions filed in this case . . . and the Court has issued 25 substantive rulings (comprising 287 pages of legal opinion). The Court has held 18 hearings (totaling more than 23 hours of court time)." Docket No. 518 at 3 (Mot.); *see also* Docket No. 519 (Liss-Riordan Dec.) at ¶ 7. In the *Yucesoy* litigation, there have been multiple motions to dismiss and motions to compel arbitration. Mot. at 4 n. 2.

No. 518; *Yucesoy*, Docket No. 206 (Mot.).[2]

Plaintiffs' motions for preliminary approval came on for hearing before the Court on June 2, 2016. As discussed below, the parties have failed to provide sufficient information, preventing the Court from performing the full assessment of the settlement as required by Federal Rule of Civil Procedure 23(e) and Ninth Circuit precedent. The Court thus orders the parties file a supplemental brief as specified below.

## II.   BACKGROUND

A.   Procedural History

The Settlement Agreement at issue covers two lawsuits pending before this Court. *O'Connor v. Uber Technologies, Inc.* was brought on behalf of all individuals who worked as Uber drivers in California.[3] Docket No. 330 (Second Amended Complaint) (SAC) at ¶ 1. *O'Connor* alleged that Uber misclassified drivers as independent contractors, and had failed to pay business expenses as required by California Labor Code section 2802, as well as failed to remit to drivers the full gratuity paid by customers in violation of California Labor Code section 351. *Id.* at ¶¶ 2-3. Following years of contentious litigation -- which included a motion to dismiss, motion for judgment on the pleadings, and a motion for summary judgment -- the Court originally certified the following class to pursue the gratuities claim:

> All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and who (1) signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) did not electronically accept any contract with Uber or one of Uber's subsidiaries which contains the notice and opt-out provisions previously ordered by this Court (including those contracts listed in the Appendix to this Order), *unless* the driver timely opted-out of that contract's arbitration agreement.

---

[2] All subsequent docket numbers are based on the *O'Connor v. Uber Technologies, Inc.* docket, unless otherwise indicated.

[3] The *O'Connor* suit was originally brought on behalf of all individuals who worked as Uber drivers in the United States (except in Massachusetts). *See* Docket No. 1 (Compl.) at ¶ 1. After the Court found that the California laws that the *O'Connor* Plaintiffs relied on did not apply extraterritorially, the *O'Connor* Plaintiffs amended their complaint to be limited to California drivers. *See* Docket No. 136 (Ord. on Motion for Judgment on the Pleadings) at 21.

2

Docket No. 342 (September 1, 2015 Class Certification Ord.) at 67. After the parties filed supplemental briefing on the motion for class certification, the Court certified the following subclass of drivers:

> All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and meet all the following requirements: (1) who signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) electronically accepted any contract with Uber or one of Uber's subsidiaries which contain the notice and opt-out provisions previously ordered by this Court, and did not timely opt out of that contract's arbitration agreement.

Docket No. 395 (December 9, 2015 Class Certification Ord.) at 32. Both the September 1, 2015 class and December 9, 2015 subclass were certified to pursue the expense reimbursement claim, as well as the gratuities claim.

*Yucesoy v. Uber Technologies, Inc.* was filed on behalf of all Massachusetts drivers, and originally alleged claims for independent contractor misclassification, violation of the Massachusetts Tips law, tortious interference with contractual and/or advantageous relations, unjust enrichment enrichment/*quantum meruit*, breach of contract, and violation of the Massachusetts minimum wage and overtime law. *Yucesoy*, Docket No. 27 (First Amended Complaint). After the Court ruled on three motions to dismiss, the remaining claims in *Yucesoy* are: (1) independent contractor misclassification (and attendant failure to pay business expenses), (2) violation of the Massachusetts tips law, and (3) tortious interference with advantageous relations. *Yucesoy*, Docket No. 198 (Fourth Amended Complaint). Thus, like *O'Connor*, *Yucesoy*'s primary claims are for business expenses and gratuities.

B. Terms of the Settlement Agreement

1. Monetary and Non-Monetary Terms

In the Settlement Agreement, Uber has agreed to pay $84 million, plus an additional $16 million contingent on an initial public offering (IPO) reaching one-and-a-half times Uber's most recent valuation (*i.e.*, about $93.75 billion). Docket No. 519 (Liss-Riordan Dec.), Exh. 6 (Settlement Agreement) at ¶ 58. Of the $84 million, $300,000 will be used for class

1  administration, a maximum of $73,000 will be allocated for enhancement payments to the named
2  Plaintiffs and other Settlement Class members who contributed to the litigation, and $8.7 million
3  will be treated as wages reported on IRS Form W-2. Settlement Agreement at ¶¶ 125, 129, 133.
4  Plaintiffs' counsel is also permitted to seek a fee and expense award of up to 25% of the
5  Settlement Fund. Settlement Fund at ¶ 134.

6  The remaining Settlement Fund will be separated into two funds: $5.5 million to $6 million
7  for the Massachusetts drivers, and $56 million to $66.9 million for the California drivers.
8  Settlement Agreement at ¶ 144. Each driver must submit a claim form to receive a payment.
9  Settlement Agreement at ¶ 138. The driver will then receive a payment that is based on the
10  number of miles the driver spent on trip. Settlement Agreement at ¶ 145. Further, drivers may
11  receive "double weight" for their mileage depending on whether they opted out of Uber's 2013
12  and 2014 arbitration agreement, and whether a driver is a member of the *O'Connor* certified class.
13  Settlement Agreement at ¶ 144. If a driver is both a member of the *O'Connor* certified class and
14  opted out of the 2013 and 2014 arbitration clause, they will receive quadruple weight for their
15  mileage. Docket No. 617 (Joint Supp. Briefing) at 4.

16  In addition to monetary payments, Uber agreed to implement certain non-monetary relief.
17  This includes a comprehensive written deactivation policy. Settlement Agreement at ¶ 135(a).
18  Deactivation will only be allowed for sufficient cause, and low acceptance rates will not be
19  grounds for deactivation,[4] although a driver may still be deactivated if they have a high
20  cancellation rate. *Driver Deactivation Policy - US ONLY*, Uber,
21  https://www.uber.com/legal/other/driver-deactivation-us-english/ (last visited June 30, 2016).
22  Uber will also provide at least two advance warnings before a driver is deactivated for reasons
23  other than safety issues, discrimination, fraud, or illegal conduct (each, an "excluded matter").
24  Settlement Agreement at ¶ 135(a)(iii). If a driver is deactivated, Uber will provide the driver with
25  an explanation for its deactivation decision. Settlement Agreement at ¶ 135(a)(v). Further, a

---

[4] However, low acceptance rates will be subject to being logged out of the app for a limited period of time. *See Driver Deactivation Policy - US ONLY*, Uber, https://www.uber.com/legal/other/driver-deactivation-us-english/ (last visited June 30, 2016).

driver whose user account is deactivated may appeal the deactivation decision to a Driver Appeal Panel, except for certain circumstances, *e.g.*, low star ratings, criminal activity, physical altercation, or sexual misconduct. Settlement Agreement at ¶ 135(a)(vi). Finally, except in the event of an excluded matter, drivers whose user accounts are deactivated will have the opportunity to take a "qualify improvement course" and be reactivated upon completion of the course. Settlement Agreement at ¶ 135(a)(vii).

Second, Uber will provide more information regarding star ratings. Settlement Agreement at ¶ 135(d). Uber will also "consider" changes such as informing drivers how they rank against their peers, providing drivers with warnings when their ratings go below a certain threshold, and warning drivers when their user accounts may be deactivated for going below a certain threshold.

Third, Uber will pay for the filing and administrative arbitration fees in cases based on: (1) an alleged employment relationship between Uber and drivers, and (2) cases arising out of, or relating to, Uber's final deactivation of a driver's user account or a threat by Uber to deactivate a user account in the event of an excluded matter. Settlement Agreement at ¶ 135(e).

Fourth, Uber will institute an internal process for drivers to bring concerns regarding the payment of specific fares in California and Massachusetts within 180 days of the effective date. Settlement Agreement at ¶ 135(f).

Fifth, Uber will collaborate with Plaintiffs regarding the creation and funding of a driver association as a means of opening a dialogue between Uber and drivers. Settlement Agreement at ¶ 135(g). The driver association's leaders will be elected by drivers, and the leader will have the opportunity to meet quarterly with Uber management to discuss driver concerns. Settlement Agreement at ¶ 135(g)(iv)-(v). The driver association will not be a union, and will not have the right or capacity to bargain collectively with Uber. Settlement Agreement at ¶ 135(g)(ii)-(iii). However, the parties were unable to provide any details on how this driver association will work in practice. Joint Supp. Briefing at 26.

Finally, Uber will make good-faith efforts to clarify its messaging regarding tipping. Settlement Agreement at ¶ 135(h). Specifically, Uber will make good faith efforts to clarify that tips are not included (except for UberTAXI), but that tipping is neither expected nor required.

Joint Supp. Briefing at 18. Drivers will also be permitted to put up signs; however, the parties disagree on whether this relief constitutes a change in policy. *See* Liss-Riordan Dec. at ¶ 97 ("Uber has confirmed that its policies do not prohibit a driver from putting up signs or requesting a tip"); Joint Supp. Briefing at 18 (Uber stating its position that the Settlement Agreement "does not change Uber's tipping policy in any way.").

### 2. Scope of the Class and Released Claims

The Settlement Agreement covers "all Drivers in California and Massachusetts who have used the Uber App at any time since August 16, 2009, up to and including the Preliminary Approval Date." Docket No. 519 (Liss-Riordan Dec.), Exh. 6 (Settlement Agreement) at ¶ 103. Thus, the settlement class will not only include the *O'Connor* certified class, but will include: (1) California drivers who were excluded by the class definition, *i.e.*, drivers who drove for a third-party transportation company or who used fictitious or corporate names; and (2) all Massachusetts drivers.

Furthermore, although the *O'Connor* and *Yucesoy* cases were limited to claims based on expense reimbursement and the payment of tips, the Settlement Agreement will require all settlement class members to release claims based on or reasonably related to the employment misclassification claim, *i.e.*, overtime, minimum wage, meal and rest breaks, and workers' compensation. Settlement Agreement at ¶ 105. The Settlement Agreement will also settle civil penalties due per California's Private Attorney General Act (PAGA). *Id.* Because the Settlement Agreement requires that the Plaintiffs file amended complaints expanding the causes of action to include all claims related to the alleged misclassification of drivers as independent contractors, *see* Settlement Agreement at ¶ 29 and Exhs. A (Proposed *Yucesoy* Fifth Amended Complaint), B (Proposed *O'Connor* Fifth Amended Complaint), the Settlement Agreement will cover claims that are brought in at least fifteen other lawsuits pending in federal and California state court.[5]

---

[5] These lawsuits include: (1) *Price v. Uber Technologies, Inc.*, Case No. BC554512; (2) *Del Rio v. Uber Technologies, Inc.*, Case No. 3:15-cv-3667-EMC; (3) *Berger v. Uber Technologies, Inc.*, Case No. 3:16-cv-41-MEJ; (4) *In re Uber FCRA Litigation*, Case No. 3:14-cv-5200-EMC; (5) *Ghazi v. Uber Technologies, Inc.*, Case No. CGC-15-545532; (6) *Richardson v. Uber Technologies, Inc.*, Case No. RG15775562; (7) *Zine v. Uber Technologies, Inc.*, Case No. BC591351; (8) *Narsi v. Uber Technologies, Inc.*, Case No. BC599027; (9) *Tabola v. Uber*

1  Settlement Agreement at ¶ 28.

2  C.     Recent Developments

3       Following the June 2, 2016 hearing on Plaintiffs' motion for preliminary approval before this Court, Plaintiffs' counsel has informed the Court that she will no longer be seeking attorney's fees in the amount of 25% of the settlement fund (as permitted by the Settlement Agreement), but will reduce her fee request by $10 million. Docket No. 699 at 2. This $10 million reduction is made regardless of whether the $16 million contingency is triggered. *Id.* at 2 n. 1. Based on this reduction, there will be an additional $10 million for distribution to the class.

     On June 16, 2016, the Ninth Circuit has also heard oral arguments in an appeal of this Court's order regarding the enforceability of the 2013 and 2014 arbitration agreements. Plaintiffs contend that "[b]ased on the questioning at the hearing, it appears that the Ninth Circuit may be poised to overturn the Court's ruling regarding Uber's arbitration agreements," and stressed their request that the Court grant preliminary approval to the settlement. Docket No. 707.

     More recently, on June 23, 2016, Judge Chhabria gave preliminary approval of the settlement in *Cotter v. Lyft*, Case No. 13-cv-4065-VC. *See* Docket No. 717, Exh. 1. Like Plaintiffs here, the *Cotter* plaintiffs alleged that Lyft misclassified its drivers as independent contractors. *Id.* at 1. Further, as with the instant settlement, the *Cotter* settlement did not reclassify the drivers as employees, but offered both monetary and non-monetary relief in exchange for a release of "*all* claims based on the assertion that California Lyft drivers are employees rather than independent contractors . . . ," including a $1 million settlement for the PAGA claims. *Id.* at 2-3. In approving the settlement, Judge Chhabria reviewed the strength of the recently filed *Zamora v. Lyft, Inc.*, Case No. 16-cv-2558-VC, which included claims that would be affected by the *Cotter* settlement. *Id.* at 9-13. Noting that the *Zamora* claims were relatively weak, had a low value relative to the value of the reimbursement claims, and could

---

*Technologies, Inc.*, Case No. CGC-16-550992; (10) *Barajas v. Uber Technologies, Inc.*, Case No. CGC-16-550198; (11) *Aquino v. Uber Technologies, Inc.*, Case No. BC608873; (12) *Adzhemyan v. Uber Technologies, Inc.*, Case No. BC608874; (13) *Gollnick v. Uber Technologies, Inc.*, Case No. CGC-15-547878; (14) *Mokeddas v. Uber Technologies, Inc.*, Case No. RG16807483; and (15) *Berwick v. Uber Technologies Inc.*, Case No. CGC-15-546378. *See* Settlement Agreement at ¶ 28.

1  potentially still be brought under other legal theories, Judge Chhabria concluded that while "the
2  *Cotter* plaintiffs ought to have identified and considered the [*Zamora*] gratuity claims before
3  negotiating a settlement agreement, their failure to do so does not render the current settlement
4  unfair, unreasonable, or inadequate within the meaning of Rule 23(e)(2)." *Id.* at 13.

### III.  DISCUSSION

A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." As the Ninth Circuit has explained, "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). The Ninth Circuit has "long recognized that 'settlement class actions present unique due process concerns for absent class members.'" *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

Before a court approves a settlement, it must conclude that the settlement is "fundamentally fair, adequate, and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008); *see also Allen v. Bedolla*, 787 F.3d 118, 1222 (9th Cir. 2015). This inquiry requires that the Court balance factors such as the strength of the plaintiffs' case, the risk and expense of further litigation, the risk of maintaining class action status, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a government participant, and the reaction of the class members of the proposed settlement. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing factors to determine fairness and adequacy); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015). "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer." *Cotter v. Lyft, Inc.*, Case No. 13-cv-4065-VC, -- F. Supp. 3d --, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016) (internal quotation omitted); *see also Procedural Guidance for Class Action Settlements*, UNITED STATES

8

1 DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA,

2 http://cand.uscourts.gov/ClassActionSettlementGuidance (last visited June 28, 2016). While it is

3 not necessarily unusual or improper for a class action settlement agreement to release claims not

4 originally brought by the plaintiff, the court must consider the strength and value of those claims

5 in deciding whether to approve the settlement. *Cotter*, *supra*.

6 Moreover, as noted at the hearing, this settlement is unusual inasmuch as it expressly seeks to terminate a large number of other pending lawsuits. What is particularly significant here is that although the Court previously certified the class as to the tips and reimbursement claims, the proposed settlement seeks to include for certification under Rule 23(e) new claims not previously asserted (but asserted in other litigation) and drivers excluded from the prior certification. As to the new proposed settlement class, a more probing inquiry is warranted. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 976 ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must with-stand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."). The inquiry is particularly important where as here the Court must be sensitive to the risk of collusion or at least less than a full adversarial process with respect to the release of claims pending in other cases, where those claims were added at the eleventh hour of negotiations and not preceded by active litigation herein, and then given little or no value in the settlement.

21 B. <u>Lack of Adequate Information</u>

22 Despite the supplemental briefing by the parties in light of issues raised by objectors and the Court, the Court concludes that it currently lacks adequate information to determine if the proposed settlement is fair, reasonable, and adequate. *E.g.*, *Nielson v. Sports Auth.*, Case No. 11-cv-4724-SBA, 2012 WL 5941614, at \*6 (N.D. Cal. Nov. 27, 2012) ("Plaintiff does not specify the maximum recovery that Plaintiff could have obtained if the action were concluded on the merits. Without that information, the Court is unable to assess, at this juncture, whether the proposed settlement is reasonable."); *Eddings v. DS Servs. of Am., Inc.*, Case No. 15-cv-2576-VC, Docket

9

No. 38 (N.D. Cal. May 20, 2016) (denying motion for preliminary approval where the plaintiffs did not give the court sufficient information to evaluate the relative value of the proposed settlement or to evaluate the strengths and weaknesses of the plaintiffs' case). Specifically, the Court finds that the parties have failed to provide sufficient information on the following matters and order the parties to file supplemental briefing addressing these issues by July 15, 2016.

    1.    Plaintiffs have yet to demonstrate that they are able to satisfy the Rule 23 certification requirements, specifically whether any of the named plaintiffs are an appropriate class representative for the claims that are being added to the cases, *e.g.*, minimum wage and overtime claims. This is particularly so with respect to the proposed *O'Connor* complaint covering California drivers which states *no* facts about any of the named plaintiffs except which city they reside in. *See* Settlement Agreement, Exh. B. Plaintiffs should demonstrate that the named plaintiffs can properly serve as class representatives for each claim now asserted (and released).

    2.    There is inadequate information on the value of full verdict value of the new claims that are being released, in particular the newly added wage and hour claims. For example, with respect to the overtime claim's estimated value of $2.4 million, the parties do not provide sufficient information on what numbers were used to calculate this value, the factual basis for these numbers, and how they resulted in the $2.4 million valuation. There appears to have been no discovery directed at the bases for this number. Furthermore, it appears that for the expenses claim, Plaintiffs simply relied on the number of miles spent by Uber drivers while transporting riders without any evidence of attempted verification. *See* Liss-Riordan Dec. at ¶ 32. This number does not include information on time and miles spent picking up riders, and the parties do not explain if and how much of this information is in fact available, what could be estimated, and what it would show.

    3.    In addition to the lack of information on how the parties calculated the full verdict value of the overtime and expense claims, the parties assign no value to the vast majority of the claims that are being added to the case. In so doing, the parties fail to address many of the legal arguments raised by the objectors, which suggest that these claims are not completely without value. For example, the parties assign no value to the meal and rest breaks claim, on the ground that the claim lacks merit because drivers can take meal and rest breaks whenever they wish by not

accepting ride requests or logging off the Uber application. Joint Supp. Briefing at 39-40. This explanation fails to address the objectors' argument that "[i]n California, an employer must affirmatively authorize all breaks required by law -- it cannot evade liability simply by arguing that it did not prevent employees from taking breaks." Docket No. 638 (Consolidated Objectors' Reply) at 4; *see also Benton v. Telecom Network Specialists, Inc.*, 220 Cal. App. 4th 701, 725-26 (2013) (reversing trial court's decision to not certify a class because "the employer's liability arises by adopting a uniform policy that violates the wage and hour laws," and the "plaintiff's theory of recovery is that TNS violated wage and hour requirements by failing to adopt a policy authorizing and permitting and rest breaks to its technicians"). Similarly, the parties fail to respond to the objectors' comments that in California, employees are entitled to compensation for time spent waiting to perform a task. *See* Docket No. 599 (Price Obj.) at 7; *see also* Cal. Code Regs., tit. 8, § 11090, subd. 2(G) (California Wage Order No. 9 (pertaining to the transportation industry), which defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so").[6] The parties also provide zero value for the workers' compensation insurance claim, without responding to the objector's comments regarding the implication of exclusivity to the legal claim asserted. *See* Docket No. 592 (Ghazi Obj.) at 9-12; *Jackson v. Pac. Gas & Elec. Co.*, 95 Cal. App. 2d 204, 207 (1949) (noting that the general rule is that "when an employee of the defendant sustains injuries in the course of his employment which are compensable under the Workmen's Compensation Act, that act provides his exclusive remedy,

---

[6] However, the Court notes that California courts applies the test used by the Ninth Circuit in the Fair Labor Standards Act (FLSA) case, *Owens v. Local No. 169*, 971 F.2d 347 (9th Cir. 1992), to determine whether on-call time is compensable. *See Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 523 (2009) ("The Ninth Circuit Court of Appeals provided a nonexclusive list of factors, none of which is dispositive, to determine whether the employee was free to engage in personal activities: '(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.'); *see also Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524, 1535-36 (2008) (listing *Owens* factors in ordering that class certification of a claim seeking gap time for individual drivers, on the ground that the record revealed the employer dictated to a large extent how drivers used their on-call time).

and he may not maintain an action for the tort in any other tribunal," but that there is an exception to the general rule where "[i]f the employer fails to *secure* the payment of compensation for such injuries, the claimant may maintain an action for the tort independently of the Workmen's Compensation Act."). To the extent that the parties contend that it is unclear that this claim can be enforced through the Unfair Competition Law (UCL), the parties do not provide any case law in support. *See* Joint Supp. Briefing at 46; *cf. People ex rel. Harris v. Pac Anchor Transp., Inc.*, 59 Cal. 4th 772, 775-76 (2014) (finding that a UCL claim seeking injunctive relief, civil penalties, and restitution on the basis that defendants misclassified drivers and failed to take statutorily mandated actions including provision of workers compensation was not preempted by the Federal Aviation Administration Authorization Act of 1994); *but see Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1143-53 (2003) (finding that the UCL could not be used to recover money that the plaintiff does not have an ownership interest in).

    4.      The parties' calculation of the PAGA penalties appears to be inaccurate. PAGA penalties are calculated at "one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." Cal. Labor Code § 2699(f)(2). Here, Plaintiffs have estimated the PAGA penalties to exceed $1 billion. *See* Liss-Riordan Dec. at ¶ 82. However, the numbers underlying Plaintiffs' estimated PAGA penalties appear arbitrary. For example, Plaintiffs calculated a total number of pay periods by taking the first and last month of work by each California driver, and assuming that the driver worked every week during this period, which Plaintiffs admit is likely a "large overestimate." Liss-Riordan Dec. at 22 n. 6. The parties do not explain why Uber could not provide accurate information on this matter. Further compounding the inaccuracy is that Plaintiffs did not multiply the total number of pay periods by $200, instead only multiplying every violation by $100 despite the statutory language. *See id.*; Cal. Labor Code § 2699(f)(2). Plaintiffs fail to provide any explanation for this calculation. Finally, Plaintiffs ignore the potential for stacking of PAGA penalties related to wage-and-hour claims other than the gratuities and expense reimbursement claim, *i.e.*, meal and rest breaks, minimum wage and overtime, and workers' compensation. Thus, Plaintiffs' estimate of the PAGA penalties at over $1 billion does not appear to rest on an accurate foundation. The parties should provide an accurate

12

assessment of the potential verdict value of the PAGA claim.

In addition, the parties should provide more substantial legal authority for why a 99.9% discount in potential PAGA recovery is warranted, even considering PAGA's requirement that the penalty be reduced in order to avoid "an award that is unjust, arbitrary and oppressive, or confiscatory, and to comport with due process" and a potential good faith defense.  *Compare with Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1203, 1214 (2008) (approving reduction of penalty amount to one-third of the damages award even though there was "no evidence that Cintas [did] not entertain a good faith belief that the LWO did not apply to workers in Plaintiffs' position"); *Thurman v. Bayshore Transit Mgmt.*, 203 Cal. App. 4th 1112, 1135-36 (2012) (reducing penalty amount by 30% where "defendants took their obligations under Wage Order No. 9 seriously and attempted to comply with the law).  While the parties suggest that a $1 million valuation is "a reasonable real-world full verdict value of Plaintiffs' PAGA claims" as in *Cotter v. Lyft*, *supra*, the parties should explain how the conventional analysis of the *Hanlon* factors should apply here, particularly where, unlike the other claims, the PAGA claims cannot be compelled to arbitration.  *See Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 360 (2014); *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 431-40 (9th Cir. 2015).[7]

Also, with respect to the PAGA claims and releases thereof (*see* ¶ 105(a) of the Settlement Agreement), it is unclear what effect the Agreement is intended to have on a class member who opts out and brings a PAGA claim in court.  Would such a claim be barred by the Agreement?  What would be the permissible scope of a post-settlement PAGA claim?

5. There is no information about the likelihood that the $16 million payment -- which is contingent upon an Initial Public Offering (IPO) of Uber yielding an average valuation of at least 1.5 times Uber's most recent valuation within 365 days from the closing of the IPO -- will be

---

[7] While Plaintiffs suggest there is a "significant risk" that the Supreme Court will grant certiorari in *Sakkab*, *see* Plaintiffs' Resp. at 32 n. 24, Plaintiffs previously pointed out that the Supreme Court has twice denied review of *Iskanian*, both in *Iskanian* and *CarMax Auto Superstores Cal., LLC v. Areso*.  *See* Docket No. 416 at 1 (Plaintiffs' Opp. to Uber's Mot. to Stay) ("The Court's ruling is on firm legal footing, as the Ninth Circuit of Appeals has upheld the Iskanian rule, the Supreme Court has repeatedly denied certiorari on this issue (as recently as this past Monday), and the California Court of Appeals has issued precedential decisions supporting the Court's interpretation of Uber's non-severable PAGA waiver").  Plaintiffs provide no explanation for why there is now an increased risk that the Supreme Court will grant certiorari.

triggered. When pressed on this issue at the hearing, Uber stated that the $16 million payment was "very likely" based on public reports about Uber's cash infusions and analysts' reports. *See* June 2, 2016 Trans. at 35:17-36:1. However, the parties have not provided any of this information, and the Court has no basis currently to determine the likelihood and value of the contingent payment. The parties shall provide additional information.

6. There is a lack of clarity about the length of the non-monetary provisions, which affects the value of the non-monetary relief. Although the parties present the non-monetary provisions as "stay[ing] in effect for a bare minimum of two years," *see* Joint Supp. Briefing at 28, the Settlement Agreement provides that Uber has 180 days to implement the non-monetary provisions following the "Effective Date," which is defined as "seven (7) days after which both of the following events have occurred: (i) the Final Approval Order has been entered and (ii) the Final Approval Order and Final Judgment have become Final." Settlement Agreement at ¶¶ 64, 135. By contrast, the non-monetary provisions expire "two years after Final Approval." *Id.* at ¶ 136. Because it is unclear how long the parties intended for the non-monetary provisions to last, the Court cannot determine the value of such provisions for the settlement class. *See* June 2, 2016 Trans. at 95:14-16 (Plaintiffs' counsel stating that the non-monetary relief is supposed to be in place for two years), 97:24-98:1 (Uber's counsel agreeing that the non-monetary relief can be in effect for just a year and a half). The parties should clarify the minimum length of time the non-monetary provisions will be in place.

7. Plaintiffs have asserted that the release (¶ 105) applies only to claims related to misclassification. *See* Docket No. 611 at 7 n. 5. However, ¶ 105 does not expressly state this; it specifies that release claims are those which "are based on or reasonably related to the claims asserted in the Action." Do the parties expressly intend to include only those claims that are based on drivers being classified as employees?

8. It is unclear what effect Plaintiffs' stipulation to the enforceability of the December 2015 arbitration agreement will have on the settlement class members, including claims that fall outside of the scope of the Settlement Agreement. *See* Settlement Agreement at ¶ 135(e). Plaintiffs state that future litigants may challenge the arbitration agreements on the merits, and that they "merely stipulated to their enforceability for purposes of this litigation." Plaintiffs' Resp. at

14

27. By contrast, Objectors have argued that the plain language of the Settlement Agreement will prevent the settlement class members from challenging the enforceability of the December 2015 arbitration agreement in any other case, even if the claim is unrelated to misclassification and is not otherwise covered in this language. *See* June 2, 2016 Trans. at 130:23-131:5 (discussing possibility that "Uber can take this language and come back and say: As a matter of res judicata, all the persons who did not opt out of O'Connor are now bound by a stipulation that the December 2015 arbitration provision is enforceable"), 132:23-133:4 ("THE COURT: In other words, people in your putative class who don't opt out may be free from the release clause because the release clause is not broad enough, but they will be trapped, perhaps unknowingly, with the arbitration stipulation unless they had opted out, and a lot of people will not know to opt out.  MR. CRABTREE: That's exactly right, your Honor."). Thus, it is entirely unclear what the parties' intent is as to the December 2015 arbitration agreement, and whether individuals may be giving up the ability to litigate claims that fall outside the scope of the released claims if they fail to opt out. As an example, does the Settlement Agreement bind the Plaintiffs in *Congdon* from asserting claims unrelated to classification to arbitration? *See* Docket No. 670 (Uber Opp. to *Congdon* Mot. to Relate) (opposing motion to relate because the *Congdon* claims would not be released by the *O'Connor* settlement as they were "not based on or reasonably related to any allegations of driver misclassification, wage-and-hour claims, expense reimbursement claims, gratuities law claims, or any of the other claims released in the parties' settlement agreement").

9. There is insufficient information on what the effect will be on drivers who relied on the Court's Rule 23(d) orders should the Court vacate those orders as contemplated by the Settlement Agreement. During the hearing, the Court raised concerns regarding the due process rights of drivers who may have chosen not to opt out of the December 2015 arbitration agreement in reliance on the Court's Rule 23(d) orders, particularly when the parties agreed that such drivers would not get a second opportunity to opt out. June 2, 2016 Trans. at 114:14-24. Plaintiffs' only response at the hearing was to dismiss the Court's concerns as "a theoretical argument." *Id.* at 114:25-115:1. This response is unsatisfactory. *See id.* at 117:2-25. Rather than "vacate" the Rule 23(d) orders, should the Court instead (if it approves the settlement), terminate the orders thereby affording Uber the right to issue new arbitration agreements, and thus give drivers a new chance to

opt out under the terms of the arbitration agreement (independent of any prior reliance on this Court's prior Rule 23(d) orders)?

10. At the hearing, the Court also raised concerns regarding the class opt-out method, including the lack of a form and the requirement that an opt-out be submitted only through mail. *See* June 2, 2016 Trans. at 139:16-21, 140:9-141:4. Plaintiffs' counsel indicated the parties would review the opt out procedure so as to include, *e.g.*, use of a fillable form, electronic option, etc. The parties shall report on a better opt out process.

## IV.    CONCLUSION

The Court acknowledges that the settlement is the product of a long, contentious litigation between the parties, and that there are significant risks to both sides, including the risk that non-PAGA claims could be deemed subject to arbitration should Uber prevail on one or more of its pending appeals. However, the Court is obliged to examine the proposed settlement to ensure the interest of class members are safeguarded, particularly where new uncertified claims are added to the settlement at the eve of settlement. The Court does not foreclose the possibility that the proposed settlement as clarified or modified may prove sufficiently fair and adequate to warrant preliminary approval. At this juncture, however, the Court needs additional information to complete its analysis and assessment. For that reason, the Court orders supplemental briefing by the parties by July 15, 2016.

**IT IS SO ORDERED**.

Dated: June 30, 2016

_____
EDWARD M. CHEN
United States District Judge