SHANNON LISS-RIORDAN, *pro hac vice*
 sliss@llrlaw.com
ADELAIDE PAGANO, *pro hac vice*
 apagano@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801

MATTHEW CARLSON (SBN 273242)
 mcarlson@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
466 Geary St., Suite 201
San Francisco, CA 94102
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801

Attorneys for *O'Connor* Plaintiffs
THOMAS COLOPY, MATTHEW MANAHAN,
and ELIE GURFINKEL, individually and
on behalf of all others similarly situated;
Attorneys for *Yucesoy* Plaintiffs

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
 tboutrous@gibsondunn.com
THEANE D. EVANGELIS, SBN 243570
 tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
SBN 254433
 dmanthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
 jlipshutz@gibsondunn.com
KEVIN J. RING-DOWELL, SBN 278289
 kringdowell@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
TRAVIS KALANICK

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

DOUGLAS O'CONNOR, THOMAS
COLOPY, MATTHEW MANAHAN, and
ELIE GURFINKEL, individually and on
behalf of all others similarly situated,
 Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,
 Defendant.

HAKAN YUCESOY, et al,
 Plaintiffs,

v.

UBER TECHNOLOGIES, INC., et al.
 Defendant.

CASE NO.  13-cv-03826-EMC
CASE NO.  15-cv-00262-EMC

**JOINT SUPPLEMENTAL BRIEFING IN
SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL**

Judge: Hon. Edward M. Chen

**REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................ 1

II.     JOINT SUPPLEMENTAL RESPONSE ............................................................................ 2

      1.   The Named Plaintiffs Can Serve as Class Representatives For Settlement
          Purposes ..................................................................................................................... 2

      2.   Full Verdict Value of the Overtime and Expense Reimbursement Claims ................. 5

      3.   Valuation of Additional Released Claims .................................................................. 10

          a.   Meal and Rest Break Claims ........................................................................ 10

          b.   Waiting Time Claims .................................................................................... 12

          c.   Workers' Compensation Insurance Claims .................................................. 14

      4.   PAGA Penalties ........................................................................................................ 15

      5.   The Likelihood of the $16 Million Contingency Being Triggered ............................ 25

      6.   Clarification Regarding the Sunset Provision ........................................................... 25

      7.   Clarification Regarding Scope of Released Claims ................................................... 26

      8.   Stipulation Regarding the Enforceability of the 2015 Arbitration Clause ................ 27

      9.   How Drivers Will Be Impacted By the Vacating of the Rule 23(d) Orders .............. 28

      10.  Opt Out Process ........................................................................................................ 30

CONCLUSION ............................................................................................................................ 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

Abdullah v. U.S. Sec. Associates, Inc.
    731 F.3d 952 (9th Cir. 2013)..................................................................... 12

Alatraqchi v. Uber Technologies, Inc.
    11-42020-CT (August 1, 2012)................................................................. 17

Alexander v. FedEx Ground Package Sys., Inc.
    765 F.3d 981 (9th Cir. 2014).................................................................... 22

Alonzo v. First Transit, Inc.
    2015 WL 6000931 (Oct. 15, 2015) ......................................................... 24

Amalgamated Transit Union Local 1309 v. Laidlaw Transit Serv., Inc.
    2009 WL 2448430 (S.D. Cal. Aug. 10, 2009) ......................................... 16

Amaral v. Cintas Corp.
    163 Cal. App. 4th 1157 (2008).................................................................. 17

Amey v. Cinemark USA Inc.
    2015 WL 2251504 (N.D. Cal. May 13, 2015) ......................................... 19

Arias v. Superior Court
    46 Cal. 4th 969 (2009) ....................................................................... 23, 24

Arreola v. Finish Line, Inc.
    2016 WL 2981819 (C.D. Cal. May 23, 2016) .................................... 18, 22

Arriaga v. Florida Pac. Farms, L.L.C.
    305 F.3d 1228 (11th Cir. 2002)................................................................... 3

AT&T Mobility LLC v. Concepcion
    131 S. Ct. 1740 (2011) ............................................................................. 19

Baumann v. Chase Inv. Servs. Corp.
    747 F.3d 1117 (9th Cir. 2014)................................................................... 24

Benton v. Telecom Network Specialists, Inc.
    220 Cal.App.4th 701 (2013)...................................................................... 12

BMW of N. America v. Gore
    517 U.S. 559 (1996)..................................................................... 20, 21, 22

Brinker Rest. Corp. v. Superior Court
    53 Cal. 4th 1004 (2012) ...................................................................... 11, 12

Bruster v. Uber Techs., Inc.
    2016 WL 2962403 (N.D. Ohio May 23, 2016)......................................... 28

Chu v. Wells Fargo Investments, LLC
    2011 WL 672645 (N.D. Cal. Feb. 16, 2011)................................................................. 18

Clemens v. Hair Club for Men, LLC
    2016 WL 3442774 (N.D. Cal. June 23, 2016............................................................... 18

Cotter v. Lyft, Inc.
    Civ. A. No. 3:13-cv-04065-VC (N.D. Cal.)....................................................... passim

Cruz v. Sun World Int'l, LLC
    243 Cal.App.4th 367 (2015)....................................................................................... 12

Cummings v. Starbucks Corp.
    2014 WL 1379119 (C.D. Cal. Mar. 24, 2014) ........................................................... 12

Cunningham v. Leslie's Poolmart, Inc.
    2013 WL 3233211 (C.D. Cal. June 25, 2013) ........................................................... 24

Dailey v. Sears, Roebuck & Co.
    214 Cal. App. 4th 974 (2013)..................................................................................... 12

Dearaujo v. Regis Corp.
    2016 WL 3549473 (E.D. Cal. June 30, 2016)...................................................... 18, 22

Del Rio v. Uber Techs., Inc.
    3:15-cv-03667-EMC (N.D. Cal.) ............................................................................ 3, 6

DIRECTV, Inc. v. Imburgia
    136 S. Ct. 463 (2015) ................................................................................................ 19

Doctor's Assocs., Inc. v. Casarotto
    517 U.S. 681 (1996) .................................................................................................. 20

Doe v. D.M. Camp & Sons
    624 F. Supp. 2d 1153 (E.D. Cal. 2008)..................................................................... 19

E. Texas Motor Freight Sys. Inc. v. Rodriguez
    431 U.S. 395 (1977) .................................................................................................... 2

Families & Sch. Together Fed. Credit Union v. Auto Maxx, Inc.
    2010 WL 96380 (E.D. Cal. Jan. 6, 2010)................................................................... 26

Fleming v. Covidien Inc.
    2011 WL 7563047 (C.D. Cal. Aug. 12, 2011) ........................................................... 20

Franco v. Ruiz Food Products, Inc.
    2012 WL 5941801 (E.D. Cal. Nov. 27, 2012) ........................................................... 18

Gollnick v. Uber Techs., Inc.
    (Super. Ct. S.F. County No. CGC-15-547878) ........................................................... 3

Hale v. Morgan
    22 Cal. 3d 388 (1978) ................................................................................... 20, 21

Hanlon v. Chrysler Corp.
    150 F.3d 1011 (9th Cir. 1988)..................................................................... 1, 18, 23

Hernandez v. DMSI Staffing, LLC
    79 F. Supp. 3d 1054 (N.D. Cal. 2015) ................................................................ 24

Hopson v. Hanesbrands Inc.
    2009 WL 928133 (N.D. Cal. Apr. 3, 2009) ........................................................ 22

In re FCRA
    Civ. A. No. 3:14-cv-5200-EMC, (N.D. Cal.)................................................ 29, 30

In re Oracle Sec. Litig.
    829 F. Supp. 1176 (N.D. Cal. 1993) .................................................................... 5

In re Syncor ERISA Litig.
    516 F.3d 1095 (9th Cir. 2008)............................................................................. 10

In re Tableware Antitrust Litig.
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................... 5

In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products
    Liab. Litig.
    2013 WL 3224585 (C.D. Cal. June 17, 2013) ..................................................... 5

Iskanian v. CLS Transp. Los Angeles, LLC
    59 Cal. 4th 348 (2014) ....................................................................................... 19

Korea Supply Co. v. Lockheed Martin Corp.
    29 Cal. 4th 1134 (2003) ..................................................................................... 15

Koval v. Pac. Bell Tel. Co.
    232 Cal. App. 4th 1050 (2014)............................................................................ 12

Lusby v. GameStop Inc.
    2015 WL 1501095 (N.D. Cal. Mar. 31, 2015) ................................................... 22

Lusby v. Gamestop Inc.
    297 F.R.D. 400 (N.D. Cal. 2013) ....................................................................... 22

Madrid v. Perot Sys. Corp.
    130 Cal. App. 4th 440 (2005).............................................................................. 15

Makabi v. Gedalia
    2016 WL 815937 (Cal. Ct. App. Mar. 2, 2016) ................................................. 20

Marmet Health Care Ctr., Inc. v. Brown
    132 S. Ct. 1201 (2012) ................................................................................................ 19

Marsh v. Zaazoom Sols., LLC
    2012 WL 952226 (N.D. Cal. Mar. 20, 2012) ............................................................. 15

Mendiola v. CPS Sec. Sols., Inc.
    60 Cal. 4th 833 (2015) .............................................................................................. 13

Moore v. PetSmart, Inc.
    2015 WL 5439000 (N.D. Cal. Aug. 4, 2015) ............................................................ 22

Morgan v. Wet Seal, Inc.
    210 Cal. App. 4th 1341 (2012) ................................................................................. 12

Ochoa-Hernandez v. Cjaders Foods, Inc.
    2010 WL 1340777 (N.D. Cal. Apr. 2, 2010) ............................................................ 24

O'Connor v. Uber Techs., Inc.
    2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ........................................................... 11

Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco
    688 F.2d 615 (9th Cir. 1982) ...................................................................................... 1

Owens v. Local No. 169
    971 F.2d 347 (9th Cir. 1992) .................................................................................... 13

People ex rel. Harris v. Pac Anchor Transp., Inc.
    59 Cal. 4th 772 (2014) .............................................................................................. 15

Perry v. Thomas
    482 U.S. 483 (1987) .................................................................................................. 20

Preston v. Ferrer
    552 U.S. 346 (2008) .................................................................................................. 19

Price v. Uber Techs., Inc.
    (BC554512 app. Pending) ............................................................................. 3, 10, 14

Quigley v. Am. Claims Servs., Inc.
    2015 WL 1258563 (E.D. Cal. Mar. 18, 2015) ......................................................... 15

Reyes v. CVS Pharmacy Inc., et al.
    2016 WL 3549260 (E.D. Cal. June 29, 2016) .......................................................... 22

Rodriguez v. W. Publ'g Corp.
    563 F.3d 948 (9th Cir. 2009) ...................................................................................... 5

S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations
    48 Cal. 3d 341 (1989) ............................................................................................... 21

Safeco Ins. Co. v. Burr
    551 U.S. 47 (2007) ................................................................................................. 21

Safeway, Inc. v. Superior Court
    238 Cal. App. 4th 1138 (2015)............................................................................... 11

Sakkab v. Luxottica Retail N. Am., Inc.
    803 F.3d 425 (9th Cir. 2015).................................................................................. 19

Sanchez v. Aerogroup Retail Holdings, Inc.
    2013 WL 1942166 (N.D. Cal. May 8, 2013) ........................................................... 3

Sena v. Uber Techs., Inc.
    No. CV-15- 02418-PHX-DLR, 2016 WL 1376445 (D. Ariz. Apr. 7, 2016).............. 28

Southland Corp. v. Keating
    465 U.S. 1 (1984) ................................................................................................... 20

Spann v. J.C. Penney Corp.
    314 F.R.D. 312 (C.D. Cal. 2016) .............................................................................. 5

State Farm Mut. Auto. Ins. Co. v. Campbell
    538 U.S. 408 (2003)........................................................................................... 20, 21

Suarez et al v. Uber Techs., Inc.
    No. CV-8:16-00166, (M.D. Fl. May 4, 2016) ........................................................ 28

Thomas v. Aetna Health of California, Inc.
    2011 WL 2173715 (E.D. Cal. June 2, 2011)........................................................... 23

Trang v. Turbine Engine Components Techs. Corp.
    2012 WL 6618854 (C.D. Cal. 2012)........................................................................ 16

Uber Techs., Inc. v. Berwick
    (Super. Ct. S.F. County, No. 15-546378, Dkt. No. 123-7), ..................................... 17

Valdez v. Himmelfarb
    144 Cal. App. 4th 1261 (2006)................................................................................ 14

Varon v. Uber Techs., Inc.
    No. CV MJG-15-3650, 2016 WL 1752835 (D. Md. May 3, 2016) ............................ 28

Vita-Herb Nutriceuticals Inc. v. Probiohealth LLC
    2012 WL 3903454 (C.D. Cal. Sept. 6, 2012).......................................................... 25

White v. Starbucks Corp.
    497 F. Supp. 2d 1080 (N.D. Cal. 2007) .................................................................. 11

Willis v. Xerox Bus. Servs., LLC
    2013 WL 6053831 (E.D. Cal. Nov. 15, 2013) ......................................................... 16

Yadira v. Fernandez
    2011 WL 4101266 (N.D. Cal. Sept. 8, 2011) ............................................................................ 19

**Statutes**

Cal. Labor Code § 2699(e)(2) ........................................................................................................ 20

Cal. Labor Code § 3706 ................................................................................................................. 14

Cal. Labor Code §2699(f)(2)........................................................................................................... 16

Mass. Gen. L. c. 151 § 1A.............................................................................................................. 6

**Other Authorities**

Mass. Labor & Workforce Development Frequently Asked Questions, available at
    http://www.mass.gov/lwd/labor-standards/minimum-wage/minimum-wage-
    faqs.html ............................................................................................................................... 6

**Regulations**

Cal. Code Regs. tit. 8, § 11090 ...................................................................................................... 13

# I.   INTRODUCTION

Pursuant to the Court's Order of June 30, 2016 (Dkt. 724) (the "Order"), the parties hereby submit this Joint Supplemental briefing (and Plaintiffs submit the Declaration of Shannon Liss-Riordan in support thereof).

The parties welcome the opportunity to provide the Court with the additional information it has requested in order to allow it to make an informed decision regarding preliminary approval. However, the parties also reiterate their position that courts must give "proper deference" to the parties' settlement agreement, because "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1027 (9th Cir. 1988) (quotations omitted).  Indeed, settlements of disputed claims are encouraged and a settlement approval hearing should "not be turned into a trial or rehearsal for trial on the merits." Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982). As such, the parties respectfully restate their request that the Court grant preliminary approval of the proposed settlement as fair and adequate, when viewed on the whole and in light of all the risks that further litigation would present.[1]

---

[1]     The parties also seek to briefly respond to one point that the Court made in passing in its Order.  The Court noted that in their previous Supplemental Briefing, the parties "were unable to provide any details on how the driver association [contemplated by the parties' Settlement Agreement] would work." Dkt. 724 at 5.  The parties, however, did in fact provide several details regarding the framework in which the Driver Associations will work, stating, *inter alia*, that "Uber envisions a series of associations [that] will be established in several of the major cities in which Uber operates," "the leaders of each Driver Association will be elected by the Driver Association itself, not by Uber," "each Driver Association will have autonomy to establish its own internal election rules," and the Driver Associations will not affect potential unionization or similar efforts. Dkt. 617 at 26-27.  The Settlement Agreement provides further detail about the Driver Associations, including the fact that the overarching goal of the Driver Associations is to provide "Leaders of the Driver Association[s] … the opportunity to meet quarterly with Uber management to discuss, in good faith, issues affecting Drivers and how Uber may address these issues." Dkt. 575-6 at ¶ 135(g). Furthermore, because drivers will have autonomy in the way in which each Driver Association operates, it would not have been practical (or appropriate) for the details of each association to have

*(Cont'd on next page)*

## II.    JOINT SUPPLEMENTAL RESPONSE

### 1.    The Named Plaintiffs Can Serve as Class Representatives For Settlement Purposes

In its Order, the Court asked that Plaintiffs "demonstrate that the named plaintiffs can properly serve as class representatives for each claim now asserted and released." Dkt. 724 at 10.  As set forth in the accompanying exhibits and declarations of Shannon Liss-Riordan and two of the named plaintiffs, Plaintiffs contend that these named plaintiffs are proper representatives for the released claims, all of which stem from the drivers' allegations that Uber has misclassified them as independent contractors, rather than employees.  Thus, with respect to the proposed Settlement Class, Plaintiffs submit that the class representatives have satisfied the dictates of Rule 23 that they "must be part of the class and possess the same interest and suffer the same injury as the class members." E. Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (internal quotation omitted).  First, Plaintiffs note that the Court has already undergone the rigorous scrutiny required by Rule 23 in finding that Plaintiffs Gurfinkel and Manahan are adequate representatives of the class on the misclassification claims of their fellow Uber partners, and the remaining released claims at issue all stem from drivers' underlying misclassification.  See Dkt. 342 at 17-26.  As set forth in the accompanying named plaintiff declarations as well as the Declaration of Shannon Liss-Riordan, the named plaintiffs are also adequate representatives for the other released claims.  For instance, with respect to overtime, Plaintiffs' trip histories and Weekly Email summaries which record their mileage, fares, and hours logged into the Application, reveal numerous instances in which named plaintiff Elie Gurfinkel spent more than forty hours per logged into the Uber Application.  See Liss-Riordan Decl. at ¶ 4.  Similarly, Plaintiffs state that these records show various instances in which Gurfinkel did not receive minimum wage for all hours he spent logged into the Uber app (taking into

---

*(Cont'd from previous page)*

already been decided before the drivers have elected their leadership.  Plaintiffs also state that—because Uber has a good faith obligation to meet with the Driver Associations on a quarterly basis—drivers can and will bring any non-compliance on Uber's part to the Court's attention.

    Plaintiffs also respond to a comment made by the Court regarding Uber's tip policy in the accompanying Declaration of Shannon Liss-Riordan, at ¶ 2.

2

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE No. CV 15-00262-EMC

account the expenses he incurred for mileage on his car during those hours). Id. at ¶ 6.[2] Thus,

Plaintiffs believe it is plain from the named Plaintiffs' records that they have standing to represent the

settlement class on the minimum wage and overtime claims. See Proposed Fifth Amended Complaint

at Counts V & VII (Dkt. 519-6 at pp. 102).[3] [4]

---

[2]     Plaintiffs note that they have already made similar allegations regarding minimum wage and overtime for named Plaintiffs Brian Morris and Hakan Yucesoy in the Yucesoy action, see Dkt. 185 at ¶¶ 32-35, and Plaintiffs have included similar calculations for Plaintiff Pedro Sanchez, see Liss-Riordan Decl. at ¶ 5-6.  Thus, Plaintiffs submit that the Yucesoy Plaintiffs have already shown standing for Counts IV, V, VIII, and IX of the Proposed Fifth Amended Complaint. See Dkt. 519-6 at 83-85.  Of course, the Court dismissed these claims due to, inter alia, the uncertainty of whether all time logged into the Uber app could count as compensable work time.  Although Plaintiffs disagreed with the Court's requirement of such specificity at the pleading stage (and could ultimately have appealed that ruling), the settlement resolves these claims (and takes into account the high hurdle that the Court placed on the plaintiffs' ability to pursue overtime and minimum wage claims – which would have required a degree of specificity that would unlikely have been common among class members).

[3]     While Plaintiffs state that the named plaintiffs clearly have standing to bring a minimum wage claim, establishing classwide liability on this claim would have been extremely difficult, given the Court's rulings in Yucesoy that cast significant doubt on the plaintiffs' ability to establish, on a classwide basis, that all time spent on the Uber app would count as compensable time.  Moreover, liability on the minimum wage claim is premised in large part on the theory that drivers' work expenses would so offset their money earned that their compensation would fall below minimum wage. See Arriaga v. Florida Pac. Farms, L.L.C., 305 F.3d 1228 (11th Cir. 2002).  However, courts in California have not adopted this theory of liability, where there is a separate statute enabling employees to recover for expense reimbursement. See Sanchez v. Aerogroup Retail Holdings, Inc., 2013 WL 1942166, *13 (N.D. Cal. May 8, 2013).  Without the Arriaga principle, Uber's compensation structure exceeds the minimum wage (particularly if plaintiffs cannot count all the time they spend on the app as compensable time), and thus there would likely be no liability at all under this claim (even if this claim were able to be certified).

[4]     Notably, while Plaintiffs contend they have shown here that they would have standing to raise these claims, the complaints filed by objecting drivers are themselves notably lacking in any detail regarding the named plaintiffs in those cases, thus making unclear whether they have standing themselves to raise the claims to which they have objected to Plaintiffs releasing in the settlement agreement. See, e.g., Del Rio, et al. v. Uber Techs., Inc., Civ. A. No. 3:15-cv-03667, Dkt. 85 (alleging simply that "Del Rio has worked over 40 hours a week as an Uber driver on multiple occasions" and that "Valdivia has never been paid minimum wage, or any hourly rate at all, for his driving work for Uber"); Price v. Uber Techs., Inc., BC554512, Compl. at ¶ 65 (asserting that "Defendant has failed to pay Plaintiff, and all other Class Members similarly situated, at least the legally required minimum wage for some portion of the hours that each such person worked as a driver for UBER during the Class Period" but without providing any more specific details); Gollnick v. Uber Techs., Inc., CGC-15-547878, Compl. at ¶¶ 9, 22 (asserting that "Defendants also failed to pay full wages when due, pay full wages on discharge, provide accurate, itemized wage stubs and pay

*(Cont'd on next page)*

---

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

Likewise, it is Plaintiffs' position that the named plaintiffs also have standing to raise the other claims that are released in the settlement.  With respect to meal and rest break claims, Plaintiffs submit that the attached declarations demonstrate that named plaintiffs Gurfinkel and Colopy have at times driven for more than four hours without taking a ten-minute duty-free rest period and more than five hours without taking a 30-minute duty-free meal period.  See Ex. F to Liss-Riordan Decl. ("Gurfinkel Decl.") at ¶ 3; Ex. G to Liss-Riordan Decl. ("Colopy Decl.") at ¶ 3.  Similarly, these named plaintiffs can recall occasions when they got in their cars and logged on to the Uber application, but received no ride requests after which he had to log off without receiving any work or pay for that time.  Id. at ¶ 4.  According to Plaintiffs, they also experienced occasions when they were sick or injured but were not paid any sick time by Uber.  Id. at ¶ 5.  Thus, the named plaintiffs also have standing to bring meal and rest break claims, reporting and waiting time claims, as well as claims for failure to provide paid sick leave.[5]

The Court therefore need not be concerned that a lack of standing precludes the named plaintiffs from settling the claims included in the agreement.[6]

_____

*(Cont'd from previous page)*

minimum wages as required by law" and that "Defendants did not compensate Plaintiff for time worked, including but not limited to, compensation for all hours worked over forty (40) per week or over eight per day in carrying out his duties as a Driver").  None of these plaintiffs appear to recognize or acknowledge this Court's rulings in Yucesoy regarding the specificity that would be required to assert such claims.  See Yucesoy, Dkt. 69 at 12-13; Dkt. 131 at 6-7; Dkt. 194 at 9-11.

[5]  Various other claims released in the O'Connor Proposed Fifth Amended Complaint (Ex. B to Dkt. 519-6, at 89-112) relate to Uber's allegedly uniform policies and actions, and thus there should be no question that the named plaintiffs would have standing to assert these claims as well, simply by virtue of having driven for Uber and being subject to those policies.  For example, Plaintiffs submit that the named plaintiffs were necessarily affected by the fact that Uber does not pay worker's compensation premiums to the state, and Uber's failure to provide accurate records and itemized wage statements.
Likewise, with respect to the Massachusetts drivers, Plaintiffs contend that the named plaintiffs likewise would clearly have standing to assert the other claims released in the Yucesoy Proposed Fifth Amended Complaint (Ex. A to Dkt. 519-6 at pp. 75-88), such as recordkeeping violations (if such claims were cognizable).

[6]  Plaintiffs believe they have addressed the claims noted by objectors and covered by the settlement release.  If there are any other specific claims about which the Court has any question, Plaintiffs would be happy to address them.

4

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE No. CV 15-00262-EMC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Full Verdict Value of the Overtime and Expense Reimbursement Claims

In its Order, the Court has asked the parties to provide further information from which it could evaluate the potential verdict value of overtime and expense reimbursement claims.  Dkt. 724 at 10.

"To evaluate adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer."  In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  "Expected recovery" does not mean the amount plaintiffs would recover if they won; it means "expected recovery" in light of all the circumstances, including risks and practical realities.  See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965-66 (9th Cir. 2009) (rejecting the notion that "the court should have specifically weighed the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter" in evaluating proposed settlement and finding that consideration of "estimated recovery," or "likely recovery" at trial is sufficient); In re Oracle Sec. Litig., 829 F. Supp. 1176, 1182 (N.D. Cal. 1993) ("settlement approval does not require aggregate damages to be determined with mathematical precision"); In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 2013 WL 3224585, *7 (C.D. Cal. June 17, 2013) ("Because absolute precision is impossible, 'ballpark valuations' are [] permissible, especially when reached after mediated negotiation among non-collusive parties.").  Thus, Plaintiffs submit that, if they did not expect to recover anything on a given claim, Ninth Circuit case law does not require that they perform detailed calculations ascribing some theoretical value to those claims.  See Spann v. J.C. Penney Corp., 314 F.R.D. 312, 323-24 (C.D. Cal. 2016) ("[T]he Ninth Circuit does not follow the approach of other circuits that requires district courts to specifically weigh the merits of the class's case against the settlement amount and quantify the expected value of fully litigating the matter") (internal quotation omitted).

Here, Plaintiffs considered the value of the various released claims in light of all the circumstances and generated an "estimated recovery" that they deemed likely given the risks and

realities.[7]  Specifically, Plaintiffs have described their calculation that led them to conclude that the overtime claims would have very little value, as compared to the reimbursement and gratuity claims. Again, Plaintiffs submit that the overtime claims would be particularly difficult for the drivers to prevail on classwide, given that this Court rejected the Massachusetts drivers' attempt to bring overtime claims in Yucesoy three times.  See Yucesoy, Dkt. 69 at 12-13, Dkt. 132 at 6-7, Dkt. 194 at 9-10; see also Del Rio v. Uber Techs., Inc., 3:15-cv-03667-EMC, Dkt. 84 (N.D. Cal.) (granting motion to dismiss overtime and minimum wage claims asserted against Uber) ("Plaintiffs do not explain how they define 'work'").

Nevertheless, the Court has requested further information as to how Plaintiffs reached an estimate of $2.4 million as the potential value of the overtime claim.  Dkt. 724 at 10.  In response, the parties state that Uber provided Plaintiffs with an estimate of the total number of hours that settlement class members in California and Massachusetts have ever driven while transporting passengers "on ride" (i.e., during Period 3): (1) over and above 40 hours in a single week; or (2) over and above eight hours in a single day (for California drivers).[8]  Uber derived this information by referencing and analyzing its internal electronic records.[9]

---

[7]    As described in their moving papers, Plaintiffs only ascribed an actual value to the reimbursement and gratuity claims (the two claims that the Court had certified), as well as the overtime claims, and considered all other claims (which other plaintiffs had filed in follow-on copycat cases) to have little merit and chance of classwide success.  (It also appeared evident that the theoretical value of any such claims would be dwarfed by the expense reimbursement claim, for which Plaintiffs calculated more than 50 cents per mile for every mile driven by each class member with a passenger in the car.)  However, to the extent the Court believes that some additional value should be ascribed to these other claims, as Plaintiffs have noted, Plaintiffs' counsel have stated that they will not seek $10 million that the agreement had allocated toward fees, see Dkt. 699, and so some or all of this amount could be allocated to these claims so that they are receiving some value in the settlement.

[8]    California law permits plaintiffs to raise overtime claims based on work performed over and above 8 hours per day, but Massachusetts law does not have such a provision.  See Mass. Labor & Workforce Development Frequently Asked Questions, available at http://www.mass.gov/lwd/labor-standards/minimum-wage/minimum-wage-faqs.html ("State law does not require overtime after eight hours in a day."); see also Mass. Gen. L. c. 151 § 1A (mandating overtime hours only "for a work week longer than forty hours").

[9]    Uber notes, however, that the total number of hours that it provided to Plaintiffs in order to calculate the potential maximum exposure arising from the overtime claim is over-inclusive, as that

*(Cont'd on next page)*

Plaintiffs state that they then used an estimated hourly rate of $20 per hour (which, based on Plaintiffs' knowledge of Uber's operations, they believe to be a high estimate), in order to make the following calculations (see Dkt. 691 at 36-37):

| | Hours Spent "On Trip" Over 40/week or 8/day (Data From Uber) | Plaintiffs' Estimated Hourly Rate | Plaintiffs' Estimated Overtime Rate | Plaintiffs' Estimate of Uber's Exposure |
|---|---|---|---|---|
| California | ■ | $20 | ■ | $1,005,380 |
| Massachusetts | ■ | $20 | ■ | $178,000 |

Thus, the number of "on-trip" overtime hours yielded potential damages of roughly $1 million for California drivers and less than $200,000 for Massachusetts drivers. Then, Plaintiffs *doubled* these figures in order to estimate Period 2 time, i.e., the additional time drivers spent driving to a location to pick up a passenger.[10] This resulted in a total of $2,366,760, which Plaintiffs then rounded up to $2.4 million.

_____

*(Cont'd from previous page)*

data includes at least 242 implausibly long trips (including individual trips totaling 24 hours or more). Rather than excluding these trips, Uber included these trips in order to help ensure that the data it provided to Plaintiffs was not under-inclusive.

[10]   Plaintiffs had to estimate time spent traveling to pick up a passenger because Uber does not keep data regarding the amount of time drivers spend driving to pick up passengers. See discussion below. Given Plaintiffs' knowledge from the record in this case and their discussions with many drivers, they believe it to be a fair estimate that the mileage driven to pick up a passenger typically does not exceed the length of the trip itself, and so this "approach" data is likely an overestimate. Plaintiffs recognize that adding in the time spent picking up passengers could lead more drivers to be counted as having driven more than 40 hours per week or 8 hours per day, but this estimate (even using a high hourly rate and doubling the overtime hours spent "on app") shows that the potential overtime damages (if drivers were able to recover on this claim) are likely to be far less than the potential damages for the expense reimbursement or gratuities claims.

This method of calculation does not include time spent waiting for passenger requests, which, again, seemed highly unlikely to be counted as compensable time (particularly on a classwide basis), given the Court's rulings related to the attempted overtime claims in Yucesoy, in which the Court did not even allow those claims to proceed past the pleading stage. (Uber had argued that Plaintiffs could not pursue an overtime claim counting waiting time as compensable time, because drivers could have spent time "on-line" running personal errands, accepting rides through other companies, or even sleeping in their car or sitting on their couch. Given the Court's rulings in Yucesoy, the potential variation among drivers as to how they used this time, as well the potential variation in the frequency

*(Cont'd on next page)*

1   With respect to the expense reimbursement claim, the Court questioned why Plaintiffs'

2   estimated damages did not include information on "the amount of time and miles spent picking up

3   riders" (i.e., "Period 2" information), and requested that the parties "explain if and how much of this

4   information is in fact available, what could be estimated, and what it would show."  Dkt. 724 at 10.

5   Plaintiffs sought this information through their discovery requests, and the parties addressed this

6   issue before the Court at a hearing on March 24, 2016, in which the parties represented that discovery

7   had revealed that Uber "does not keep data on those miles." Dkt. 498 at 77:3; 79:9-13 (Uber's

8   counsel stated to the Court that "[w]e don't have the data on the mileage. We have been looking for

9   ways to be responsive" but that it would be a "herculean task" to derive that mileage).

10   As previously disclosed, Uber does not maintain aggregated mileage from GPS data for the

11   territory at issue during the timeframe when a ride request is accepted through the time when the

12   accepting driver picks up the requesting rider to begin a given trip.  What Uber does maintain is raw

13   data reflecting the GPS pings of drivers from the time they accept a given ride request until the time

14   the drivers pick up a rider to begin a trip.  Uber has explained that there are several material problems

15   in trying to estimate Period 2 information to any degree of certainty based on the limited available

16   data.  First, Uber does not have the raw GPS pings associated with every accepted ride request and

17   beginning of a trip, as a substantial portion of data is missing or otherwise has been lost in the

18   ordinary course of business.  Second, while Uber in its ordinary course of business undertakes a

19   verification process to collect, store, and convert raw GPS pings into mileage estimates for each

20   *completed* trip, Uber does not process or store to the same level of accuracy the GPS pings associated

21

22   _____

     *(Cont'd from previous page)*

23

24   of ride requests, appears to have made potential certification of such a claim – if it were allowed to
     proceed past the pleading stage – extremely difficult.)

25   These data showing very low potential overtime damages are not surprising, given Uber's

26   repeated statements (and as reflected in the data that Uber provided in discovery regarding mileage,
     from which Plaintiffs calculated reimbursement damages) that most drivers have driven few miles,

27   and relatively very few have driven a substantial amount on a weekly basis.  See Dkt. 575-1 (showing
     that more than half of the certified class members in O'Connor have driven 750 miles or less *in total*).

28

with driver activity while *en route* to pick up a rider.[11]  Therefore, even if Uber did have the raw data showing where drivers were located when they accepted a ride request, it has not in the ordinary course of business maintained the mileage estimates for the distance driven to pick up passengers, and doing so retroactively would be a herculean task. Moreover, the quality of that data prevents Uber from converting that data into a readily ascertainable estimate of such mileage.[12]

On a related note, the Court questioned Plaintiffs' reliance on data produced by Uber without "attempted verification."  Dkt. 247 at 10.  Plaintiffs note that Uber produced data regarding mileage driven as part of discovery in this case, prior to settlement discussions, and while the parties were preparing for trial.  Parties are of course required to be truthful in responding to discovery, and their counsel are bound by the Rules of Professional Conduct, and as officers of the Court, to ensure that their clients do not provide untruthful discovery responses.  Plaintiffs thus saw no reason to dispute the accuracy of Uber's production.  Furthermore, Plaintiffs confirmed that the mileage produced for the named plaintiffs appeared accurate.[13]  The overall mileage numbers also did not appear surprising to counsel, given her knowledge of this industry.[14]

---

[11]     There has never been a practical business need for this data because Uber's insurance program covering accepted trips is priced based on the distance traveled from pick up to drop off, even though the coverage includes the distance traveled en route to the pick up location.  In effect the miles spent picking up riders are "free of charge."

[12]     At the March 24, 2016, hearing and in their Trial Plan (Dkt. 492 at 19-20), Plaintiffs suggested allowing the jury to extrapolate this mileage from the "on-trip" mileage, or, alternatively, they proposed employing sampling as a way to ascertain the mileage driven to pick up passengers. However, the Court rejected Plaintiffs' request that the jury be allowed to extrapolate this mileage at trial, and the Court suggested that sampling might not be warranted depending on the feasibility of obtaining it.  Dkt. 498 at 79-84.  Thus, even for trial purposes, based upon Uber's explanation, the data was too difficult to generate so as to make sampling infeasible.  As such, for settlement purposes, Plaintiffs made an informed decision to focus on damages for mileage spent transporting passengers only.

[13]     Plaintiffs analyzed the total mileage recorded in the trip histories of Plaintiffs Manahan and Gurfinkel and compared it to the mileage produced by Uber and found that the figures lined up almost exactly.  See Liss-Riordan Decl. at ¶¶ 7-9.

[14]     With respect to Uber's production of overtime hours data (which was produced, not for trial, but instead for purposes of settlement discussions), it is standard practice in wage and hour litigation that a defendant provides data to plaintiffs for settlement purposes.  If there were a requirement that cases could never be resolved through the use of data provided voluntarily or informally for

*(Cont'd on next page)*

9

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

### 3.   Valuation of Additional Released Claims

With respect to certain other released claims, the Court asked the parties to address certain arguments raised by various objectors, see Dkt. 724 at 11, which the parties respond to in turn:

### a.   Meal and Rest Break Claims

With respect to meal and rest break claims, the Court noted that Plaintiffs explained that "the claim lacks merits because drivers can take meal and rest breaks whenever they wish by … logging off the Uber application," but asked Plaintiffs to address the objectors' argument that in California employers must "affirmatively authorize" all breaks required by law.  Dkt. 724 at 10-11.  First, the parties note that Judge Chhabria recently agreed that these very same claims had little to no value in granting preliminary approval to the proposed settlement against Lyft.  See Cotter v. Lyft, Inc., Civ. A. No. 3:13-cv-04065-VC (N.D. Cal.), Dkt. 246 (approving settlement that valued meal and rest break claims as having no value).[15]  The parties submit that as in Cotter, here, they have sufficiently addressed objectors' arguments as to why these claims do not add appreciable value to the potential damages that drivers might have obtained.

California courts have held that an employer satisfies its obligation under the meal and rest break laws "if it relieves its employees of all duty, relinquishes control over their activities and

_____

*(Cont'd from previous page)*

settlement purposes, or a mandate that parties could only rely on information obtained through contested discovery, there would be far fewer settlements (which would contravene the Ninth Circuit's directive that settlements are to be encouraged). See In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008) ("[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned").  Indeed, there is no reason why data provided by a defendant for settlement purposes would be inherently less trustworthy than data provided in response to formal discovery requests.

[15]   At an earlier hearing addressing the Price v. Lyft litigation in state court (brought by the same lawyers who filed the Price v. Uber case, and with the same lead plaintiff in both cases, both of which were filed substantially after the Cotter v. Lyft case and O'Connor v. Uber case), Judge Chhabria commented that "intuitively it seems very unlikely that drivers would be able to get reimbursed for meal breaks and rest breaks."  Cotter, Dkt. 133 at 7: 1-4.  He also stated "there's not much upside to them proceeding with their case … but there is a significant downside" and suggested that "the plaintiffs in the state court case do not have the best interests of the proposed class members at heart".  Id. at 9:9-20.

10

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

permits them a reasonable opportunity to take an uninterrupted 30–minute break, and does not impede or discourage them from doing so." Safeway, Inc. v. Superior Court, 238 Cal. App. 4th 1138, 1148 (2015), review denied (Oct. 21, 2015) (quoting Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012)).[16]  The California Supreme Court has acknowledged that "[w]hat will suffice may vary from industry to industry." Brinker, 53 Cal. 4th at 1040.  Here, Uber allows drivers to log-off at any time for as long as they wish, during which time Uber has no control over the drivers' activities.  Uber places no restrictions on when drivers can log-off the application and does not discourage them from doing so.  In sum, Plaintiffs submit that it would be highly unlikely for drivers to establish that Uber had not met its obligations under the meal and rest break laws because of its policy of allowing drivers to take breaks whenever and for however long they want.  See O'Connor v. Uber Techs., Inc., 2015 WL 5138097, *17 (N.D. Cal. Sept. 1, 2015) ("Here, both parties agree that Uber does not control any of its drivers' schedules—all Uber drivers are free to work as much or as little as they like").

Moreover, as Plaintiffs noted in their briefing, the situation presented by this case differs from a traditional workplace where the default is that an employee is working, except during recognized breaks.  See Dkt. 678 at 15.  In such a workplace, unless an employer "affirmatively authorizes" a break (rather than merely allowing it), an employee may not feel comfortable taking a break.  But with Uber, the whole system is set up so that drivers log in and out whenever they want, so that there can never be any circumstance in which a driver might feel pressure (even implicitly) not to take a break.  In other words, Uber's entire system can be understood to constitute a policy of "permitting" or "authorizing" breaks whenever a driver wants.  See, e.g., Dkt. 223-6 at 8 ("All you need to go off-duty is press the 'Go Off-Duty' button in the app"); id. at 4 ("We also don't have any requirements

---

[16]    The California Supreme Court made clear in Brinker that an employer is not liable for meal and rest break claims simply because employees do not always take their breaks.  53 Cal. 4th at 1034 (holding that "an employer must relieve the employee of all duty for the designated period, but need not ensure that the employee does no work").  See also White v. Starbucks Corp., 497 F. Supp. 2d 1080, 1088-89 (N.D. Cal. 2007) (employers need to "offer meal breaks" but need not "actively [] ensure that workers are taking these breaks. In short, the employee must show that he was forced to forego his meal breaks as opposed to merely showing that he did not take them regardless of the reason").

on when you should be on duty"); Dkt. 223-40 at 2 ("Part-time, full-time, daytime or night.  Work on

your own schedule").  The issue raised by Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th at 1033,

and other cases cited by objectors is when the employer does not have a policy "permitting" or

"authorizing" breaks, but here Uber "permits" and "authorizes" drivers to take unlimited breaks as

often and for as long as they want.  Thus, Plaintiffs properly recognized that meal and rest break

claims were very unlikely to succeed in this case and thus were warranted in ascribing them no value

for settlement purposes.[17]

###    b.    Waiting Time Claims

With respect to waiting time claims, the Court has asked the parties to respond to the

objectors' comments that "in California, employees are entitled to compensation for time spent

waiting to perform a task."  See Dkt.724 at 11.  In response, the parties note that this issue raises the

---

[17]    Moreover, Plaintiffs note that there is a line of "post-Brinker district court cases that find that
liability springs not simply from a facially defective policy, but from proof that a rest break was
unlawfully *denied*." Cummings v. Starbucks Corp., 2014 WL 1379119, *19 (C.D. Cal. Mar. 24,
2014) (emphasis added) (collecting cases).  Here, Plaintiffs do not know how they could show that
drivers were denied breaks given that they could log-off the App at will at any time.

Also, even if one assumes that Uber had somehow failed in its obligation to adopt a policy
"authorizing and permitting" meal and rest breaks, the courts have still make these claims quite
difficult to certify on a class-wide basis.  For example, even in Benton, cited by this Court in its
Order, see Dkt. 724 at 11, "the appellate court did not hold that certification is required in all cases
involving allegedly uniform policies" but rather "held that the lower court had erred in "fail[ing] to
evaluate *whether* plaintiffs' theory of recovery could be proved (or disproved) through common facts
and law.'" Koval v. Pac. Bell Tel. Co., 232 Cal. App. 4th 1050, 1062 (2014) (quoting Benton, 220
Cal.App.4th at 731) (emphasis in original).  Thus, even where there is a uniform policy that would
appear to violate the meal and rest break laws, class certification has been denied where the policies
were communicated or understood by class members in "extremely variable" ways.  Id. at 1062-63;
Morgan v. Wet Seal, Inc., 210 Cal. App. 4th 1341, 1357-58 (2012); see also Abdullah v. U.S. Sec.
Associates, Inc., 731 F.3d 952, 964 (9th Cir. 2013) (noting that "it is an abuse of discretion for the
district court to rely on uniform policies to the near exclusion of other relevant factors touching on
predominance" when considering class certification); Dailey v. Sears, Roebuck & Co., 214 Cal. App.
4th 974, 989 (2013) ("For class certification purposes, then, [plaintiff] was required to present
substantial evidence that proving *both* the existence of [defendant's] uniform policies and practices
*and* the alleged illegal effects of [defendant's] conduct could be accomplished efficiently and
manageably within a class setting.") (citation omitted); Cruz v. Sun World Int'l, LLC, 243
Cal.App.4th 367, 384 (2015) (class plaintiffs may not rely solely on the existence of a uniform policy
or practice, but must also "present substantial evidence" proving that the "illegal effects of that policy
or practice [can] be accomplished efficiently and manageably within a class setting.").

same concerns that led the Court to dismiss Plaintiffs' overtime and minimum wage claims in the Yucesoy case, namely whether waiting time could count as compensable time. Wage Order 9 defines "hours worked" as "time during which an employee is subject to the control of an employer, [] includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. tit. 8, § 11090. "California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and have relied upon the same factors employed by the Ninth Circuit when interpreting whether time is compensable under the FLSA. See Mendiola v. CPS Sec. Sols., Inc., 60 Cal. 4th 833, 840-41 (2015), reh'g denied (Mar. 18, 2015) (quoting list of seven factors from Owens v. Local No. 169, 971 F.2d 347, 351 (9th Cir. 1992)).[18] Thus, employees still have to prove that this time was compensable work time – the same inquiry the Court demanded in Yucesoy. As explained above, the entire Uber system is based on the concept that the drivers can turn the app on and off whenever they want, and thus it would appear to be extremely difficult for drivers to prove that they were under Uber's "control" while they were waiting for ride requests. If a driver decided to go somewhere or do something else while waiting for a ride request, the driver could simply turn off the app and suffer no consequences. While Plaintiffs recognize that work time includes any time that an employer "suffers or permits" work to be performed, it is difficult to see how waiting for a ride request, when the driver is not transporting a rider and the driver can stop waiting at any time with no penalty, could constitute being "suffer[ed] or permit[ted]" to work.[19]

---

[18]     These factors include: "(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time." Mendiola, 60 Cal. 4th at 840-41.

[19]     In Yucesoy, the Court stated that the plaintiffs could not even proceed past the pleading stage without allegations regarding why "waiting time" would be compensable for overtime and minimum wage purposes and rejected the plaintiffs' repeated attempts to plead such allegations. Yucesoy, 3:15-cv-00262-EMC, Dkt. 84; see also Del Rio, Dkt. 84 at 4 (dismissing overtime and minimum wage claims because plaintiffs did not adequately allege "how they define 'work'"). Not only have the objectors who have raised waiting time claims not included such detailed allegations in their complaints, see, e.g., Dkt. 677-1 (Tabola v. Uber Complaint) at ¶ 2(a) (making conclusory allegations

*(Cont'd on next page)*

### c.   Workers' Compensation Insurance Claims

The Court has asked the parties to address additional questions regarding the Ghazi objectors' statements regarding the release of workers' compensation-related claims.  Dkt. 724 at 11.  As Plaintiffs have previously explained, the settlement does <u>not</u> release individual workers' compensation claims, <u>see</u> Dkt. 575-6 at ¶ 98, nor does it release claims for personal injury that injured workers could attempt to bring in court against an employer who failed to carry workers' compensation insurance.  <u>See</u> Dkt. 678 at 13-14.[20]  The only types of workers' compensation-related claims that would be released by the settlement are claims like the one brought under the Ghazi objectors' novel theory—which has never been accepted by any court in a case brought by employees—that employees could recover damages from an employer who fails to carry workers' compensation insurance, in the form of insurance premiums that the employer allegedly should have paid, or similar claims premised on the employer's practice of failing to carry worker's compensation insurance.  While this type of claim has been brought before by the <u>State</u>, no case has been cited for the proposition that <u>employees</u> could ever recover under such a theory.

Plaintiffs ascribed no value to this novel workers' compensation claim for settlement purposes because it is difficult to see how drivers would have standing to bring such a claim since it is the State, not drivers, that would have missed out on these premiums (should Uber have been required to

_____

*(Cont'd from previous page)*

that Uber failed "to pay for all hours worked, including the on-duty time spent driving without passengers ('dead miles') and the time spent waiting for passengers"), <u>Price v. Uber Techs., Inc.</u>, BC554512, Doc. 1 at ¶¶ 65, 93 (making conclusory allegations that "Defendant has failed to pay Plaintiff… at least the legally required minimum wage for some portion of the hours that each such person worked as a driver for UBER"), but it is difficult to see how such allegations could ever be made with sufficient specificity to satisfy the Court, given its rulings in <u>Yucesoy</u> and <u>Del Rio</u>, as well as sufficient commonality to obtain class certification on this claim.

[20]   Cal. Labor Code § 3706 provides an exception to the "exclusivity rule" insofar as it allows a plaintiff to pursue a civil action in court for injuries sustained at work where the employer has no worker's compensation coverage.  This cause of action would be a personal injury action, which is expressly ***not*** released by the settlement.  <u>See</u> <u>Valdez v. Himmelfarb</u>, 144 Cal. App. 4th 1261, 1268 (2006) ("section 3706 creates a statutory cause of action for personal injuries"); Dkt. 575-6 at ¶ 98 ("Notwithstanding any other provision of this Settlement Agreement, 'Released Claims' do not include claims for personal injuries").

1    carry this insurance), and restitution under the UCL is aimed at restoring benefits in which the

2    plaintiff has an ownership interest.[21]   The California Supreme Court has held that "disgorgement of

3    . . . profits is not an authorized remedy in an individual action under the UCL" where the

4    disgorgement sought represents "neither money taken from a plaintiff nor funds in which the plaintiff

5    has an ownership interest."  Korea Supply Co., 29 Cal. 4th at 1140.  Indeed, the only case cited by the

6    Ghazi objectors in which a UCL claim was predicated on violations Cal. Labor Code § 3700 is

7    People ex rel. Harris v. Pac Anchor Transp., Inc., 59 Cal. 4th 772, 776 (2014), cert. denied sub nom.

8    PAC Anchor Transp., Inc. v. California ex rel. Harris, 135 S. Ct. 1400 (2015), but that case was

9    brought by the State, not by private individuals.   Thus, it seems clear that the Ghazi objectors—

10   private individuals with no ownership interest in the funds they are seeking—cannot recover under

11   the UCL.   As such, there was nothing improper with Plaintiffs' decision to ascribe no value to this

12   claim for settlement purposes.[22]

13        **4.    PAGA Penalties**

14        The Court has raised several issues regarding Plaintiffs' penalty calculations under the Private

15   Attorneys' General Act of 2004 ("PAGA").  Dkt. 724 at 12-13.

16        First, the Court requested "accurate information" regarding the number of weeks in which

17   drivers have actually transported passengers (rather than an estimate from Plaintiffs that simply

18   _____

19   [21]    See Quigley v. Am. Claims Servs., Inc., 2015 WL 1258563, *6 (E.D. Cal. Mar. 18, 2015)
20   ("[U]nder the UCL, an individual may recover profits unfairly obtained to the extent that these profits
     represent monies given to the defendant or benefits in which the plaintiff has an ownership interest")
     (emphasis added); Marsh v. Zaazoom Sols., LLC, 2012 WL 952226, *14 (N.D. Cal. Mar. 20, 2012)
21   ("Under a 17200 Claim, 'restitution' is limited to the return of property or funds in which the plaintiff
     has an ownership interest"); Madrid v. Perot Sys. Corp., 130 Cal. App. 4th 440, 453 (2005) (noting
22   that "in the context of the UCL, 'restitution' is limited to the return of property or funds in which the
     plaintiff has an ownership interest (or is claiming through someone with an ownership interest)");
23   Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003) ("The object of
     restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an
24   ownership interest") (finding that UCL could not be used to recover money in which plaintiff had no
25   ownership interest).

26   [22]    Plaintiffs have discussed in detail their rationale for ascribing no value for settlement purposes
27   to the other claims that are included in the release.  But, again, if the Court were to believe that some
     value should be allocated to these various claims, it could do so from part or all of the $10 million in
28   legal fees that Plaintiffs' counsel has chosen not to seek.

_____

15

assumes that drivers in the settlement class have transported riders each and every week).  In

response, Uber has provided Plaintiffs with data showing that, from the inception of Uber's business

to July 1, 2016, drivers in the settlement class have provided rides to riders in ███████ unique

weeks.[23]  Uber provides this information solely because the Court has requested it, and disputes that

this figure constitutes the number of "pay periods" that would be used to calculate a PAGA penalty.[24]

   The Court also questioned Plaintiffs' decision to calculate PAGA penalties using $100 for

each allegedly aggrieved employee per pay period (which applies to each "initial violation"), rather

than using $200 for each allegedly aggrieved employee per pay period (which applies to each

"subsequent" violation).  Dkt. 724 at 12 (citing Cal. Labor Code §2699(f)(2)).  The reason that

Plaintiffs used $100 for each alleged violation is because "initial" and "subsequent" violations are

defined terms for purposes of calculating PAGA penalties—not simply references to an employer's

very first PAGA violation and then all other PAGA violations, respectively.  "Subsequent" penalties

of $200 apply only after an employer receives notice from the Labor Commissioner or a court that it

has violated the Labor Code.  See, e.g., Trang v. Turbine Engine Components Techs. Corp., 2012 WL

6618854, at *5 (C.D. Cal. 2012) ("Under California law, courts have held that employers are not

subject to heightened penalties for subsequent violations unless and until a court or commissioner

notifies the employer that it is in violation of the Labor Code."); Amalgamated Transit Union Local

1309 v. Laidlaw Transit Serv., Inc., 2009 WL 2448430, at *9 (S.D. Cal. Aug. 10, 2009) ("For the

purposes of subsequent violation penalties, the issue is not whether Laidlaw willfully violated the

Labor Code, but rather whether a court or commissioner had notified it of any violation."); Willis v.

Xerox Bus. Servs., LLC, 2013 WL 6053831, at *6 (E.D. Cal. Nov. 15, 2013) (finding that "[t]he

phrase 'subsequent violation' is a term of art" and "[f]or a plaintiff to recover for a 'subsequent

violation,' an employer must have notice that it has violated the Labor Code.").

---

[23] For settlement purposes, Plaintiffs had estimated 5,392,002 weeks, based on data that Uber
had provided that went up to January 2016 (see Dkt. 519).

[24] For example, this figure does not account for the fact that a driver may transport a rider for a
de minimis amount of time—five minutes or less in any given week.

Here, no court has informed Uber of a violation, and it is not clear what would constitute notice of a violation from the Labor Commissioner. To be sure, one driver did prevail on her misclassification claim before the Labor Commissioner, but that determination related to that one particular driver (it was not a class determination), and is currently being challenged in court by Uber, where it is subject to de novo review. See Uber Techs., Inc. v. Berwick, Case No. 15-546378 Dkt. No. 123-7, Superior Court of California, County of San Francisco. The Labor Commissioner has not informed Uber that it has misclassified *all* its drivers, and *other* decisions by the Labor Commissioner have found drivers to be independent contractors under California law, not employees. See, e.g., Dkt. 123-7, Alatraqchi v. Uber Technologies, Inc., 11-42020-CT (August 1, 2012). Thus, it does not appear that the $200 penalty for "subsequent" violations has been triggered.

The Court also stated that Plaintiffs did not take into account the potential for stacking of PAGA penalties, based on multiple violations of different provisions of the Labor Code. Again, Plaintiffs note that, even potential penalties for just the two statutory claims pursued in this case lead to numbers far beyond what any court is likely to impose, and certainly far beyond what any defendant would voluntarily agree to in settlement. Given the large number of wage and hour laws in California, if a $100 (or $200) penalty could be imposed many multiple times for every workweek in which an employee worked, and if a settlement needed to take into account what would then become routinely astronomical numbers, no PAGA claim would or could ever be settled – and thus wage and hour litigation in California simply would not be capable of being settled. Recognizing this practical reality, other courts have routinely approved nominal PAGA allocations.

In the Cotter v. Lyft case, Judge Chhabria faced precisely this same issue and determined that a settlement that provided a $1 million allocation for similar PAGA claims was acceptable. In granting preliminary approval to the settlement, he noted that this allocation was very high compared to other settlements that have been approved, and he stated that he would have reduced the amount of the penalties in light of Amaral v. Cintas Corp., 163 Cal. App. 4th 1157 (2008). See Cotter v. Lyft, Civ. A. No. 3:13-cv-04065-VC (N.D. Cal. 2016), Dkt. 246 at 8-9 (noting that "[a]lthough $1 million might seem low when compared to the maximum PAGA penalties that would accrue in the event the plaintiffs won on the merits of their claims that Lyft violated the Labor Code by misclassifying them

as independent contractors, it's quite high compared to the typical amount apportioned to claims for PAGA penalties in wage and hour settlements" and noting that "Lyft's obligations to its drivers are genuinely unclear" such that a significant reduction in penalties would be appropriate under California Labor Code § 2699(e)(2)).[25]

Nonetheless, the Court has asked that the parties "explain how the conventional analysis of the Hanlon factors should apply" to the PAGA claims, given that they cannot be compelled to arbitration. Dkt. 724 at 13. These factors include:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Here, these factors all support the parties' decision to allocate $1 million towards settlement of the PAGA claims.

First, with respect to the strength of Plaintiffs' case, there are a number of risks associated with pursuing these PAGA claims. There is the obvious risk that Plaintiffs would not prevail on the misclassification issue. See Dkt. 241 at 26; see also Cotter, Civ. A. No. 3:13-cv-04065-VC (N.D. Cal. 2016), Dkt. 246 at 9 ("[T]here is no straight answer to the question whether [] drivers must be classified as employees or independent contractors under California law."). However, even assuming that Plaintiffs were to prevail on the misclassification issue, Plaintiffs would have had to clear other hurdles such as proving that the PAGA claim itself is manageable enough to be tried to a jury – an issue on which this Court had previously expressed doubt and required supplemental briefing. See Dkt. 401 at 5 (noting the Court's concerns about the PAGA claims and setting forth a number of

---

[25]    See also Dearaujo v. Regis Corp., 2016 WL 3549473, *3 (E.D. Cal. June 30, 2016) (approving PAGA settlement of $7,500 out of a $1,212,500 settlement); Chu v. Wells Fargo Investments, LLC, 2011 WL 672645, *1 (N.D. Cal. Feb. 16, 2011) (approving PAGA settlement payment of $7,500 to the LWDA out of $6.9 million common-fund settlement); Franco v. Ruiz Food Products, Inc., 2012 WL 5941801, *13 (E.D. Cal. Nov. 27, 2012) (approving PAGA settlement payment of $7,500 to the LWDA out of $2.5 million common-fund settlement); Arreola v. Finish Line, Inc., 2016 WL 2981819, *2 (C.D. Cal. May 23, 2016) (approving PAGA settlement of $5,000 out of the settlement of $750,000); Clemens v. Hair Club for Men, LLC, 2016 WL 3442774, *1 (N.D. Cal. June 23, 2016) (approving PAGA settlement of $5,000 out of a $500,000 settlement); see also cases cited at Dkt. 574 at n. 8; Dkt. 617 at 53.

18

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

1   questions regarding manageability); Dkt. 501; Dkt. 503 (supplemental briefing regarding PAGA

2   claims); see also Amey v. Cinemark USA Inc., 2015 WL 2251504, *16 (N.D. Cal. May 13, 2015)

3   (noting "concerns about manageability related to the numerous 'aggrieved employees' that plaintiff

4   sought to represent.").  Plaintiffs would also have had to successfully argue (and defend on appeal)

5   Uber's argument that PAGA penalties arising from claims that also provide for damages do not

6   constitute an impermissible double recovery. See Yadira v. Fernandez, 2011 WL 4101266, *3 (N.D.

7   Cal. Sept. 8, 2011) (recognizing that "'[w]here state law provides for statutory damages, the trial

8   court's discretion may be called upon to prevent double recovery'") (quoting Doe v. D.M. Camp &

9   Sons, 624 F. Supp. 2d 1153, 1174 (E.D. Cal. 2008)).  Thus, even without the arbitration issue in

10  play,[26] the PAGA claim carries its own substantial risks.

---

12   [26]      Plaintiffs acknowledge that in light of Sakkab  and Iskanian, the PAGA claims might not be

13   as vulnerable on appeal as the other claims because, under the current state of the law, they cannot be
     compelled to arbitration.  However, this issue has not yet been addressed by the U.S. Supreme Court.

14   The Court stated in a footnote that "Plaintiffs suggest there is a 'significant risk' that the Supreme
     Court will grant certiorari in Sakkab" but "provide no explanation for why there is now an increased

15   risk that the Supreme Court will grant certiorari." Dkt. 724 at n. 7.  By way of explanation, Plaintiffs
     are not arguing that there is an increased risk as compared to before.  Since Iskanian and Sakkab were

16   decided, there has always been the risk that the Supreme Court would take up this issue.  Plaintiffs
     merely noted earlier, during this litigation, that the Supreme Court had passed up opportunities to

17   address this issue, but the risk that it may take up this issue in the future remains.  In fact, Uber has
     informed Plaintiffs that if this Court were to deny settlement approval here and permit Plaintiffs to

18   add a PAGA claim into the case, Uber would argue that the Federal Arbitration Act ("FAA")
     preempts the Iskanian rule.  According to Uber, Uber would also raise this issue on appeal, through a

19   petition for writ of certiorari, if necessary.

20

21           Moreover, if the Supreme Court were to grant certiorari, there certainly can be no guarantee
     that Sakkab and Iskanian's preemption analysis would remain good law.  Indeed, the Supreme

22   Court's jurisprudence regarding the preemptive effect of the FAA is well-known.  See, e.g.,
     DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 471 (2015) (holding that the FAA preempted California

23   Court of Appeal's interpretation of contractual language); Am. Express v. Italian Colors Rest., 133 S.
     Ct. 2304, 2309 (2013) (holding that the "the FAA's command to enforce arbitration agreements

24   trumps any interest in ensuring the prosecution of low-value claims"); Marmet Health Care Ctr., Inc.
     v. Brown, 132 S. Ct. 1201, 1203-04 (2012) (per curiam) (holding that the FAA preempted West

25   Virginia law prohibiting arbitration of personal injury or wrongful death claims); AT&T Mobility
     LLC v. Concepcion, 131 S. Ct. 1740, 1753 (2011) (holding that the FAA preempted California law

26   barring enforcement of a class-arbitration waiver); Preston v. Ferrer, 552 U.S. 346, 356 (2008)
     (holding that the FAA preempted California law vesting exclusive jurisdiction of a particular type of

27   statutory claim with administrative agency); Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 684

28   *(Cont'd on next page)*

---

In addition, Plaintiffs would face the extremely likely risk that the PAGA penalties would be greatly reduced by this Court (or the Ninth Circuit, on appeal).  Courts are required to reduce PAGA penalties when the prescribed award would be "unjust, arbitrary and oppressive, or confiscatory." See Cal. Labor Code § 2699(e)(2); see also Fleming v. Covidien Inc., 2011 WL 7563047, at *3-4 (C.D. Cal. Aug. 12, 2011) (invoking § 2699(e)(2) and reducing PAGA penalty award from $2.8 million to $500,000); Makabi v. Gedalia, 2016 WL 815937, at *2 & n.3 (Cal. Ct. App. Mar. 2, 2016) (unpublished) (noting that the trial court invoked § 2699(e)(2) and declined to apply any PAGA penalties, despite finding that defendants violated PAGA).

In fact, Uber submits that any PAGA penalty over $1 million would not only be "unjust, arbitrary and oppressive, [and] confiscatory" under PAGA Section 2699(e)(2); it would also violate Uber's due process rights.  See BMW of N. America v. Gore, 517 U.S. 559, 575 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."); see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.") (citations omitted); Hale v. Morgan, 22 Cal. 3d 388, 402-03 (1978) ("Though the Legislature need not, of course, precisely adjust its regulatory efforts to ensure exact justice in every case, neither may it, in defiance of due process requirements, compel the exaction of penalties which, in a particular case, demonstrably overbalance and outweigh reasonable goals of punishment, regulation, and deterrence.").  Courts must "consider three guideposts" when evaluating whether a civil penalty violates the due process clause:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual harm or

---

*(Cont'd from previous page)*

(1996) (holding that the FAA preempted Montana law mandating that arbitration clauses be printed on the first page of an agreement in underlined capital letters); Perry v. Thomas, 482 U.S. 483, 492 (1987) (holding that the FAA preempted California law stating that wage collection actions may be maintained notwithstanding the existence of private arbitration agreements); Southland Corp. v. Keating, 465 U.S. 1, 16 & n.11 (1984) (holding that the FAA preempted California law requiring judicial consideration of claims brought under California's Franchise Investment Law).

1    potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference

2    between the [penalties] awarded … and the civil penalties authorized or imposed in comparable

3    cases." Campbell, 538 U.S. at 418.  In this case, Uber submits that all three factors require a finding

4    that any PAGA penalty in excess of $1 million would violate Uber's due process rights.

5         With respect to the first prong—the degree of reprehensibility—Uber submits that its conduct

6    could not be described as willful or reckless, let alone "egregiously improper" or in "bad faith."

7    BMW, 517 U.S. at 578, 580; cf. Safeco Ins. Co. v. Burr, 551 U.S. 47, 69-70 (2007) (a defendant's

8    conduct "falls well short" of being "reckless" if its "reading of [a] statute, albeit erroneous, was not

9    objectively unreasonable").  To the contrary, Uber maintains that its classification of drivers who use

10   Uber as independent contractors is a reasonable and good faith position—regardless of whether a

11   fact-finder ultimately agrees with that position—given the substantial uncertainty in the law and (as

12   this Court has expressly recognized) the many Borello  factors that weigh in favor of independent

13   contractor status.  See Dkt. 241 at 26 (stating that "numerous [Borello] factors point in opposing

14   directions"); Cotter, Civ. A. No 3:13-cv-04065-VC, Dkt. 246 at 9 (noting that "Lyft's obligations to

15   its drivers are genuinely unclear" under the law); BMW, 517 U.S. at 577-78 (finding that defendant's

16   conduct was not "sufficiently reprehensible" to justify $2 million punitive damages award because

17   defendant "reasonably interpret[ed]" the laws at issue, even though its interpretation was ultimately

18   incorrect).  Moreover, Uber submits that its conduct is in no way a "repetitive" or "ongoing"

19   violation of any law; rather, it constitutes a single decision to classify drivers as independent

20   contractors.  See Hale, 22 Cal. 3d at 400-04 (finding that civil penalty of $17,300 violated

21   defendant's due process rights, in part, because the statute under which the penalty was levied

22   "mandate[d] essentially that a single wrongful act … if not correct, [would] subject [defendant] to

23   potentially infinite penalties").  As for the second prong, drivers are receiving a massive

24   compensatory-like payment as part of this settlement—either $99,250,000 or $83,250,000 in total,

25   less Plaintiffs' attorneys' fees, administrative costs, and incentive awards.  See Campbell, 538 U.S. at

26   425 ("When compensatory damages are substantial, then a lesser ratio [of compensatory to punitive

27   damages] …. can reach the outermost limit of the due process guarantee.").  Finally, the $1 million

28   PAGA penalty anticipated by the parties' settlement is exceptionally high compared to other PAGA

settlements and judgments.  See BMW, 517 U.S. at 583-84 (finding that $2 million punitive damage award violated defendant's due process rights, in part, because it was "greater than the statutory fines available … for similar malfeasance.").  As Judge Chhabria recently found, a $1 million allocation for a PAGA claim is "quite high compared to the typical amount apportioned to claims for PAGA penalties in wage and hour settlements."  See Cotter, Civ. A. No 3:13-cv-04065-VC, Dkt. 246 at 9.  Indeed, with the exception of the recent Alexander settlement, the parties are not aware of any other settlement or verdict that has *ever* allocated a higher amount to a PAGA claim.[27]  This $1 million PAGA payment is particularly striking, given the vast discounts that most courts apply to approving settlements of PAGA claims.[28]

Furthermore, viewed in isolation, the $1 million allocation does not take into account the non-monetary value of the settlement terms, which, as described in the parties' previous filings, will provide significant benefits to class members.  Such non-monetary benefits must be considered when considering the value conferred to the class by the settlement of the PAGA penalties (which form an integral piece of the settlement as a whole).  See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1049

---

[27]   The Alexander settlement allocated $1.6 million towards PAGA out of a larger $226.5 million settlement fund. See Alexander, Civ. A. No. 3:05-cv-0038-EMC (N.D. Cal. 2016), Dkt. 149-1 at 13.  Moreover, in that case, the Ninth Circuit had *already* determined that the defendant had misclassified the plaintiffs as independent contractors, see Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 997 (9th Cir. 2014).  Here, Plaintiffs still would need to prove misclassification in order to obtain any recovery under PAGA.

[28]   See supra, p. 15 (collecting cases in which PAGA claims were settled for less than $10,000).  Indeed, many courts have approved settlements that allocate less than 1% of the overall value of the PAGA claim. See, e.g., Hopson v. Hanesbrands Inc., 2009 WL 928133, *9 (N.D. Cal. Apr. 3, 2009) (approving total PAGA allocation that was .49% of $408,420.32 gross settlement); Moore v. PetSmart, Inc., 2015 WL 5439000, *8 (N.D. Cal. Aug. 4, 2015) (approving total PAGA allocation that was .5% of $10,000,000 gross settlement); Arreola v. Finish Line, Inc., 2016 WL 2981819, *2 (C.D. Cal. May 23, 2016) (approval of settlement including a 0.67% PAGA fee, or $5,000 out of the settlement of $750,000) ; Reyes v. CVS Pharmacy Inc., et al., 2016 WL 3549260, *2 (E.D. Cal. June 29, 2016) (approving PAGA payment of 0.25% or $1,000 out of a $400,000 settlement); Dearaujo v. Regis Corp., 2016 WL 3549473, *3 (E.D. Cal. June 30, 2016) (approving PAGA payment of 0.62% or $7,500 out of a $1,212,500 settlement);  Lusby v. Gamestop Inc., 297 F.R.D. 400, 407 (N.D. Cal. 2013) (approving total PAGA allocation that was .67% of $750,000 gross settlement), final approval granted, Lusby v. GameStop Inc., 2015 WL 1501095, *2 (N.D. Cal. Mar. 31, 2015).

1    (9th Cir. 2002) ("Incidental or non-monetary benefits conferred by the litigation are a relevant

2    circumstance" in assessing the results achieved by a settlement); Willner v. Manpower Inc., 2015 WL

3    3863625, *7 (N.D. Cal. June 22, 2015) (noting that a change in policy, even if it cannot be

4    specifically valued, must factor into courts' analysis of the degree of success achieved by a

5    settlement); Brawner v. Bank of Am. Nat'l Ass'n, 2016 WL 161295, *5 (N.D. Cal. Jan. 14, 2016)

6    (noting that Ninth Circuit precedent requires courts to consider the significance of non-monetary

7    benefits provided to the class in assessing of the degree of success achieved by a settlement).

8        The parties also note that the additional Hanlon factor of the presence of a governmental

9    participant cuts in favor of approval here because the LWDA has been informed of the full scope of

10   the PAGA claims that would be released and has not taken any action with respect to these claims.

11   See Dkt. 542.  Thus for all these reasons, the parties submit that their proposed allocation of $1

12   million is fair and adequate when considered through the lens of the Hanlon factors.[29]

13       Finally, the Court has asked what effect the agreement would have on a class member who

14   opts out and later attempts to bring a PAGA claim.  Dkt. 724 at 13.  Both the agreement itself, see

15   Dkt. 575-6 at ¶¶ 193, 200, as well as case law, would prohibit such a driver from bringing a PAGA

16   claim—for the period up to the settlement approval—because the first-settled PAGA case has

17   preclusive effect on nonparty aggrieved putative employees.  See Arias v. Superior Court, 46 Cal. 4th

18   969, 986 (2009) ("Because an aggrieved employee's action under the Labor Code Private Attorneys

19   General Act of 2004 functions as a substitute for an action brought by the government itself, a

20   judgment in that action binds all those, including nonparty aggrieved employees, who would be

21   bound by a judgment in an action brought by the government"); Thomas v. Aetna Health of

22   California, Inc., 2011 WL 2173715, *18 (E.D. Cal. June 2, 2011) ("a PAGA judgment precludes all

23   other suits for PAGA civil penalties based on the same predicate facts—including any imposition of

24   penalties by the LWDA"); Cunningham v. Leslie's Poolmart, Inc., 2013 WL 3233211, at *6 n.2

25   (C.D. Cal. June 25, 2013) ("While absent parties seeking to enforce their individual rights under

26   _____

27   [29]    As noted, should the Court believe that a somewhat higher allocation for the PAGA claims
     would be appropriate or necessary, an additional allocation could be drawn from the $10 million that
28   Plaintiffs' counsel will not be seeking for fees.

California's Labor Code are not bound by the judgment in a representative PAGA action, they are precluded from re-litigating PAGA claims for civil penalties.") (italics added).[30]

In fact, the California Court of Appeal has already confronted and answered the precise question raised by the Court here.  In Alonzo v. First Transit, Inc., a group of drivers filed a class action in which they asserted wage-and-hour claims against their employer, the parties reached a settlement that purported to resolve those wage-and-hour claims as well as related PAGA claims (claims that were amended into a settlement complaint), and the trial court approved the parties' settlement.  See Alonzo, 2015 WL 6000931, at *1-2 (Oct. 15, 2015) (unpublished).  On appeal, the California Court of Appeal held that appellant—a driver who had affirmatively opted out of the settlement class and initiated a second lawsuit against defendant asserting PAGA claims only—had standing to appeal the trial court's order granting settlement approval because that order, if affirmed, would "preclude him from pursuing his PAGA claims" in his own separate suit.  Id. at *4.  As the Court explained, "under Arias, a judgment in a PAGA action brought by a single employee, or a group of employees, precludes all aggrieved employees who were not named in that action from later bringing PAGA claims against the same defendant …."  Id. (citing Arias, 46 Cal. 4th at 986).  Similarly, the PAGA judgment in this action will have res judicata effect on all allegedly aggrieved drivers, regardless of whether they opt out of the settlement class.

Notably, however, the preclusive effect of the settlement has only a retroactive effect; if a plaintiff were able to plead and prove that Uber is misclassifying drivers on a going-forward basis, after settlement approval, nothing would stop a driver from bringing a PAGA claim for Uber's alleged violations *after* the settlement becomes effective. See Vita-Herb Nutriceuticals Inc. v.

---

[30]     The fact that drivers will have opted out of the class action settlement does not alter this analysis.  Baumann v. Chase Inv. Servs. Corp., 747 F.3d 1117, 1122 (9th Cir. 2014) ("Unlike Rule 23(c)(2), PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action."); Ochoa-Hernandez v. Cjaders Foods, Inc., 2010 WL 1340777, at *5 (N.D. Cal. Apr. 2, 2010) ("Unnamed employees need not be given notice of the PAGA claim, nor do they have the ability to opt-out of the representative PAGA claim.  There is no indication that the unnamed plaintiffs can contest a settlement, if any reached between the parties."); Hernandez v. DMSI Staffing, LLC, 79 F. Supp. 3d 1054, 1063 (N.D. Cal. 2015) (Chen, J.) ("The due-process-related procedural requirements of formal class actions do not obtain in PAGA representative actions.").

24

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

Probiohealth LLC, 2012 WL 3903454, *7 (C.D. Cal. Sept. 6, 2012) (settlement releases do not waive future claims) (collecting cases).

### 5.   The Likelihood of the $16 Million Contingency Being Triggered

The Court has requested "additional information" regarding "the likelihood that the $16 million payment -- which is contingent upon an Initial Public Offering (IPO) of Uber yielding an average valuation of at least 1.5 times Uber's most recent valuation within 365 days from the closing of the IPO," Dkt. 724 at 13, or upon a "Change in Control of Uber Technologies, Inc. within 36 months of the date on which the Court enters its Final Approval Order in which Uber Technologies, Inc.'s valuation … is at least 1 ½ times [Uber's] most recent valuation," Dkt. 575-6 at 13-14 -- "will be triggered." Order at 14. In response, Uber states that it is not able to provide the Court with specific additional information at this time regarding the likelihood that it will engage in an initial public offering or private sale, or the expected value of any security arising from such a transaction. In light of federal and state securities laws and the potential for liability arising therefrom, Uber further states that it would not be proper for Uber to provide such information.

Plaintiffs have included their statement in response to the Court's question in the Declaration of Shannon Liss-Riordan, at ¶¶ 10-11.[31]

### 6.   Clarification Regarding the Sunset Provision

The Court has asked the parties to clarify the "minimum length of time the non-monetary provisions will be in place." Dkt. 724 at 14. The parties respond that it was their intention that each non-monetary relief provision will remain in effect until at least the earliest of the following two dates: (i) two years after Uber implements the non-monetary provision at issue; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Uber reasonably believes would require a modification to the provision at issue in order to comply with the applicable statute, regulation, or law. In other words, absent a change to an applicable statute, regulation, or other law, each non-monetary provision will remain in place for at least two years *from the date Uber implements that particular non-monetary provision.*

---

[31]   Uber takes no position on the accuracy of the representations contained in the Declaration of Ms. Liss-Riordan. Those statements are made by Plaintiffs and Plaintiffs alone, not Uber.

To the extent there is any discrepancy between this representation and Paragraph 136 of the Settlement Agreement, as it is currently phrased, the Parties hereby state that—pursuant to Paragraph 214 of the Settlement Agreement—they are willing to amend Paragraph 136 of the Settlement Agreement so that it states as follows:

> 136.    In recognition of the fact that the business and regulatory landscape may significantly change over time, the Parties agree that each separate provision of the Agreement set forth at Paragraph 135(a)-(h) shall expire upon the earliest of the following two dates: (i) two years after Uber implements the particular non-monetary provision at issue; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Uber reasonably believes would require a modification to any of the provisions of the agreement set forth at Paragraph 135(a)-(h) to comply with the applicable statute, regulation, or law.

The Court can accept this as an acknowledgment that, in the absence of an intervening statute, regulation, or other law, each non-monetary provision will remain in place for a minimum of two years.  See Families & Sch. Together Fed. Credit Union v. Auto Maxx, Inc., 2010 WL 96380, *2 (E.D. Cal. Jan. 6, 2010) (modifications of settlement are sufficient if they are placed on the record).

**7.    Clarification Regarding Scope of Released Claims**

The Court has also asked that the parties clarify the scope of the release in Paragraph 105 of the Settlement Agreement and specifically, to clarify whether it will apply only to claims related to misclassification.

In response, Plaintiffs state as follows:  Plaintiffs explained in their Motion for Preliminary Approval that "[e]xcept for the named plaintiffs, the release does not provide for release of claims unrelated to the core misclassification allegation, *e.g.* claims for discrimination, wrongful termination, personal injury, etc." Dkt. 574 at 10.  Plaintiffs state that Uber assented to Plaintiffs' Motion and thus agreed to this description of the release.  See Dkt. 520.  For clarity purposes, the settlement agreement itemizes in detail the claims that would be released.

Uber, on the other hand, states that the release applies to:  (1) claims based on or reasonably relating to drivers being classified as employees; and (2) claims based on or reasonably relating to the conduct alleged in the proposed settlement complaint, regardless of whether classification as an employee is technically a requirement of that claim.  Thus, for example, a claim alleging unfair business practices, included in the Settlement Agreement's list of released claims in section 105, see

26

1    Dkt. 575-6 at ¶ 105(n), would be released if the claim was based on or reasonably related to being

2    classified as an employee, or the failure to reimburse drivers for certain business expenses.  It also

3    would apply, for example, where a driver sought to assert a common law claim or any other type of

4    statutory unfair competition law claim based on or reasonably related to an alleged entitlement to a

5    tip, even though that driver may or may not also allege she was an Uber employee.

6        **8.    Stipulation Regarding the Enforceability of the 2015 Arbitration Clause**

7            The Court has requested that the parties clarify "what effect Plaintiffs' stipulation to the

8    enforceability of the December 2015 arbitration agreement will have on the settlement class

9    members, including claims that fall outside of the scope of the Settlement Agreement."  Dkt. 724 at

10   14.  In response, the parties state that the joint stipulation as to the enforceability of the December

11   2015 Arbitration Provision would apply in any lawsuit brought by settlement class members,

12   including actions unrelated to employment misclassification.  See Dkt. 522 at 2 ("Plaintiffs have

13   agreed to stipulate to the enforceability of the December 2015 Arbitration Provision"); id. at 5-6

14   ("[A]ll Parties jointly agree and stipulate that the December 2015 Arbitration Provision … is

15   enforceable in its entirety."); Dkt. 575-6 at 38 ("Plaintiffs agree to stipulate to the enforceability of

16   the December 10, 2015 Arbitration Agreement").

17           However, it is worth noting that, in December 2015, Uber "fixed" the portions of its

18   arbitration clause that this Court found to be invalid.  Given this fact, as well as the fact that the

19   "December 2015 arbitration agreement … ha[s] no effect on the rights of certified class members to

20   pursue the claims subject of the certification in O'Connor," Dkt. 435, Plaintiffs believed this

21   stipulation to be an acceptable settlement term.[32]  In fact, it now appears quite possible that the Ninth

22   Circuit will hold that the earlier 2013 and 2014 agreements are enforceable, see Dkt. 707.  If so, the

23   joint stipulation will not put class members in any worse a situation than they were already in.[33]

24   ---

25   [32]    This Court has never ruled on the enforceability of the 2015 Arbitration Agreement, but given
     the reasoning of its earlier opinions and the tenuousness of even those rulings, it appeared likely to
26   Plaintiffs that the Court would have upheld the 2015 Arbitration Agreement if it had been before it.

27   [33]    Even before the oral argument at the Ninth Circuit in Mohamed, this Court appeared to be
     reconsidering its earlier ruling that the earlier version of the arbitration agreement was invalid on
28   unconscionability grounds.  See Dkt.379 at 7:21-24 ("I will tell you now that I am taking a second

                                                                              *(Cont'd on next page)*

Thus, Plaintiffs submit that their stipulation to the enforceability of the December 2015 agreement does not meaningfully sacrifice class members' rights in light of benefits of settlement and the likelihood that the 2015 agreement would likely be enforced anyway.[34]

### 9.    How Drivers Will Be Impacted By the Vacating of the Rule 23(d) Orders

The Court has also asked for additional information regarding "what the effect will be on drivers who relied on the Court's Rule 23(d) Orders," should the Court vacate those orders. Dkt. 724 at 15. When Plaintiffs described this issue at the preliminary approval hearing as "theoretical", the Court called this response inadequate. However, in further response, the parties submit that it does not make sense that there would be drivers who received the 2015 agreement, knew about the arbitration clause and their right to opt out of it, knew that the Court had ruled that they would get another chance to opt out, and so intentionally decided to wait for their next opportunity to opt out of the clause. There was no formal notice issued to drivers informing them that they would get a future additional opportunity to opt out of the arbitration clause. Thus, the reality is that any drivers who were aware of the issue and desired to opt out of the arbitration clause did so at the time.[35] There is

---

*(Cont'd from previous page)*

look at the 2014 question of procedural unconscionability, especially in light of the Sanchez decision, which came down after my Mohamed analysis"). Also, the Court refused to certify a class including drivers who were bound by the 2013 or 2014 arbitration clauses on the ground that the Court's ruling in Mohamed was not generally applicable to other drivers besides the driver at issue in that ruling. See Dkt. 342 at 61-64. Thus, the Court's certification of a class including drivers bound by the 2013 and 2014 arbitration clauses was based solely on its holding that the clause contained a non-severable PAGA waiver. The tenuousness of this lengthy and close decision has now been underscored by the Ninth Circuit's comments at the Mohamed hearing. Thus, again, it did not seem to be an untenable sacrifice for the plaintiffs to stipulate to the enforceability of the 2015 Arbitration Agreement in order to achieve this global settlement.

[34]    As previously noted, all other federal courts to have addressed Uber's arbitration clause (even the earlier 2014 agreement) have held it to be enforceable. See Bruster v. Uber Techs., Inc., 2016 WL 2962403 (N.D. Ohio May 23, 2016); Suarez et al v. Uber Techs., Inc., No. C8:16-00166, (M.D. Fl. May 4, 2016) (Dkt. 31); Varon v. Uber Techs., Inc., No. CV MJG-15-3650, 2016 WL 1752835 (D. Md. May 3, 2016); Sena v. Uber Techs., Inc., No. CV-15- 02418-PHX-DLR, 2016 WL 1376445 (D. Ariz. Apr. 7, 2016).

[35]    Indeed, in large part due to the efforts of Plaintiffs' counsel and the publicity generated around this issue, thousands of drivers took steps to opt out of that agreement within the 30 days. See Dkt. 691 at 54:5-6 (Uber's counsel stated that 15,000 drivers opted out).

*(Cont'd on next page)*

simply no logical reason why any drivers who were aware of the issue and desired to opt out of the arbitration clause would have waited because they understood that the Court was going to give them another chance to opt out sometime in the future.  Nor is there any evidence that any drivers, in reliance on this Court's Orders, would have deliberately *not* opted out of the December 2015 arbitration clause on the assumption that they would have a later chance to opt out.

Indeed, Plaintiffs' counsel encouraged all drivers who came in contact with her office to opt out of the arbitration clause, even after the Court's December 23, 2015, order declared that the agreement would not be enforceable in the O'Connor case, in recognition of the fact that future circumstances could render it important that they opted out of the agreement.  There is simply no reason to think that any drivers who were presented with the agreement on December 11, 2015, learned of the Court's ruling on December 23, 2015, and thereafter chose <u>not</u> to opt out of the arbitration agreement before the 30-day deadline on January 10, 2016, based upon the understanding that they would get another chance to do so.

In response to the Court's specific question whether, in lieu of "vacating" the Rule 23(d) Orders, the Court should instead "terminate the Orders thereby affording Uber the right to issue new arbitration agreements, and thus give drivers a new chance to opt out under the terms of the arbitration agreement," Dkt. 724 at 15-16, Uber submits that—for the reasons discussed above—the Court should "vacate" the Rule 23(d) Orders as contemplated by all parties in the Settlement Agreement, rather than "terminating" those agreements.[36]  Indeed, the provisions requiring that this Court "vacate" the Rule 23(d) orders are "significant and material term[s] of the Parties' settlement agreement," Dkt. 522 at 3, so much so in fact that "Defendants obligations under [the] agreement … are voidable at Defendants' option unless and until the Court vacates the [Rule 23(d)] orders …, and

---

*(Cont'd from previous page)*

[36]     The parties note that the <u>FCRA</u> plaintiffs objected to the vacating of the Court's Rule 23(d) orders. <u>See</u> Dkt. 524, 597.  However, those plaintiffs have now reached a proposed settlement of their case and have likewise stipulated to the vacating of these same orders. <u>See</u> <u>In re FCRA</u>, Civ. A. No. 3:14-cv-5200-EMC, (N.D. Cal.), Dkt. 179. Thus, the concern that vacating these orders would affect another pending case is no longer an issue.

1    allows Uber to distribute and enforce the December 10, 2015 Arbitration Agreement as to all Drivers

2    nationwide," Dkt. 575-6 at ¶ 135(e).

3            Plaintiffs, on the other hand, have no objection to "termination" in lieu of "vacatur," which,

4    according to Plaintiffs, would similarly recognize that the claims brought here that led to the issuance

5    of these orders have now been resolved.

6            **10.    Opt Out Process**

7            The Settlement Agreement currently provides that settlement class members may exclude

8    themselves from the settlement (i.e., "opt out") by submitting a "timely, written request[] for

9    exclusion," consisting of "the Settlement Class Member's name, address, and telephone number; a

10   clear and unequivocal statement that the Settlement Class Member wishes to be excluded from the

11   Settlement Class and that the Settlement Class Member understands that he or she is still bound by

12   the release of the PAGA Claims upon the issuance of the Final Approval Order and Final Judgment;

13   and the signature of the Settlement Class Member or the Legally Authorized Representative of the

14   Settlement Class Member."  Dkt. 575-6 ¶ 193.  Such requests must be "mailed to the Settlement

15   Administrator at the address provided in the Notice of Settlement of Class Action and must be

16   postmarked no later than the Exclusion/Objection Deadline."  *Id.*  In its Order, the Court requested

17   that the parties "report on a better opt out process," including "use of a fillable form, electronic

18   option, etc."  Order at 16.

19           In response, the parties state that they have met and conferred with one another, as well as the

20   Claims Administrator for this settlement (Garden City Group, LLC), and they do not believe that a

21   fillable opt out form or electronic option is "better" than the current opt out method set forth in the

22   parties' Settlement Agreement.  To the contrary, in counsel's experience and in the experience of

23   Garden City Group, LLC, providing non-traditional opt-out methods for a class settlement, like those

24   suggested by the Court, substantially *increases* the likelihood of potential confusion among class

25   members, as they may feel like they need to fill out both the claim form and the opt-out form (either

26   in paper or online).  Especially with the size of the settlement class at issue here, that likely confusion

27   could cause substantial delays, muddle the intent of class members, and increase the cost of notice

28

1    administration.[37]  For all of these reasons, the parties believe the settlement opt out process set forth

2    in the Settlement Agreement is, not only commonplace in approved class settlements, but reasonable,

3    and they believe it should be approved.

4                                                      **CONCLUSION**

5            The parties have worked faithfully to respond to the Court's additional questions.  If the Court

6    has any other questions, the parties are happy to address them.

7            For all the reasons set forth above and in the parties' previous briefing, the parties believe that

8    the settlement is a fair and adequate resolution of highly contentious litigation, on which both sides

9    faced significant risks.  The parties thus respectfully request that the Court grant preliminary approval

10   of the proposed settlement and allow the notice process to proceed.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [37]        As explained at the hearing, Plaintiffs' counsel reiterates that she disfavors the use of "opt out
     forms" in settlements because (no matter how clearly they are drafted) class members will fill them
27   out believing they need to do so in order to receive their settlement share. Plaintiffs' counsel has
     relied upon her extensive past experience with wage and hour settlements in trying to craft a
28   settlement process that minimizes confusion.

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE No. CV 15-00262-EMC

1    Date: July 15, 2016

2                                    Respectfully submitted,

3    THOMAS COLOPY, MATTHEW
     MANAHAN, and ELIE GURFINKEL individually and
     on behalf of all others similarly situated,

4                                    By their attorneys,

5

6                                    */s/ Shannon Liss-Riordan*

7                                    Shannon Liss-Riordan, *pro hac vice*
                                     LICHTEN & LISS-RIORDAN, P.C.
                                     729 Boylston Street, Suite 2000
8                                    Boston, MA 02116

9    Date: July 15, 2016

10                                   Respectfully submitted,

11   UBER TECHNOLOGIES, INC. and
     TRAVIS KALANICK

12                                   By their attorneys,

13                                   */s/ Theodore Boutrous, Jr.*

14                                   Theodore, J. Boutrous, Jr.
                                     GIBSON, DUNN & CRUTCHER LLP
15                                   333 South Grand Avenue
                                     Los Angeles, CA 90071-319
16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT SUPPLEMENTAL BRIEFING IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC