SHANNON LISS-RIORDAN, SBN 310719
(sliss@llrlaw.com)
ADELAIDE PAGANO, *pro hac vice*
(apagano@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:     (617) 994-5801

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC,<br><br>Defendant. | CASE NO. CV 13-03826-EMC<br>CASE NO. CV 15-00262-EMC<br><br>**DECLARATION OF SHANNON LISS-RIORDAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**Hon. Edward M. Chen** |
| HAKAN YUCESOY, ABDI MAHAMMED, MOKHTAR TALHA, BRIAN MORRIS, and PEDRO SANCHEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC. and TRAVIS KALANICK,<br><br>Defendants. | Hearing:     March 21, 2019<br>Time:         1:30 p.m.<br>Courtroom:  5 |

## **DECLARATION OF SHANNON LISS-RIORDAN**

I, Shannon Liss-Riordan, declare as follows:

1.      I am a partner at the law firm of Lichten & Liss-Riordan, P.C., and am lead attorney and class counsel for the settlement class in the above-captioned matters.  I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.  I have personal knowledge of the information set forth herein.

### **Litigation History**

2.      The O'Connor case has now been pending for five and a half years, since I filed it in August 2013.  During that time, the parties have engaged in extensive discovery and motion practice and have briefed numerous appeals and cross-appeals at the Ninth Circuit Court of Appeals.

3.      With respect to discovery, Plaintiffs propounded multiple sets of written discovery (totaling over 73 requests), reviewed more than 30,000 pages of documents produced by Uber, and closely analyzed several sets of confidential data made available by Uber.  In turn, Uber propounded multiple sets of written discovery (totaling over 1,000 requests) and reviewed more than 5,000 pages of documents produced by the Named Plaintiffs. The Parties collectively deposed 10 witnesses, including the named plaintiffs and several Uber employees, totaling approximately 55 hours of deposition testimony.  These witnesses included Uber managers, two separate Rule 30(b)(6) witnesses, and Uber's Senior Vice President of Operations Ryan Graves.  The Parties also reviewed more than 1,000 pages of documents produced by third parties.  The Parties also litigated at least 10 discovery disputes over five formal discovery dispute letters that were adjudicated by the Court.

4.      My firm has also been in near-constant contact with putative class members in this case.  Thousands of drivers in California and Massachusetts have contacted my firm about the O'Connor and Yucesoy cases, and I have personally been in email contact with numerous

drivers, often on a daily basis. We have received such a high volume of contact regarding this case that my firm has hired staff that are fully dedicated to fielding inquiries from drivers.

5.      In addition to in-depth discovery, the parties have engaged in aggressive motion practice regarding class certification issues and the substantive merits of Plaintiffs' claims. The parties briefed a Motion to Dismiss (Dkt. 39), Motion for Judgment on the Pleadings (Dkt. 116), two Motions for Summary Judgment (Dkt. 211 & 499), and Motions to Compel arbitration (Dkt. 346 & 397). The parties engaged in extensive briefing regarding Plaintiffs' Motion for Class Certification including supplemental briefing (Dkt. 276). The parties also briefed multiple Motions to Stay as well as multiple Motions for Protective Order (Dkt. 4, 15, 405, 411, 427, 439, 506). Altogether, the Court has held 24 hearings and conferences in this case (totaling more than 30 hours of court time), not counting the time spent related to the proposed 2016 settlement. Id.

6.      A trial on both liability and damages was scheduled to begin in this case on June 20, 2016, and the parties also expended tremendous effort preparing for that trial before the case was stayed prior to trial.

7.      Moreover, because of the number of appeals filed in the O'Connor case, the parties fully briefed *five* separate appeals of this Court's Orders before the Ninth Circuit Court of Appeals before those appeals were eventually consolidated for a single oral argument. See Ninth Circ. Appeal Nos. 14-16078, 15-17420, 15-17532, 16-15000, and 16-15595.

8.      I filed the Yucesoy case after the O'Connor case in June 2014 as a putative class action on behalf of drivers in Massachusetts, alleging misclassification and resulting wage claims. This case has also been hotly contested with Uber filing four separate Motions to Dismiss as well as three Motions to Compel arbitration of several of the named plaintiffs, all of which Plaintiffs have vigorously opposed. See Yucesoy Dkt. 6, 36, 109, 149, 62, 94, 296. Plaintiffs also filed a Motion for Partial Summary Judgment (Yucesoy Dkt. 38) and a Motion for Class Certification (Yucesoy Dkt. 246), but the Court declined to entertain those Motions.

## Settlement History

9. The Parties first attempted mediation early in the case in April 2014 with mediator Jeff Ross, but the parties made no significant progress.

10. Two years later, the parties launched mediation efforts again ahead of their class trial, scheduled for June 2016, with a second mediator, Mark Rudy. The parties met with Mr. Rudy on March 10, 2016, April 1, 2016, and April 8, 2016, and thereafter, Plaintiffs filed their Motion for Preliminary approval on April 21, 2016, which provided for up to $100 million ($84 million if the company did not go public and meet certain contingencies related to its IPO) to settle the misclassification-related wage claims of all drivers in California and Massachusetts, as well as PAGA claims brought against Uber on behalf of the state of California.

11. The proposed 2016 agreement would have paid $100 million (or $84 million if Uber had not gone public and met certain contingencies related to its IPO) and would have covered approximately 385,000 drivers.

12. After extensive briefing of the fairness and adequacy of the proposed 2016 settlement over the course of several months, the Court eventually denied preliminary approval. In doing so, the Court noted that it "would be inclined, after weighing the Hanlon factors, to find the consideration afforded by the settlement to be adequate for release of the *non-PAGA* claims." O'Connor, 201 F. Supp. 3d at 1132 (emphasis added). However, the Court objected to settling the PAGA claims against Uber for a proposed sum of $1 million. Id. at 1133. Indeed, even after I offered to raise that sum to $11 million through a reduction in the proposed attorneys' fees, the Court opined that this sum would still be inadequate to settle PAGA claims theoretically worth $1 billion. Id. at 1135, n. 21. Those claims were later settled in another case for $7.75 million in Price v. Uber Technologies, Inc., Case No. BC554512 (Los Angeles Superior Court). On behalf of the plaintiffs in this case, I vociferously objected to that settlement, but the settlement was approved over our objection.

13.     After this Court denied approval of the 2016 settlement, Plaintiffs sought to continue to litigate the case, but the Court chose to stay the entire O'Connor case until the Ninth Circuit could rule on the pending appeals in this case, including an appeal from the Court's class certification order.

14.     Meanwhile, the Yucesoy case also remained stayed as a result of the various appeals pending at the Ninth Circuit Court of Appeals.  See Ninth Cir. Appeal No. 15-17422, 15-17534, 16-15001.  However, in March 2018, the Court lifted the stay and ordered that the case could resume on behalf of individuals who were not bound to arbitrate, reasoning that the Ninth Circuit's forthcoming ruling on the O'Connor class certification orders could only address the arbitration clause or the Borello factors (which are not relevant under Massachusetts law).  To that end, the Court allowed Plaintiffs to file a Fifth Amended Complaint for the purpose of adding additional named plaintiffs who opted out of the arbitration clause and ordered the parties to confer regarding outstanding discovery needed for a renewed and updated motion for class certification.  Plaintiffs filed a Fifth Amended Complaint, adding two additional named plaintiffs in March 2018, and we prepared a response to Uber's latest Motion to Compel arbitration and strike class allegations.[1]

15.     The Ninth Circuit eventually issued its long-anticipated ruling in September 2018.  In its decision, the Ninth Circuit panel reversed this Court's finding that Uber's arbitration clause was unenforceable.  It also reversed the Court's class certification orders on this basis, holding that the class could not include any drivers who were bound to individually arbitrate.  O'Connor v. Uber Technologies, Inc., 904 F.3d 1087, 1094-95 (9th Cir. 2018).  Under this ruling, Plaintiffs' certified class of 240,000 drivers would now be limited at most to only those approximately 11,000 California drivers who are not covered by arbitration clauses.  According to data I have obtained from Uber, of these approximately 11,000 California drivers

---

[1]     However, before we filed this response, the parties reached this proposed settlement.

not bound by an arbitration clause, 7,556 drivers last drove for Uber before it implemented the arbitration clause, and 2,788 drivers opted out of the arbitration clause. Uber has no record of an additional 646 California drivers having accepted the arbitration clause.

16.     Similarly, according to Uber's records, among the approximately 2,600 Massachusetts drivers not bound by an arbitration clause, 1,905 drove for Uber before it implemented the arbitration clause, approximately 368 opted out, and Uber has no record of another 303 drivers having accepted the arbitration clause.

17.     While the Supreme Court was considering Epic Systems Corp. v. Lewis, 138 S. Ct. 1612 (2018), the parties resumed their settlement negotiations.

18.     I met with Uber's representatives in person on May 3, July 26, and September 7, 2018, and engaged in extensive and hard-fought negotiations over this case, assisted by mediators Mark S. Rudy and Francis J. ("Tripper") Ortman, III. These negotiations continued into the fall of 2018 with the assistance of the mediators. The parties ultimately agreed to settle the claims of drivers not bound to arbitrate in California and Massachusetts (approximately 13,600 drivers in total) for a non-reversionary payment of $20,000,000, along with certain non-monetary relief.

### The Proposed Settlement

19.     Under the terms of the proposed settlement, the parties have agreed to settle the claims of drivers not bound to arbitrate in Massachusetts and California (approximately 13,600 drivers in total) for a non-reversionary payment of $20,000,000, along with certain non-monetary relief, in exchange for a release of certain claims through February 28, 2019.

20.     Assuming a 50% claim rate, the average net settlement share per claiming class member (after deduction of attorneys' fees) in this settlement would be $2,206.

21.     This average settlement share per driver in this settlement is approximately 6 times higher than the average anticipated share in the 2016 agreement, which at a 50% claims

rate was $390, assuming Uber had gone public and met the contingency for a $100 million settlement (or $327 had Uber not met this contingency)[2] but, of course, for far fewer drivers.[3]

22.     However, given the fact that the vast majority of drivers have driven for a very short time (often only trying it out for a handful of trips, or just a few days or weeks), and only a very small percentage of drivers have continued to drive for any extended length of time or a significant number of miles, the average settlement share per class member is not (and was not) a particularly informative statistic. For drivers who drove in the highest category of miles (25,000 or more), the 2016 settlement was expected to pay them on average approximately $3,164. Under this settlement, drivers in the highest category of miles are expected to be paid more than double of this amount.[4]

---

[2]     These average estimated shares are based upon my expectation that approximately half of the settlement fund will be claimed by settlement class members; because the settlement is non-reversionary, unclaimed amounts will be distributed to class members who submit claims. In other settlements I have negotiated and administered involving misclassification claims against "gig economy" companies, using a similar claim process, the claim rate has typically been approximately 50%. These settlements have all utilized multiple reminders to class members who have not claimed, which is also included in this settlement. I expect that the drivers included in this settlement who opted out of arbitration will likely claim at a much higher rate than the drivers who last drove for Uber prior to when Uber implemented its arbitration agreement (as the latter group, who have not driven for Uber since 2014 or earlier, may be harder to locate, since many drivers will have moved, their addresses changed, etc., although the settlement does provide for efforts to locate current contact information for class members).

[3]     In the 2016 proposed agreement, the average share per class member was lowered significantly because it included class members who faced the risk of arbitration clauses, as well as class members who had been excluded from the class in the Court's class certification rulings. For the California drivers who had opted out of arbitration and who had not been excluded from the Court's certification orders, the average share they would have likely received from the 2016 settlement was higher – approximately $961 net (and $1,281 gross, before deduction of attorneys' fees).

[4]     For drivers who drove 0-1,000 miles, they may receive over $180. For drivers who drove 10,000 miles, they may receive almost $2,000. For drivers who drove 100,000 miles, they may receive more than $18,000. These estimates assume a 100% claim rate. Thus the

23.     I anticipate a claim rate of approximately 50% based on my experience in other similar settlements.  These settlements include other cases which used a similar notice and distribution process to that included here: <u>Cotter v. Lyft</u>, 3:13-cv-04065-VC (N.D. Cal.) (claim rate of 64%); <u>Singer v. Postmates</u>, 4:15-cv-01284-JSW (N.D. Cal.) (claim rate of 48%); and <u>Marciano v. DoorDash</u>, CGC-15-548102 (Cal. Sup. Ct.) (claim rate of 46%).  I believe that these cases provide a useful proxy for this case because they also involved so-called "gig economy" companies that utilize a similar business model to Uber, and the settlement class is made up of workers who fit a similar profile.  These cases utilized a similar notice and claims process, allowing workers to submit claims via an online portal or by paper.  One factor that may somewhat decrease the claim rates in this case is that those drivers who only drove using the Uber app prior to the arbitration clause have not driven for Uber for many years, and these drivers may be more difficult to locate or less engaged with the litigation.  However, I will work closely with the Settlement Administrator to ensure appropriate and repeated reminders are sent to ensure that as many class members as possible may be located and encouraged to submit claims.

24.     Projected administration costs for the settlement total $146,000.  I obtained proposals from two prospective administrators (using the same methods of notice and claims payment).  The first, Epiq (formerly known as Garden City Group) agreed to a cap on settlement expenses of $146,000 (assuming that the expectations regarding the settlement administration do not change), which I believe is reasonable.  The second prospective administrator provided a quote of less than this amount; however, I believe that the second administrator greatly underestimated the work that will be required to administer this

actual average shares drivers will receive may be higher.  For example, if there is a 50% claim rate, these estimates would double for drivers who submit claims.

settlement, and so I do not believe the estimate was an accurate estimate. I have worked extensively with Epiq's staff, at their predecessor firm, Garden City Group. Garden City Group administered several other large settlements that my firm achieved in other so-called "gig economy" cases over the last several years (including settlements with Lyft, Postmates, and DoorDash). Having worked with me on similar settlements in the past, their staff are very familiar with the notice and claim process that is included in this settlement, and I believe they were better able (and more realistically able) to predict the amount of work that would be involved in this settlement administration. With a settlement of this size and complexity, I believe it is important to use an administrator whom I have worked with in the past and trust will undertake their role with care and diligence and will not take shortcuts to save on costs. Garden City Group previously managed the class notice process in this case. Given our firm's familiarity working with their staff, and vice versa, I believe using Epiq will make the settlement process smoother than using an administrator with whom I have not had such a longstanding and good working relationship. This administrator is familiar with the types of issues that have arisen in these settlements with other "gig economy" companies. Their staff have been committed to diligent follow-up with class members as I have requested and with providing good customer service and keeping me well informed regarding the settlement claims and distribution process. The costs of administration will be paid from the settlement.

25. The settlement will use a claim process for settlement class members. As with the prior proposed settlement in 2016, I believe that this is an appropriate method to distribute funds from this settlement. Indeed, our firm typically uses a claim process for settlement distributions. It will be extremely simple for settlement class members to submit claims, either through an online portal or through a paper claim form. In order to submit a claim, settlement class members will only need to provide their name and their mailing address to which they want their settlement check mailed. My experience working with class members in cases such as this one, particularly "gig economy" workers, is that they move very frequently. Based on

my experience, claims process are much better for ensuring that class members receive their payment because this process ensures that an up-to-date mailing address is used for settlement checks. Because the settlement process involves a lot of follow-up to find class members, this process will likely allow more payments to reach class members than if checks were to be simply mailed, without requiring a claim form. In my experience, sending checks without a claim form has resulted in extremely messy distribution processes because the checks often do not reach their intended recipients, they are often cashed by current residents of class members' former addresses, and it is difficult to track down and rectify the issue of checks being delivered to old addresses and cashed by non-class members. Further, this process has also resulted in 1099 tax forms sent to the IRS for class members who never actually received their checks. In one settlement I negotiated a number of years ago in which I agreed to allow checks to be sent without a claim form, I and the administrator spent years dealing with the issue of upset class members contacting us about notifications they had received from the IRS for unreported payments that they had never received.

26.     Further, this settlement will be paid by checks mailed to settlement class members, rather than direct deposit of funds to class members' bank accounts. Although the 2016 proposed settlement proposed to utilize the direct deposit method, I do not think that method is appropriate here. I have used the direct deposit method in other "gig economy" settlements, and it has not resulted in a greater success rate for transmitting payments to class members than paper checks, nor has it resulted in cost savings. Even when class members have been asked to provide their direct deposit information, there have been frequent inaccuracies with the transmittal of that information, resulting in the administrator having to reverse numerous direct deposit payments, communicate extensively with class members and banks, etc. In consultation with the administrator, I concluded that it would be most efficient and economical to simply use paper checks for this settlement distribution. Moreover, because this settlement involves a much smaller class than the proposed 2016 settlement, the cost of

postage for settlement checks is much lower here than it would have been for the 2016 settlement.

27.     Under the terms of the proposed Settlement, my firm will seek attorneys' fees totaling twenty-five (25%) of the Settlement Fund or $5,000,000. The chart below demonstrates a summary of hours worked on these cases and it shows that based on a projected lodestar analysis, the fees incurred on these cases actually exceed this requested fee award. Thus, Plaintiffs are not requesting a multiplier, and the lodestar analysis further underscores the reasonableness of the requested fee award:

| Attorney | Hours | Rate | Fees |
|---|---|---|---|
| Shannon Liss-Riordan | 4,500 | $850 | $3,825,000 |
| Adelaide Pagano | 1,640 | $350 | $ 574,000 |
| Anne Kramer | 380 | $300 | $ 114,000 |
| Ben Weber | 223 | $450 | $ 100,350 |
| Sara Smolik | 36 | $450 | $  16,200 |
| Olena Savytska | 55 | $300 | $  16,500 |
| Matthew Carlson | 215 | $450 | $  96,750 |
| Michael Freedman | 57 | $450 | $  25,650 |
| Monique Olivier | 29 | $700 | $  20,300 |
| Paralegal Staff | 5,000 | $225 | $1,125,000 |
| **TOTAL:** | | | **$ 5,913,750** |

28.     Plaintiffs are also requesting incentive payments for the named plaintiffs in this case. These include enhancements of $7,500 for the named plaintiffs who have been involved in the case for a number of years and have participated actively (Elie Gurfinkel and Matthew Manahan in the O'Connor case and Mokhtar Talha and Pedro Sanchez in the Yucesoy case) and lesser enhancements of $5,000 for two Massachusetts named plaintiffs who were recently added to the case (Aaron Dulles and Antonio Oliveira). Their contributions to this litigation will be detailed further in Plaintiffs' forthcoming Motion for Attorneys' Fees, but I will summarize their hard work briefly here. Plaintiffs Manahan and Gurfinkel both sat for

deposition and responded to multiple rounds of voluminous discovery requests in this case and were prepared to testify at trial in 2016. They have been in close contact with my firm about this case for years. Likewise, Plaintiffs Talha and Sanchez provided documents and information to my firm as part of our ongoing investigation of the claims in the <u>Yucesoy</u> case. These plaintiffs have stuck with these cases for many years, through periods of intense litigation as well as appeals and stays. They have acted as a resource to their fellow drivers and have been willing to put their names in the public eye as part of this high-profile litigation. Plaintiffs Dulles and Oliveira have likewise joined this case and worked with counsel to help oppose Uber's most recent attempt to compel arbitration and strike class allegations in the case. For all these reasons, I believe these requested incentive payments are fair and reasonable.

## Assessment of the Risks of Further Litigation

29.     In particular, in negotiating the settlement, I considered several key factors: (1) the effect of the <u>Epic Systems</u> decision and the Ninth Circuit's ruling decertifying the class in this matter; (2) the effect of the California Supreme Court's decision in <u>Dynamex Operations W. v. Superior Court</u>, 4 Cal. 5th 903, 416 P.3d 1 (2018), <u>reh'g denied</u> (June 20, 2018), which adopted a more stringent "ABC" test for misclassification, the scope of which is still uncertain; and (3) the risks and delays attendant to continued litigation, including an eventual potential jury trial and nearly certain appeals.

30.     First, with respect to the <u>Epic Systems</u> decision and the Ninth Circuit's rulings in this case, these decisions effectively eviscerated the previously certified class in this case by reducing it from hundreds of thousands of drivers to a maximum potential of 11,000 drivers in California and 2,600 in Massachusetts.

31.     Second, with respect to the California Supreme Court's recent decision in <u>Dynamex</u>, I believe that this decision poses a serious risk to Uber because it makes the standard for employment misclassification stricter and very difficult for Uber to justify

classifying the drivers as independent contractors. I have considerable experience litigating under the "ABC" test for employment status in Massachusetts, which California adopted in the Dynamex decision. Thus, I believe that this decision represents a boon to workers. However, considerable uncertainty remains regarding the precise scope of the Dynamex decision, including whether it should apply retroactively to claims arising before April 2018 and whether it applies to the principal claim in this case, expense reimbursement. Compare Johnson v. VCG-IS, LLC, et al., Case No. 30-2015-00802813, Ruling on Motion in Limine (Orange County Super. Ct. July 18, 2018) (finding expense reimbursement claims under § 2802 covered by the Dynamex decision), with Garcia v. Border Transportation Group, LLC, 28 Cal. App. 5th 558 (2018) (assuming that § 2802 claims are not covered by the "ABC" test even though there was no § 2802 claim at issue in that case); Karl v. Zimmer Biomet Holdings Inc., 2018 WL 5809428 *3 (N.D. Cal. Nov. 6, 2018) (finding plaintiff's claim for expense reimbursement did not arise under the Wage Orders and therefore Dynamex did not apply).

32.     Third, I considered the risk associated with prevailing on the merits before a jury, if the case were ultimately to be sent to a jury. As this Court acknowledged in its previous Preliminary Approval Order, these risks are substantial:

> …Plaintiffs face risks on the merits of the case. The fundamental question of whether Uber drivers are employees or independent contractors is not a simple one. As this Court held in denying Uber's motions for summary judgment, there are factors under the *Borello* analysis that support each side's position. While the Court found that drivers performed a service for Uber and were therefore presumptively employees, it found that questions of fact existed as to the primary *Borello* inquiry of Uber's control over the drivers. … As a result, should the issue of employee versus independent contractor status proceed to trial, it would be up to the jury to make the ultimate determination, the outcome of which cannot be predicted with any certainty.

O'Connor v. Uber Technologies, Inc., 201 F. Supp. 3d 1110, 1123–24 (N.D. Cal. 2016).

33.     Moreover, I have adamantly maintained that the employment status question is a legal question for the Court to decide. The Court, however, rejected this argument, with

respect to the <u>Borello</u> test, and so if the Court held that the multi-factor <u>Borello</u> would still apply to any aspect of this case, there are great risks for the plaintiffs in this case going to a jury. The multi-factor <u>Borello</u> test is complicated, and a decision by a jury risks that the jurors would rely on their own lay understanding of what constitutes an employee or an independent contractor. I am also concerned that a jury would give undue weight to the fact that drivers value their flexibility (something that Uber made clear it intended to impress upon the jury even though I contend it is not relevant) and would likewise give undue weight to the fact that the parties' contract states that drivers are independent contractors. Even with proper jury instructions, there can be no avoiding the risk of jurors imposing their own beliefs and understanding regarding this question.

34. Finally, in light of the decertification of the class and the <u>Dynamex</u> decision, it is clear that if the parties were to continue this litigation, considerable briefing about the scope of <u>Dynamex</u> and a renewed class certification motion would be required. This extensive briefing would likely take months or even years (particularly given that Uber would likely attempt to file another Rule 23(f) appeal, should a revised class now be certified). Thus, I also took into account the value of a swift recovery at this time for the settlement class (which has already been waiting more than five years and a half since this case began) in view of the fact that litigating this case to a judgment, and then appeal, would almost certainly take several more years at least.

### Information Used to Assess the Fairness of This Settlement

35. I believe this settlement is fair, reasonable, and adequate based on the factors enumerated in Rule 23(e) and falls within the range of likely approval, and the Court should grant the settlement preliminary approval.

36. The parties have exchanged extensive information necessary to make an informed evaluation of the case, including detailed damages discovery, which has been

updated and augmented since our previous mediation sessions. In particular, I have received information regarding which drivers are not covered by arbitration clauses and their mileage and fares, from which I have been able to derive estimates of their damages for the expense reimbursement and gratuities claims in this case.

37.     Paragraphs 38 to 75 below set forth Plaintiffs' analysis, based upon my review of extensive confidential data provided by Uber of the potential value of each claim asserted in this case, as well as some of Plaintiffs' considerations regarding the likelihood of establishing liability on these claims, were Plaintiffs to prevail on the threshold issue of whether Uber misclassified its drivers as independent contractors.

**Failure to Reimburse for Necessary Work-Related Expenses (Cal. Lab. Code § 2802 and Mass. Gen. L. c. 149 § 148)**

38.     Cal. Lab. Code § 2802 requires an employer to indemnify its employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties.

39.     If Plaintiffs were to prevail on the misclassification issue at trial, I believe drivers' expenditures for their vehicles and cellular phone data plans were necessary business expenditures.

40.     However, Uber has informed me that it intended to defend the Cal. Labor Code § 2802 claim on the merits at trial by asserting, among other arguments, that Uber has, in fact, satisfied Section 2802 by structuring the fare to be an all-inclusive fare that takes into account things like expenses, see Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 558–59 (2007) ("[A]n employer may satisfy its statutory reimbursement obligation by paying employees enhanced compensation in the form of increases in base salary or increases in commission rates . . . ."). Although I disagree with this argument, because Uber did not expressly indicate that it was reimbursing for expenses, it is conceivable that this argument may gain traction with a jury, thus precluding recovery under § 2802.

41.     Based on data that Uber produced showing the number of miles that Plaintiffs drove in California while transporting riders, and applying the IRS fixed reimbursement rates that have been in effect each year during this period, I calculated Plaintiffs' claim for unreimbursed vehicle expenses in California to be worth approximately $39.8 million for the California drivers.

42.     However, Uber has vigorously contested this calculation and made clear that it intended to argue at trial that Plaintiffs' use of the fixed IRS reimbursement rate did not provide a proper or accurate estimate of drivers' expenses and that instead the IRS "variable rate" should be used instead.[5]

43.     The variable rate for mileage reimbursement (favored by Uber) varied from 16.5 to 24 cents per mile during the applicable timeframe, whereas the fixed and variable rate for mileage reimbursement (favored by Plaintiffs) varied from 50 to 58 cents per mile during the applicable timeframe.  Thus, using the higher IRS reimbursement rate, we calculated the

---

[5] The costs of owning and operating a vehicle fall into two categories: fixed and variable. Fixed expenses are those that do not vary over time from month to month, including depreciation and insurance, whereas variable expenses are costs that fluctuate month to month, such as the costs of gas, maintenance, and tires.  Plaintiffs' use of the IRS fixed rates (which are actually called the IRS "Fixed and Variable Rates", but I refer to them here as the "fixed rates" for convenience) would compensate drivers for both types of costs, but Uber intended to argue at trial (had Plaintiffs succeeded on liability) that only variable costs attributable to driving for Uber should be used because drivers would have incurred the fixed expenses even if they did not use their cars for Uber.  In other words, a driver using his own car would have had to pay for insurance and depreciation whether or not he drove for Uber, whereas variable costs like gas and wear and tear are more directly attributable to driving for Uber.

Plaintiffs would have disputed Uber's reasoning because drivers cannot perform their job without a car, and Uber requires them to have cars of a certain make and model and to have insurance, meaning that they cannot do the job without having to pay these fixed expenses. Furthermore, many drivers do upgrade their cars or even buy a brand new car in order to meet Uber's standards, so Plaintiffs do not agree that all drivers were paying only these fixed costs regardless.  However, although Plaintiffs would have vigorously disputed Uber's argument, they recognize that there was a serious risk that Uber's argument could gain traction with the jury, and that if the variable rate were applied, the expense reimbursement claim would be worth far less than Plaintiffs had estimated.

mileage reimbursement claim for the O'Connor certified class to be worth approximately $39.8 million. If the lower rate were used (which Uber believed was more appropriate), this damages figure would be significantly lower.

44. The settlement also includes drivers in Massachusetts who are not bound by arbitration clauses. Plaintiffs estimated that expense reimbursement claim for Massachusetts drivers at $4.1 million. Using the lower IRS rate that Uber believed would be more appropriate, the damages would be significantly lower.

45. Because there is not an express expense reimbursement statute in Massachusetts analogous to Cal. Labor Code § 2802, Plaintiffs' recovery for expenses in Massachusetts is less certain. See Schwann v. FedEx Ground Package Sys., Inc., 2014 WL 496882, *3 (D. Mass. Feb. 7, 2014) (in Massachusetts, "the question of whether business expenses and deductions borne by employees are recoverable under the Wage Act is unsettled under state law.") (certifying this question to the Massachusetts Supreme Judicial Court but not deciding the issue because certification was withdrawn). Thus, Plaintiffs have used the "single damages" number to calculate the exposure for Massachusetts drivers (rather than the treble damages figure) in order to account for this increased risk and uncertainty.

46. With respect to expense reimbursement for telephones, I received data from Uber, showing that drivers who leased their phones directly from Uber in California for the years 2013 through 2016 were charged a total of $13.8 million for their phones. We used this data to estimate the total phone expenses for California drivers who did not lease their phones from Uber by analyzing the data for drivers who leased their phones from Uber to generate an average monthly phone leasing cost during the class period and applying that to all the other drivers. We then applied that amount to the approximate total number of months worked by the O'Connor class at the time (by taking the start date and end date of each driver and assuming work for Uber during the intervening months). We then multiplied the average monthly phone charges by the total months worked by the class to arrive at an approximation

of total telephone expenses for the class. Using the same methodology, I was able to estimate that telephone expense damages for this class of drivers who are not bound by the arbitration clause, through December 2018, is worth $3 million for California drivers and $556,710 for Massachusetts drivers.

**Unlawful Taking of Gratuities (Cal. Lab. Code § 351; Cal. Bus. & Prof. Code § 17200 and Mass. Gen. L. c. 149 § 152A)**

47. Cal. Lab. Code § 351 prohibits employers from taking any part of a gratuity given to its employees. Section 351 does not provide for a private cause of action; however, a violation thereof can be brought as a claim under Cal. Bus. & Prof. Code § 17200, *et seq.*

48. Plaintiffs have argued that, if they were to prevail on the misclassification issue, and prevailed on the claim that Uber has charged passengers a gratuity but without passing it on in full to the drivers, then the jury would be asked to determine what amount of the fare constituted a gratuity. I made calculations based on a conclusion that the jury may have found that Uber included a 20% tip in the fare (a figure which Uber stated on some occasions in communications with customers, see Dkt. 485-3 at 9, 20, 52). In other words, under this theory, if a driver had a $10 fare, Uber should have set aside 20% of the fare ($2) to be remitted exclusively to the driver as a tip. Uber should then have taken its commission (of, for example, 20%) out of the remaining $8. Uber would then receive a commission of $1.60. Instead, Uber took its commission out of the entire $10 fare and thus received $2. Thus, Uber would owe the driver the 40 cent difference (which equals 20% of Uber's commission).

49. Uber added a tipping function to the Application in July 2017 (and thereafter no longer claimed that a tip was already included in the fare), and therefore this claim only runs through July 2017.

50. Based on this theory and data produced by Uber (showing the total amount of fares for California drivers who are not bound by an arbitration clause), I calculated the total potential value of this claim to be approximately $5.6 million.

51.     Using the same logic, based on data produced by Uber providing the total amount of fares in Massachusetts, the total value of the analogous claim in for Massachusetts drivers under Mass. Gen. L. c. 149 § 152A is approximately $902,729.

52.     Plaintiffs recognize the risks in proving this claim, including the risk that the jury could find that Uber's communications that "tip is included" in Uber's fare were too variable or not widespread enough to warrant a finding that a tip was actually included given conflicting messages that Uber has disseminated regarding whether a tip is included in the fare (as well as the current message that allows passengers to leave voluntary tips).  In addition, in order to succeed on this claim, Plaintiffs would have to prove employee status for the drivers.  And, even if Plaintiffs succeeded on the claim, the jury could conclude that a lesser amount of tip than 20% was included (such as 15% or 18%).  For example, Uber was prepared to argue that, even if Plaintiffs succeeded on this claim, its research demonstrates that 16% is a more usual tip left for taxicab drivers and, if liability were established, damages could not exceed that amount.

53.     The claims described above are the statutory claims that Plaintiffs have been pursuing in these lawsuits.  For settlement purposes, Plaintiffs have also agreed to a release of additional employment misclassification and wage-and-hour claims that have been brought against Uber in California and Massachusetts, in order to effectuate the final resolution of all employment-misclassification and wage-and-hour disputes in these states.  However, for the reasons discussed below, Plaintiffs did not value these claims as posing significant risk to Uber and thus contributing any appreciable increase in likely damages that drivers may have been able to obtain.  In assessing the prior proposed settlement, this Court generally agreed with Plaintiffs' valuation of these claims, noting that "the Court agrees with Plaintiffs that there were substantial risks as to the breaks claims, minimum wage and overtime claims, and workers' compensation claims, and it was therefore reasonable for Plaintiffs' counsel to assign no or little value to these claims when considering the overall full-verdict value." O'Connor,

201 F. Supp. 3d at 1128.

**Failure to Pay Overtime Wages (Cal. Lab. Code §§ 510, 1198, 1194) and Fair Labor Standards Act (29 U.S.C. §207(a)(1))**

54.     Plaintiffs also ascribed some value to the overtime claims released by drivers as part of the settlement, though they believe that value is minimal for the reasons explained below.  Cal. Lab. Code § 1198 and Wage Order 9 require employers to pay their employees at their overtime rate of pay for hours worked in excess of eight per day and/or 40 per week. Cal. Lab. Code § 1194 permits an employee receiving less than his or her overtime wages to recover the unpaid balance of such wages in a civil action.  Likewise, the Fair Labor Standards Act requires that an employer pay time-and-a-half an employee's regular rate of pay for all hours worked beyond forty in a workweek.  See 29 U.S.C. §207(a)(1).

55.     The Court already dismissed Plaintiffs' overtime claims in the Yucesoy case, see Civ. A. No. 3:15-00262-EMC, Dkt. 194 at 9-10 (after several attempts at amendment), and dismissed similar overtime claims under the FLSA in the Del Rio case, see Civ. A. No. 3:15-cv-03667-EMC Dkt. 84 at 4.  The Court rejected this claim based upon the difficulty in proving what time would be compensable (on a classwide basis).  FLSA claims brought on behalf of drivers using the Uber app have not been successful in Razak v. Uber Technologies, Inc., 2018 WL 1744467, at *1 (E.D. Pa. Apr. 11, 2018), appeal pending Third Cir. Appeal No. 18-1944.  Moreover, it is not certain whether the Court would certify a claim for only those drivers who worked these hours.

56.     However, if the Court did certify this claim, and if Plaintiffs were to prevail on the misclassification issue, I have extrapolated our prior calculations from the earlier proposed settlement to estimate that the value of this claim would be less than approximately $200,000 for California drivers and $32,000 for Massachusetts drivers (given that this Court previously questioned whether time not spent transporting passengers could count as compensable time).

**Failure to Pay Minimum Wages (Cal. Lab. Code §§ 1182.12, 1194, 1194.2, 1197, 1197.1) and FLSA (29 U.S.C. § 201, *et seq.*)**

57.     Cal. Lab. Code § 1194 permits an employee receiving less than the legal minimum wages (currently $12.00 per hour under California law) to recover the unpaid balance of minimum wage in a civil action. Section 1194.2 further provides for an award of liquidated damages in a minimum wage action unless an employer can show that the violation was in good faith and that it had reasonable grounds for believing it was not subject to minimum wage requirements. Likewise, the federal Fair Labor Standards Act requires that employers pay at least the federal minimum wage of $7.25 per hour for all hours worked. See 29 U.S.C. § 201, *et seq.*

58.     As with the overtime claims, this Court dismissed Plaintiffs' minimum wage claim in the Yucesoy case, Civ. A. No. 3:15-00262-EMC, Dkt. 194 at 9-10 (after several attempts to amend), and dismissed similar minimum wage claims under the FLSA in the Del Rio case, see Civ. A. No. 3:15-cv-03667-EMC Dkt. 84 at 4. Furthermore, I believe that Plaintiffs faced a significant hurdle in resolving this claim on a class-wide basis, as discovery has not revealed that Uber has had a uniform policy or practice that would support a finding of liability (or no liability) on this claim for all drivers and may well have required individualized analysis. Given the Court's skepticism of this claim in the Yucesoy case, and the hurdles to its certification, I believe it would have been very difficult to achieve recovery on this claim for the plaintiff class.

59.     This court generally agreed with this assessment when considering the parties' previous proposed settlement. The Court noted:

> [W]ith respect to minimum wage and overtime, the primary question appears to be whether drivers would be entitled to compensation for time spent waiting to perform a task. *See* Docket No. 724 at 11. This Court previously dismissed with prejudice the minimum wage and overtime claims in *Yucesoy*, finding that Plaintiffs had failed to plead specific facts to support their claim that waiting time should be compensable. *Yucesoy*, Docket No. 194 at 10-11. For example, there Plaintiffs did not explain how

often ride requests came in, how many requests they had to accept, and the magnitude of the risk of deactivation if requests were not accepted. … While the Court does not conclude that drivers could not prevail on this claim were sufficient allegations pleaded and evidence presented, there are significant risks.

O'Connor, 201 F. Supp. 3d at 1125.  Moreover, over time, Uber has appeared to relax its requirements regarding how many rides drivers must accept before suffering consequences. Moreover, even if Plaintiffs were able to make allegations regarding frequent ride requests and the consequences of failing to accept these requests, these facts would likely vary by driver depending on the particular location, time, and day, meaning that these claims could be difficult to certify on a class-wide basis.  Thus, for the reasons set forth above and by the Court in its previous preliminary approval order, I believe there would be a substantial risk of no recovery on this claim.

**Failure to Pay Wages When Due (Cal. Lab. Code §§ 201-203, 204, 210)**

60.     Cal. Lab. Code §§ 201 and 202 require employers to page wages earned and unpaid within a certain time frame if an employee quits (within 72 hours) or is discharged (immediately).  Cal. Lab. Code § 203 provides for "waiting time" penalties assessed only when such failure to pay wages when due is "willful," and a finding of willfulness is precluded when there is a "good faith dispute" as to whether a plaintiff is subject to the Labor Code provisions at all, *i.e.* when there is a good faith dispute as to whether a plaintiff is in independent contractor rather than an employee.

61.     Wage Order 9 defines "hours worked" as "time during which an employee is subject to the control of an employer, [] includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so."  Cal. Code Regs. tit. 8, § 11090. "California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and have relied upon the same factors employed by the Ninth Circuit when interpreting whether time is compensable under the FLSA.

See Mendiola v. CPS Sec. Sols., Inc., 60 Cal. 4th 833, 840-41 (2015), reh'g denied (Mar. 18, 2015) (quoting list of seven factors from Owens v. Local No. 169, 971 F.2d 347, 351 (9th Cir. 1992)).

62.     Even if Plaintiffs prevail on the misclassification issue, I expect that it would be difficult for Plaintiffs to overcome Uber's good faith defense to liability with respect to this claim (particularly for the period of time before the Dynamex decision was issued), which requires a finding of "willfulness." Given the heated dispute regarding whether drivers are employees or independent contractors, and the lack of any definitive court rulings on this question, I believe it would have been challenging for the drivers to prevail on claims requiring a finding of "willfulness." See, e.g., Dalton, 2011 WL 1045107, *5 (granting summary judgment to defendant on Cal. Lab. Code § 203 claim, which requires a finding of willfulness, on grounds that there was a good faith dispute that plaintiff was an independent contractor); see also O'Connor, 201 F. Supp. 3d at n. 12 (noting that "Cal. Lab. Code § 203 … requires[s] a finding of willfulness").

63.     Furthermore, employees still have to prove that the time at issue was compensable work time in order to recover damages for waiting time – the same inquiry that led the Court to dismiss the minimum wage and overtime claims in Yucesoy. As explained above, the Uber system is based on the concept that the drivers can turn the app on and off whenever they want, and thus, it would appear to be difficult for drivers to prove that they were under Uber's "control" while they were waiting for ride requests. If a driver decided to go somewhere or do something else while waiting for a ride request, the driver could simply turn off the app and suffer no consequences. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Unlawful Deductions (Cal. Labor Code § 221-224, 227)**

64.     Cal. Labor Code §§ 221 and 224 provide that an employer may only lawfully

withhold amounts from an employee's wages when (1) required or empowered to do so by state or federal law; (2) when a deduction is expressly authorized in writing by the employee to cover insurance premiums, benefit plan contributions, or other deductions not amounting to a rebate on the employee's wages; or (3) when a deduction to cover health, welfare or pension contributions is expressly authorized by a wage or collective bargaining agreement.

65. Here, Uber's conduct as alleged herein has violated Cal. Labor Code §221-224 insofar as Uber has, for some drivers for some period of time, deducted the costs of equipment (*i.e.*, telephones). However, because the telephone expenses are part of Plaintiffs' Labor Code § 2802 claim, Plaintiffs do not think that this claim adds any value. Thus, although Plaintiffs added this claim for settlement purposes in an effort to give Uber global peace, Plaintiffs do not believe that this claim has any additional value.

**Failure to Provide Meal Periods and Failure to Authorize and Permit Rest Periods (Cal. Lab. Code §§ 226.7, 512, Wage Order 9**

66. Cal. Lab. Code §§ 226.7, 512 and Wage Order 9 generally require employers to provide all employees with one 30-minute duty-free meal period if such employee works more than five hours in a day. Additionally, § 226.7 and Wage Order 9 generally require employers to provide all employees with one 10-minute duty-free rest period for every four hours worked each day, or major fraction thereof. California courts have held that an employer satisfies its obligation under the meal and rest break laws "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30–minute break, and does not impede or discourage them from doing so." Safeway, Inc. v. Superior Court, 238 Cal. App. 4th 1138, 1148 (2015), review denied (Oct. 21, 2015) (quoting Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012)). The California Supreme Court has acknowledged that "[w]hat will suffice may vary from industry to industry." Brinker, 53 Cal. 4th at 1040.

67. If Plaintiffs were to prevail on the misclassification issue, I believe it would be

very difficult for them to prove that Uber did not meet its obligation to provide meal and rest periods. While drivers might feel pressure to accept ride requests and therefore skip meal and rest periods, given the way that I understand Uber's application works, I believe that Uber will be able to argue that drivers can take breaks whenever they wish, including by not accepting a ride request or by logging out of the Uber App and going "off-line" whenever the driver wishes to take break. For example, when drivers are not logged in to driver mode, they do not receive ride requests, and, therefore, cannot be punished by Uber for declining ride requests or be pressured into missing or cutting short their breaks. I believe that such facts would likely preclude liability for meal and rest period violations.[6] This Court agreed in assessing the previous settlement, noting that:

> [A]s to meal and rest breaks, California courts have found liability for failure to provide such breaks when the employer lacked a policy authorizing and permitting breaks. *E.g.*, *Benton v. Telecon Network Specialists, Inc.*, 220 Cal.App.4th 701, 725–26, 163 Cal.Rptr.3d 415 (2013). But Uber states that it has set up a system in which "drivers log in and out whenever they want, so that there can never be any circumstance in which a driver might feel pressure (even implicitly) not to take a break. In other words, Uber's entire system can be understood to constitute a policy of 'permitting' or 'authorizing' breaks whenever a driver wants." July 15, 2016 Joint Supp. Briefing at 11. There has been little argument that Uber drivers lack the freedom to choose their days and hours of work (although there has been evidence of the control Uber exercises over drivers when they *do* report to work), *see* March 11, 2015 Summary Judgment Ord. at 25, creating a potential risk that a jury would find that Uber had not deprived its drivers of meal and rest breaks.

---

[6]   In this sense, the situation presented by this case differs from a traditional workplace where the default is that an employee is working, except during recognized breaks. In such a workplace, unless an employer "affirmatively authorizes" a break (rather than merely allowing it), an employee may not feel comfortable taking a break whereas with Uber, the whole system is set up so that drivers log in and out whenever they want, so that there can never be any circumstance in which a driver might feel pressure (even implicitly) not to take a break. In other words, Uber's entire system can be understood to constitute a policy of "permitting" or "authorizing" breaks whenever a driver wants. See, e.g., Dkt. 223-6 at 8 ("All you need to go off-duty is press the 'Go Off-Duty' button in the app").

O'Connor, 201 F. Supp. 3d at 1125.  Judge Chhabria likewise agreed that these very same claims had little to no value in granting approval to the settlement in the case against Lyft.  See Cotter v. Lyft, Inc., Civ. A. No. 3:13-cv-04065-VC (N.D. Cal.), Dkt. 246 (approving settlement that valued meal and rest break claims as having no value).  Thus, I believe that my negligible valuation of this claim is appropriate.

**Failure to Keep Accurate Records (Cal. Lab. Code §§ 1174.5, 353)**

68.    Cal. Lab. Code § 1174 requires employers to maintain payroll records pertaining to its employees, and Cal. Lab. Code § 1174.5 provides for penalties for willful failures to maintain such records.  A finding that an employer's failure to comply with § 1174 was in good faith precludes liability for the violation.  Dalton, 2011 WL 1045107, *6 (granting summary judgment on § 1174 claim because of a good faith dispute that employees were independent contractors).

69.    As set forth above, even if Plaintiffs were to prevail on the misclassification issue, I believe it would be difficult for Plaintiffs to show that Uber does not maintain all information required by §1174, and, even if it does not, it would be difficult for Plaintiffs to overcome Uber's good faith defense to liability with respect to this claim.  This Court noted the same thing in its previous Preliminary Approval Order.  O'Connor, 201 F. Supp. 3d at n. 12. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Failure to Furnish Accurate Wage Statements (Cal. Lab. Code § 226)**

70.    I believe that Uber would likely argue that their weekly driver summary emails constitute pay statements that show all information required by § 226(a), except for the information required by § 226(a)(7) (drivers' last four digits of their social security numbers). Thus, I believe Plaintiffs may be able to show a technical violation of § 226(a)(7).

71.     However, to recover under § 226, an employee must also show injury.  Injury exists under § 226 when an employee is not provided with a pay statement at all, § 226(e)(2), or when there is a deficient wage statement *and* an employee cannot promptly and easily determine from the statement alone the information required by § 226(a)(2) (total hours worked), (a)(3) (piece rate units earned, if applicable), (a)(4) (all deductions), (a)(6) (inclusive dates of the pay period), and (a)(9) (all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee).  Courts have determined that this injury generally requires that the employee be unable to "quickly verify earnings when looking at the wage statements." Holak v. K Mart Corp., 2014 WL 4930762, *7 (E.D. Cal. Sept. 30, 2014).

72.     I believe it would have been difficult for Plaintiffs to show injury here, including because Uber likely would argue that its pay statements set forth the information required by §226(a)(2) (statements show hours online), (a)(3) (inapplicable because drivers are not paid on a piecework basis), (a)(4) (Uber did not make any deductions), (a)(6) (statements show dates of the pay period), and (a)(9) (inapplicable because there have not been hourly rates "in effect" for drivers).  Additionally, Uber would likely argue that the weekly statements clearly set forth earnings during each pay period, hours worked and substantial additional information, which allow drivers to "quickly verify earnings when looking at the wage statements."

73.     Moreover, even assuming that Plaintiffs can show injury arising from a violation of §226, such a violation of § 226 is actionable only if it is "knowing and intentional," and therefore courts have permitted employers to assert a good faith defense to the claim at or after trial. Dalton, 2011 WL 1045107, *5 (finding that good faith dispute as to whether plaintiffs were independent contractors exempt from Section 226 precludes a finding that defendant acted "with the requisite scienter" of knowing and intentional); Hurst v. Buczek Enterprises, LLC, 870 F. Supp. 2d 810, 829 (N.D. Cal. 2012) ("when a party makes a good

faith claim that a worker [has been properly classified as exempt], its failure to provide accurate wage statements is not knowing and intentional.") Accordingly, Plaintiffs recognize they would face a challenge in overcoming Uber's defenses to this claim, including that it had a good faith belief that drivers were properly classified and therefore not subject to the requirements of § 226.

74.     Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**One in Seven Day's Rest (Cal. Labor Code §§ 551, 552, and 558)**

75.     Cal. Lab. Code § 551 provides that every person in every occupation is entitled to one day's rest in seven, and Cal. Lab. Code § 552 prohibits employers from requiring an employee to work more than six days out of seven. Here, some drivers worked seven days per week although based on data from Uber it appears that this was true only for a very small minority of drivers. In any case, Plaintiffs believe they would face difficult hurdles in proving this claim on a class-wide basis given that many drivers drove only occasionally and given that it is undisputed that drivers are able to sign on and off the app whenever they wish and can drive as much or as little as they wish. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Requiring Drivers To Agree to Unlawful Terms (Cal. Labor Code § 432.5)**

76.     Cal. Lab. Code § 432.5 makes it unlawful for an employer to require an employee or applicant to agree, in writing, to a term or condition that the employer knows to be prohibited by law. Here, there is an argument Uber required drivers to accept its agreements, which contained numerous illegal provisions. However, Plaintiffs believe that they would face a challenge in overcoming Uber's defenses to this claim, including that it had a good faith belief that the provisions of its agreements were lawful because it had a good faith basis for

believing that its drivers are properly classified as independent contractors. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Failure to Provide Paid Sick Leave (Cal. Labor Code §§ 245-249)**

77.     Cal. Labor Code § 246 provides that an employer must provide any employee who, on or after July 1, 2015, works in California for the same employer for 30 days or more within a year from the start of employment, with paid sick days. If Plaintiffs succeed in proving employee status, then drivers who drove more than 30 days in a calendar year arguably accrued a certain number of paid sick days and were entitled to use these accrued paid sick days for purposes enumerated in Labor Code section 246.5(a)(l)-(2).

78.     However, Plaintiffs likely would face serious challenges in proving liability under section 246 because they must first prove the employees' hourly rate of pay, a figure that the Court might find to be incalculable in the case of drivers who use Uber. <u>See</u> Cal. Labor Code § 246(k). Even if calculable, the Court may conclude that individual issues predominate for purposes of class certification. Moreover, because employees must be employed for at least 90 days before being able to use paid sick leave, a court may conclude that many of the drivers who use Uber infrequently may not be entitled to paid sick leave at all. <u>See</u> Cal. Labor Code § 246(c).

**Failure to Pay Worker's Compensation Insurance (Cal. Labor Code §§ 3700.5, 3712, 3715 Brought Pursuant to Cal. Bus. & Prof. Code § 17200)**

79.     These sections of the Labor Code require employers to provide worker's compensation insurance to employees injured on the job. Cal. Lab. Code § 3700.5 provides that "the failure to secure the payment of compensation as required by this article by one who knew, or because of his or her knowledge or experience should be reasonably expected to have known, of the obligation to secure the payment of compensation" is punishable by fines and imprisonment.

80.     First, I note that the settlement does not release individual workers'
compensation claims or personal injury claims against an employer who failed to carry
workers' compensation insurance. Instead, this release covers claims against Uber for its failure
to obtain workers' compensation insurance in the first instance, which seek to recover the
savings it has achieved by failing to obtain such insurance.  I believe that recovering on such
claims poses challenges.  First, I believe that it is highly questionable whether drivers could
bring such a claim in a private lawsuit as I believe that Uber would argue the claim is
preempted by the exclusivity of the Worker's Compensation Act, Cal. Labor Code §§ 3600,
3602, and that a UCL claim cannot be utilized as a backdoor way to avoid this exclusivity.  See
Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund, 24 Cal. 4th 800, 828 (2001); Hughes
v. Argonaut Ins. Co., 88 Cal. App. 4th 517, 522 (2001) (dismissing claim "on behalf of the
general public, asserting violations of California's unfair competition law (UCL)" where the
underlying challenged conduct was a violation of the Worker's Compensation Act because the
WCAB had "exclusive jurisdiction"); Koszdin v. State Comp. Ins. Fund, 186 Cal. App. 4th
480, 495 (2010).   Second, as this Court previously found, "[t]here is a risk that such a claim
could not be enforced through the UCL, as the California Supreme Court has generally found
that the UCL cannot be used to recover money in which the plaintiff does not have an
ownership interest." O'Connor, 201 F. Supp. 3d at 1126 (citing Korea Supply Co. v. Lockheed
Martin Corp., 29 Cal.4th 1134, 1143–53 (2003)).  There, the Court noted that while the State
has brought similar claims under the UCL, "it is not clear that private individuals could recover
under such a claim, in light of Korea Supply Co." Id.  Accordingly, I believe there would be a
substantial risk of no recovery on this claim.

**Failure to Pay Reporting Time (Wage Order 9)**

81.     Wage Order 9, § 5, requires that for each workday that a California employee is
required to report for work and does report, but is either not put to work or is furnished less

than half of that employee's usual or scheduled day's work, each such employee must be paid an amount equal to half of his or her usual or scheduled day's pay, or in any event must be paid an amount equal to 2 hours at the employee's regular rate of pay. Here, the claim would presumably apply where drivers signed onto the app but received no ride requests and gave no rides. I believe there is a substantial risk of no recovery on this claim because drivers can indisputably work as often as they like and are not required to "report" or sign onto the app at any particular time. Thus, because drivers are arguably never "required" to report for work, I do not ascribe any value to this claim.

### Benefits of the Settlement

82.     The allocation formula distributes the settlement funds among drivers on a proportional basis based on number of miles while on trip, transporting a passenger in the car. Because expense reimbursement is the greatest source of damages by far, this allocation is fair and reasonable. Moreover, the total amount of miles driven is also a good proxy for other sources of damages (such as the tips claim, which is correlated to total fares prior to July 2017) and to overtime because drivers who drove a lot of hours also drove a lot of miles.

83.     The average settlement award is projected to be $2,206 after attorneys' fees are deducted. For those drivers who drove 25,000 miles, the average award is projected to be more than double of this amount (assuming a 50% claim rate).

84.     Further, I believe the non-monetary relief in the settlement provides some meaningful benefit to drivers. In particular, Uber has agreed to make the following modifications: (1) Uber will change its policies such that low acceptance rates will no longer be grounds for account deactivation; (2) Uber will maintain a comprehensive policy online in an easily accessible and easily-understood format and will provide advance warning before a driver's user account is deactivated for reasons other than safety issues, physical altercations, discrimination, fraud, sexual misconduct, harassment, or illegal conduct (excluded matters); (3) Uber will institute a formal appeal process for deactivation decisions for drivers in California

and Massachusetts, except in certain circumstances (*e.g.*, among others, where deactivation relates to or arises from low star ratings, safety issues, criminal activity, physical altercation, sexual misconduct, fraud, discrimination, harassment and background checks); (4) Uber will make quality courses available for drivers whose user accounts are deactivated in California and Massachusetts, except in certain excluded matters set forth above and will work with third-party providers to help lower the cost of these courses for drivers. Completion of one of these courses will make the driver eligible for consideration for reactivation. These modifications will provide some relief to drivers, concerning issues that we have heard from many drivers are a particular concern to them (namely issues surrounding deactivation from Uber).

85. Attached hereto as **Exhibit 1** is a true and correct copy of the parties' proposed Settlement Agreement along with Exhibits A through G thereto.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 11, 2019, in Boston, Massachusetts.


By: ___*/s/ Shannon Liss-Riordan*_____
      Shannon Liss-Riordan