UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, et al., | Case No. 13-cv-03826-EMC |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | Docket No. 915 |
| Defendants. | |
| | |
| HAKAN YUCESOY, et al., | Case No. 15-cv-00262-EMC |
| Plaintiffs, | |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | Docket No. 321 |
| Defendants. | |

Plaintiffs brought two lawsuits against Defendant Uber Technologies, Inc., alleging that Uber misclassifies its drivers as independent contractors rather than employees. *See O'Connor v. Uber Techs., Inc.*, Case No. 13-cv-3826-EMC, Docket No. 330 ¶ 3; *Yucesoy v. Uber Techs., Inc.*, Case No. 15-cv-262-EMC, Docket No. 292 ¶ 2. Five years of contentious litigation ensued. The parties eventually entered into an agreement to settle both suits in March 2019 (the "Settlement Agreement"), and Plaintiffs' motions for preliminary approval are now before the Court. *O'Connor*, Docket No. 915 ("Mot."); *Yucesoy*, Docket No. 321.[1]

For the reasons discussed below, the Court concludes that the Settlement Agreement is fair, adequate, and reasonable, and therefore **GRANTS** the motions for preliminary approval.

---

[1] All subsequent docket citations are to the *O'Connor* docket, unless otherwise indicated.

# I.   BACKGROUND

A.   Procedural History

The Settlement Agreement at issue covers two lawsuits pending before this Court. *O'Connor* was brought in 2013 on behalf of individuals who worked as Uber drivers in California. Docket No. 330 ¶ 1.  The *O'Connor* Plaintiffs allege that Uber misclassified its drivers as independent contractors rather than employees.  Plaintiffs characterize Uber as wielding considerable control and supervision over the methods and means of its drivers' provision of transportation services.  *See id.* ¶ 21.  Uber counters that its drivers cannot be considered employees because it exercises minimal control over how drivers set their own hours and work schedule.  Should Uber drivers be deemed employees, they would be entitled to the protections of the California Labor Code, including section 2802, which requires that employees be reimbursed for expenses such as gas and the use of their vehicles.  *Id.* ¶¶ 3, 23.  Plaintiffs also contend that although Uber advertised to customers that gratuity was included in their fare and that there was no need to tip drivers, drivers did not receive the full proceeds of any such gratuity.  *Id.* ¶¶ 1, 20. By failing to remit the full gratuity to drivers as required by California Labor Code section 351, Uber allegedly violated California's Unfair Competition Law, and Plaintiffs sought to recover the portion of the gratuities that Uber withheld.  *Id.* ¶ 34.  These claims, too, are predicated on drivers being employees rather than independent contractors.

Over the course of fierce litigation, the Court has adjudicated motions to dismiss, for judgment on the pleadings, and for summary judgment, as well as numerous motions regarding class certification and arbitration.  In late 2015, the Court certified a class of 240,000 California Uber drivers to pursue their expense reimbursement and gratuities claims.  *See* Docket No. 342 at 7; 395 at 32.  In so doing, the Court found that Uber's arbitration agreement was invalid as a matter of public policy for including an inseverable waiver of PAGA claims.  *See* Docket No. 395 at 24.  On April 5, 2016, the Ninth Circuit granted Uber's petition for permission to appeal the class certification ruling under Rule 23(f).  Docket No. 512.

Shortly thereafter, the parties announced a proposed settlement.  Docket No. 574.  Under the settlement, Uber would have paid Class Members $84 million, plus an additional $16 million

contingent on the results of an initial public offering for Uber, in exchange for a release from claims with a total verdict value of $854.5 million.  Docket No. 519-6 ("First Proposed Settlement") ¶¶ 58, 125.  Drivers' recoveries were calculated based on the number of miles driven for Uber.  *Id.* ¶¶ 138, 145.  Assuming a 100% claim rate, Plaintiffs' counsel estimated that California certified class members would have received an average distribution of $24 to $1,950, California non-certified class members would have received an average distribution of $10 to $836, and Massachusetts drivers would have received an average distribution of $12 to $979.  Docket No. 748 at 8.  "[T]he vast majority of class members [we]re slated to receive less than $100 each from the settlement."  *Id.*  Uber additionally agreed to implement various forms of non-monetary relief, including a revamped policy for the deactivation of drivers, clarification of Uber's tipping policy, and the creation and funding of a driver association.  First Proposed Settlement ¶ 135.

The Court, after considering extensive briefing and argument, ultimately declined to grant preliminary approval of the proposed settlement.  Docket No. 748 ("Denial Order").  The Court agreed with Plaintiffs' assessment that they faced a substantial risk that the Ninth Circuit would decide that Uber's arbitration agreement was enforceable, which "could well render a settlement providing for monetary relief reflecting a 90% discount off the verdict value along with limited non-monetary relief fair and adequate."  *Id.* at 29.  Accordingly, the Court indicated that it "would be inclined . . . to find the consideration afforded by the settlement to be adequate for release of the non-PAGA claims."  *Id.*  However, the parties' inclusion of a waiver of PAGA claims as part of the settlement, and the settlement of those PAGA claims for only 0.1% of the potential verdict value, led the Court to conclude that the settlement as a whole was not fair, adequate, and reasonable.  *Id.* at 33–34.

In December 2016, the Ninth Circuit in *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) rejected this Court's rationale for finding Uber's arbitration provision unenforceable.  *Mohamed* held that although the PAGA waiver was unenforceable, it was severable, making the remainder of the arbitration agreement enforceable.  *See id.* at 1210–14.  Then, in September 2018, the Ninth Circuit in *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087 (9th Cir. 2018) decertified the

*O'Connor* class, as certification was premised on this Court's determination that Uber's arbitration agreement was unenforceable. *Id.* at 1095–96.

In the meantime, *Yucesoy* was filed in 2015 on behalf of Uber drivers in Massachusetts, who brought similar claims for independent contractor misclassification, violation of the Massachusetts Tips law, tortious interference with contractual and/or advantageous relations, unjust enrichment/quantum meruit, breach of contract, and violation of the Massachusetts minimum wage and overtime law. Like *O'Connor*, *Yucesoy* has been vigorously litigated. The Court ruled on multiple motions to dismiss and motions to compel arbitration. Plaintiffs also filed a motion for partial summary judgment and a motion for class certification, which the Court declined to rule on due to the posture of the case. *Yucesoy*, Docket Nos. 38, 246.

B.     Settlement Agreement

1.     Scope of the Class and Released Claims

The Settlement Agreement currently before the Court covers "all Drivers in California and Massachusetts who have used the Uber App at any time since August 16, 2009, up to and including February 28, 2019, and who have validly opted out of arbitration or for whom Uber has no record of acceptance of an arbitration agreement." Docket No. 926 ("Sett. Agmt.") ¶ 96. Thus, the settlement class does not include drivers who must pursue their claims against Uber in individual arbitration following the Ninth Circuit's rulings in *Mohamed* and *O'Connor*.

Although the *O'Connor* and *Yucesoy* cases were limited to claims based on expense reimbursement and tips, the Settlement Agreement contains an expansive release provision: it requires settlement class members to release "any and all" claims "based on or reasonably related to the claims asserted in" *O'Connor* and *Yucesoy*, including claims for unpaid minimum and overtime wages, interest, and penalties. *Id.* ¶ 98. The Settlement Agreement requires that the Plaintiffs file amended complaints expanding the causes of action to include all claims related to the alleged misclassification of drivers as independent contractors. *See id.*, Exhs. A, B. As a result, the Settlement Agreement covers claims that are brought in at least eight other lawsuits against Uber currently pending in federal and California and Massachusetts state courts,

effectively terminating those suits.[2] *Id.* ¶ 29.

Unlike the First Proposed Settlement, this Settlement Agreement does not include any PAGA claims and would not release any PAGA claims. Mot. at 2 n.2. Nor does the Settlement Agreement purport to resolve the key underlying dispute whether Uber drivers are employees or independent contractors.

### 2. Monetary Relief

In exchange for Class Members' release of their claims, the Settlement provides monetary and non-monetary consideration. The monetary component of the Settlement is a $20 million non-reversionary fund. Sett. Agmt. ¶ 95. From the fund, $5 million will be deducted for attorneys' fees, $146,000 for costs of claims administration, and $40,000 for incentive awards for the settlement class representatives. *Id.* ¶¶ 79, 125, 126. The remainder—an estimated $14,814,000—will be distributed to Class Members who timely submit claims. *Id.* ¶ 130. Claim forms may be submitted by mail or online. *Id.* ¶ 131. Each claimant's share will be calculated in proportion with the number of miles he or she drove for Uber, based on "relevant records that Uber is able to identify following a good-faith inquiry." *Id.* ¶ 135. Assuming a 50% claim rate—which Plaintiffs' counsel represents has been typical in similar settlements—Class Members who drove 0–1,000 miles would receive approximately $360, those who drove 10,000 miles would receive $4,000, and those who drove 100,000 miles would receive $36,000. Docket No. 916 ("Liss-Riordan Decl.") ¶¶ 21 n.2, 22 n.4. The average settlement share for each claiming class member, after attorneys' fees are deducted, would be approximately $2,206. *Id.* ¶ 20. If the claim rate is 100%, these numbers would be halved.

After an initial distribution is made to drivers whose claims are approved by the Settlement

---

[2] These lawsuits include: (1) *Colopy et al. v. Uber Technologies, Inc.*, Case No. CGC-16-54996 (Cal. Super. Ct., San Francisco County); (2) *Del Rio et al. v. Uber Technologies, Inc. et al.*, Case No. 3:15-cv-03667-EMC (N.D. Cal.); (3) *Tabola et al. v. Uber Technologies, Inc. et al.*, Case No. CGC-16-550992 (Cal. Super. Ct., San Francisco County); (4) *Toyserkani, et al. v. Rasier, LLC, et al.*, Case No. BC660915 (Cal. Super. Ct., Los Angeles County); (5) *James, et al. v. Kalanick, et al.*, Case No. BC666055 (Cal. Super. Ct., Los Angeles County); (6) *Hassen, et al. V. Uber Technologies, Inc.*, Case No. BC699261 (Cal. Super. Ct., Los Angeles County); (7) *Manson, et al. v. Uber Technologies, Inc.*, Case No. 37-2018-00014744-CU-OE-CTL (Cal. Super. Ct., San Diego County); and (8) *Abulzahab, et al. v. Uber Technologies, Inc., et al.*, Case No. 1:18-cv-12658-MLW (D. Mass). Sett. Agmt. ¶ 29.

Administrator, a second distribution of uncashed checks will be made to claimants who cashed their checks, in proportion to their on-trip mileage. Sett. Agmt. ¶ 142; Docket No. 927 at 11. Any funds remaining after the second distribution will be distributed to two *cy pres* beneficiaries: Legal Aid at Work, for unclaimed funds in the California settlement pool, and Greater Boston Legal Services, for unclaimed funds in the Massachusetts settlement pool. *Id.*

        3.     Non-Monetary Relief

Uber has agreed to modify its business practices in three ways. First, Uber will maintain a comprehensive, written policy governing the deactivation of drivers' accounts that will be easily accessible online. Sett. Agmt. ¶ 127(a)(ii). Second, the deactivation policy will provide several safeguards to drivers: low passenger acceptance rates will not be grounds for deactivation; Uber will provide advance warning before a driver is deactivated for reasons other than safety issues, physical altercation, discrimination, fraud, sexual misconduct, harassment, or illegal conduct ("excluded matters"); if a driver is deactivated, Uber will provide the driver with an explanation for the deactivation; and Uber will institute a formal appeals process for deactivation decisions. *Id.* ¶¶ 127(a)(i)–(iv), 127(b). Third, except for the excluded matters, drivers whose accounts are deactivated will have the opportunity to take a "quality course" and be "eligible for consideration for reactivation" upon completion of the course. *Id.* ¶ 127(c). It appears that drivers will be required to pay for these courses, although Uber states it "will work with third-party providers to help lower the cost of these courses." *Id.*

These policy modifications "shall expire" upon either two years after Final Approval, or "changes to any applicable statute, regulation, or other law that Uber reasonably believes would require a modification to any of the provisions," whichever is earlier. *Id.* ¶ 128. Thus, the modifications will remain in effect for at most two years.

## II.     **LEGAL STANDARD**

Per Rule 23, a class action may only be settled with court approval. Fed. R. Civ. P. 23(e). Before a court renders approval, it must determine that the settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (citing Fed. R. Civ. P. 23(e)(2)).

6

Amendments to Rule 23 took effect on December 1, 2018. These amendments provide new guidance on the "fair, adequate, and reasonable" standard at the preliminary approval stage. Prior to the amendments, "[t]he standard for reviewing class action settlements at the final approval stage [wa]s well-settled," but the standard applied to preliminary approval was less clear. *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035–36 (N.D. Cal. 2016). Courts in the Ninth Circuit generally interpreted Rule 23 to require a determination of whether the proposed settlement "falls within the range of possible approval" and "has no obvious deficiencies." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079–80 (N.D. Cal. 2007). The new Rule 23 clarifies that preliminary approval should only be granted where the parties have "show[n] that the court *will likely be able to* . . . approve the proposal under [the final approval factors in] Rule 23(e)(2)" and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added). Hence, review for preliminary approval is more robust.

Accordingly, for the purposes of this motion the Court will consider the factors informing final approval, namely, whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

 (i) the costs, risks, and delay of trial and appeal;

 (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

 (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

 (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Moreover, "settlement approval that takes place prior to formal class certification requires

7

a higher standard of fairness." *Id.* This more "exacting review" is designed "to ensure that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027). Because the Settlement Agreement here covers the claims of California drivers in the decertified *O'Connor* class and the Massachusetts drivers who have not been certified in *Yucesoy*, this Court must apply the more "exacting" standard in assessing the fairness of the Settlement. A searching review is especially warranted given that the parties here propose to release *all* claims related to misclassification, including many which have not been brought in this case and have not been subject to class certification.

## III.      DISCUSSION

A.      Certification of Settlement Class

The settlement class here is defined as:

> [A]ll Drivers in California and Massachusetts who have used the Uber App at any time since August 16, 2009, up to and including February 28, 2019, and who have validly opted out of arbitration or for whom Uber has no record of acceptance of an arbitration agreement.

Sett. Agmt. ¶ 96. Typically, when a court is evaluating a pre-certification settlement, its "threshold task is to ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Hanlon*, 150 F.3d at 1019 (citation omitted). If all four Rule 23(a) prerequisites are satisfied, the court must then decide whether the action can be maintained under one of the three subsections of Rule 23(b). *Hanlon*, 150 F.3d at 1022.

That task is complicated by the posture of this case. The Court certified a class in *O'Connor* after finding that all the requirements of Rule 23(a) and 23(b)(3) were met with respect to the California drivers' expense reimbursement and gratuities claims. *See* Docket Nos. 342, 395. The Ninth Circuit subsequently reversed the class certification order, so the case is effectively back at the pre-certification stage. *See O'Connor*, 904 F.3d at 1095. However, the Ninth Circuit

reversed on the rationale that Uber's arbitration provision is enforceable, and therefore that drivers subject to the provision could only pursue their claims in individual arbitration rather than as members of the class. *Id.* at 1093–94. The ruling did not otherwise disturb this Court's findings that the California drivers had established numerosity, commonality, typicality, and adequacy with respect to their expense reimbursement and gratuities claims. *See id.* at 1095 (agreeing with Plaintiffs that "[r]emand for further proceedings is appropriate" for the district court to "consider certification of a class that might be defined differently based on some new analysis," accounting for the enforceability of the arbitration provision).

It remains true that the settlement class, minus the drivers subject to Uber's arbitration provision, meets the numerosity, commonality, and typicality requirements of Rule 23(a). The settlement class now numbers 13,600, which is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). With respect to commonality, "there are numerous legally significant questions in this litigation that will have answers common to each class member that are apt to drive the resolution of the litigation," including most notably "the common legal issue of whether all class members should be classified as employees or independent contractors," as well as "whether Uber ever actually remitted tips to its drivers." Docket No. 342 at 15, 17; *see* Fed. R. Civ. P. 23(a)(2). Typicality is present because "named Plaintiffs' legal claims all arise from essentially the same conduct underlying their fellow class members' claims"—Uber's classification of them as independent contractors instead of employees, alleged failure to remit tips, and refusal to reimburse expenses—which caused Named Plaintiffs and their fellow class members the same legal injury. Docket No. 342 at 20; Fed. R. Civ. P. 23(a)(3).

The Court's determination that Plaintiffs' expense reimbursement and gratuities claims can be resolved on a classwide basis under Rule 23(b) remains valid. As to the misclassification question, "every (or nearly every) consideration under the California common-law test of employment can be adjudicated with common proof on a classwide basis." Docket No. 342 at 56. Indeed, now that the multifactor, totality-of-the-circumstances common-law test for employee status has (at least to some extent) been superseded by the more structured "ABC test" under the California Supreme Court's ruling in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903

9

United States District Court
Northern District of California

1    (2018), the misclassification question is arguably more amenable to classwide resolution.  *See* Part

2    III.B.3.a., *infra* (discussing the import of *Dynamex*).  Nor would the tip and expense

3    reimbursement claims cause individualized issues to predominate over common questions.  *See*

4    Docket No. 342 at 57–58 ("Uber essentially admits that despite making allegedly consistent and

5    uniform representations to customers that a tip was included in all of its fares, Uber never actually

6    . . . remitted any tip amount to drivers."); Docket No. 395 at 28 (Named Plaintiffs are "pursu[ing]

7    expenses that are common to all drivers").  Finally, "Uber does not even contest the superiority

8    element [of Rule 23(b)(3)], and it appears easily satisfied."  Docket No. 342 at 64.

9         However, the Settlement Agreement's broad release of all claims "based on or reasonably

10   related to the claims asserted in" the *O'Connor* and *Yucesoy* actions, Sett. Agmt. ¶ 98, requires the

11   Court to scrutinize the adequacy of Named Plaintiffs' representation of the absent settlement class

12   members.  *See* Fed. R. Civ. P. 23(a)(4) (requiring that "the representative parties [in a class action]

13   will fairly and adequately protect the interests of the class); Fed. R. Civ. P. 23(e)(2)(A) (requiring

14   a court to find that "the class representatives and class counsel have adequately represented the

15   class" before approving class action settlement).  Most notably, the Settlement would release wage

16   and hour claims, brought in at least eight other lawsuits against Uber, that are related to the

17   expense reimbursement and tip claims asserted here but were not alleged in the *O'Connor* and

18   *Yucesoy* complaints.  *See* Sett. Agmt. ¶ 29.

19        The resolution of the adequacy of representation issue requires two questions to be

20   addressed: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other

21   class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously

22   on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000)

23   (citing *Hanlon*, 150 F.3d at 1020).  Clearly, there is no conflict between Named Plaintiffs and the

24   other Class Members as to their common expense reimbursement and tip claims, and those claims

25   have been litigated vigorously since the outset of these actions.  And because Uber's

26   reimbursement and tip policies extended to all its drivers, any Class Member with related wage

27   and hour claims that would be released by this Settlement also has reimbursement and tips claims.

28   In other words, all the drivers with the wage and hour claims are part of the class as originally

alleged. Moreover, as the Court discusses in more detail in Part III.B.3.a., *supra*, the value of the related wage and hour claims is likely insubstantial. Plaintiffs' counsel has provided a detailed and fair analysis of the value of those claims. The Court thus finds that there is no conflict of interest between Named Plaintiffs and the rest of the Class (as defined in the amended complaint).

In sum, the requirements for certifying the Settlement Class are met.

## B. Preliminary Approval Factors

The Court now turns to the Rule 23(e)(2) preliminary approval factors.

### 1. Adequate Representation of the Class

The first factor asks whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). As discussed above, the Court finds that Named Plaintiffs have done so here, both with respect to the claims originally brought in *O'Connor* and *Yucesoy* and the additional claims being released under the Settlement Agreement. Thus, this factor weighs in favor of preliminary approval.

### 2. Arms-Length Negotiation

The second factor asks whether "the [settlement] proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).

Here, the parties arrived at the Settlement Agreement after three rounds of negotiations overseen by the experienced and respected mediators Mark Rudy and Francis J. "Tripper" Ortman. *See* Liss-Riordan Decl. ¶ 18; *Nielson v. The Sports Auth.*, No. C 11-4724 SBA, 2013 WL 3957764, at *5 (N.D. Cal. July 29, 2013) ([T]he settlement resulted from non-collusive negotiations; *i.e.*, a mediation before Mark Rudy, a respected employment attorney and mediator."). Moreover, as discussed above, the parties have conducted extensive discovery. Plaintiffs have propounded 73 requests for written discovery and reviewed more than 30,000 pages of documents produced by Uber in addition to "several sets of confidential data." Liss-Riordan Decl. ¶ 3. Uber has propounded over 1,000 requests for written discovery and reviewed more than 5,000 pages of documents produced by Named Plaintiffs. *Id.* Between them, the parties have deposed 10 witnesses, including Named Plaintiffs and Uber's Senior Vice President of Operations, Ryan Graves. *Id.* This means Plaintiffs had enough information to gauge the value

11

of their claims and the adequacy of the settlement terms.  *See Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) ("By the time the settlement was reached, the litigation had proceeded to a point in which both plaintiffs and defendants had a clear view of the strengths and weaknesses of their cases.") (citation and alteration omitted).

In the context of pre-certification settlements, courts must be especially vigilant to ensure that "the settlement is not the product of collusion among the negotiating parties."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (citations and internal quotation marks omitted).  Signs of collusion include: (1) "when counsel receive a disproportionate distribution of the settlement;" (2) when the parties negotiate a "clear sailing" arrangement under which defendants agree not to oppose an attorneys fee award up to a certain amount separate from the class's actual recovery; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* at 947.

There are no such red flags here.  As discussed below, Plaintiffs' counsel is requesting 25% of the settlement fund for attorneys' fees, which is the benchmark percentage in the Ninth Circuit.  *See id.* at 942.  And while Uber has agreed not to oppose the fee request, the concerns associated with this clear sailing provision are mitigated by the fact that the Settlement Agreement "is not contingent upon the Court approving counsel's application," Mot. at 30, and that any amount of the fee request not awarded to counsel will revert to the settlement class rather than Uber, *see Bluetooth Headset*, 654 F.3d at 948 (noting that a non-reversionary fund reduces "the likelihood that class counsel will have bargained away something of value to the class").

Accordingly, this factor weighs in favor of approval.

3.    Relief Provided for the Class

The next factor requires the Court to consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C).

a.    Costs, Risks, and Delay of Trial and Appeal

When evaluating the parties' First Proposed Settlement in 2016, the Court catalogued the risks Plaintiffs would face in litigating their case through trial. *See* Denial Order at 16–20. Of these, "[t]he most obvious risk" looming over all their claims was "that the Ninth Circuit will uphold the validity of the arbitration provision contained in" Uber's driver agreements. *Id.* at 16. And with respect to the driver classification question, there were factors under the *Borello* test, which then governed the employee status inquiry, "that support each side's position." *Id.* at 16–17 (citing multi-factor test from *S.G. Borello & Sons, Inc. v. Dep't of Indust. Relations*, 48 Cal. 3d 341, 350 (1989)). "For example, although drivers could choose their own days and hours or work, Uber controlled certain aspects of driver performance," such as "terminat[ing] individuals with low acceptance rates." *Id.* at 17. As to Massachusetts drivers, an additional risk arises "because Massachusetts does not have an express expense reimbursement statute, and thus recovery for expenses in Massachusetts may be less likely." *Id.* at 18. Moreover, Plaintiffs' tips claim was complicated by concerns that a jury may find that "Uber's communications indicating that 'tip is included' in a fare were too variable or not widespread enough to conclude that a tip was actually included." *Id.*

Even if drivers were determined at trial to be employees, Uber had arguments limiting recovery on their claims. "For instance, with respect to the expense reimbursement claim, Plaintiffs' counsel noted that Uber intended to argue that it already structured the fare to be "all-inclusive that takes into account things like expenses." *Id.* There was also a "risk as to which IRS mileage reimbursement rate would apply." *Id.* Plaintiffs argued for use of the fixed rate, but if the variable rate endorsed by Uber were instead applied, damages would have been reduced by approximately 60%. *Id.*

Many of these risks remain. But the landscape has shifted with respect to the two most significant risks. First, Plaintiffs' concern that the Ninth Circuit would find Uber's arbitration provision enforceable has come to pass. *See Mohamed*, 848 F.3d at 1210–14; *O'Connor*, 904 F.3d at 1095–96. The newly-defined settlement class excludes all drivers who are subject to the arbitration provision; only drivers "who have validly opted out of arbitration or for whom Uber

has no record of acceptance of an arbitration agreement" are part of the class. Sett. Agmt. ¶ 96.

As Plaintiffs recognize, this means the most significant risk to their case when the First Proposed

Settlement was formulated has now been eliminated. *See* Mot. at 3 n.5.

Second, the California Supreme Court in *Dynamex Operations W. v. Superior Court*, 4

Cal. 5th 903 (2018) recently adopted a new test for determining whether workers are employees or

independent contractors for certain types of claims. Prior to *Dynamex*, California courts applied

the multifactor *Borello* standard, which "calls for consideration of all potentially relevant factual

distinctions in different employment arrangements on a case-by-case, totality-of-the-circumstances

basis," to the employee/independent contractor question. *Dynamex*, 4 Cal. 5th at 954. But

*Dynamex* "adopted a simpler, more structured test for distinguishing between employees and

independent contractors—the so-called 'ABC' test" for claims arising under Industrial Welfare

Commission Wage Orders:

> The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions: (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Dynamex*, 4 Cal. 5th at 955–56 (emphases in original). If a defendant fails to satisfy any of the

three conditions, the presumption of an employment relationship obtains. Unlike the *Borello*

standard, "the ABC test allows courts to look beyond labels and evaluate whether workers are

truly engaged in a separate business or whether the business is being used by the employer to

evade wage, tax, and other obligations." *Id.* at 958 (citation omitted). In adopting the ABC test,

the *Dynamex* court emphasized that "wage orders are the type of remedial legislation that must be

liberally construed in a manner that serves its remedial purposes," and therefore "support a very

broad definition of the workers who fall within the reach of the wage orders." *Id.* at 952–953.

In the wake of *Dynamex*, Uber bears a hefty burden to establish that its drivers are not

employees, since they are presumptively considered employees and Uber can only overcome that

14

1    presumption by satisfying all three of the "ABC" conditions. *Id.* at 955–56. Indeed, in the short

2    time since the decision was rendered, many commentators have observed that *Dynamex* likely

3    makes it more difficult for "gig economy" companies like Uber to designate their workers as

4    independent contractors. *See, e.g.*, Cynthia Estlund, *What Should We Do After Work? Automation*

5    *and Employment Law*, 128 Yale L.J. 254, 326 n.181 (2018) ("Commentators have pointed out that

6    Uber and many other 'gig economy' firms will be especially hard pressed to meet the second part

7    of the [*Dynamex*] test.") (citing Noam Scheiber, *Gig Economy Business Model Dealt a Blow in*

8    *California Ruling*, N.Y. Times (Apr. 30, 2018),

9    https://www.nytimes.com/2018/04/30/business/economy/gig-economy-ruling.html; Anna

10   Deknatel & Lauren Hoff-Downing, *ABC on the Books and in the Courts: An Analysis of Recent*

11   *Independent Contractor and Misclassification Statutes*, 18 U. Pa. J.L. Soc. Change 54, 65–71

12   (2015)); Richard Frankel, *The Federal Arbitration Act and Independent Contractors*, 2018

13   Cardozo L. Rev. de novo 101, 140 n.65 (2018) (reading *Dynamex* to "indicate[] that the drivers

14   [for ride-sharing companies like Uber] should likely be treated as employees rather than as

15   independent contractors under California law"); John O. McGinnis, *The Sharing Economy As an*

16   *Equalizing Economy*, 94 Notre Dame L. Rev. 329, 359 (2018) (expressing concern that *Dynamex*,

17   in "rul[ing] that employers must treat workers who do work related to a company's 'usual course

18   of business' as full-fledged employees," "threatens to impose [a] corporate-employee relationship

19   on companies providing services in the sharing economy"). Also noteworthy is the California

20   Court of Appeal's recent reversal of a summary judgment that had been granted in favor of taxicab

21   company under the *Borello* standard. *See Garcia v. Border Transportation Grp., LLC*, 28 Cal.

22   App. 5th 558, 575 (2018). Applying the new *Dynamex* standard, *Garcia* found that the company

23   no longer met their burden to show its drivers are independent contractors. *Id.*

24       While Plaintiffs justifiably "believe[] [*Dynamex*] would make it much more difficult for

25   Uber to defend against these misclassification claims," Mot. at 4 n.7,[3] they acknowledge that

26   substantial questions remain as to the impact of the decision. For one thing, it is an open question

27

28   ───────────────
     [3] Obviously, the central question whether Uber drivers are employees or independent contractors
     is not resolved by this Settlement. That question awaits future litigation.

whether the ABC test applies to expense reimbursement claims, which comprise Plaintiffs'
primary claim for damages. *Id.* at 23. *Dynamex* endorsed the use of the ABC test "in one specific
context"— to determine "whether workers should be classified as employees or as independent
contractors *for purposes of California wage orders*." 4 Cal. 5th at 913–14 (emphasis in original).
Thus, Plaintiffs' minimum wage, overtime, meal and rest breaks, and failure to pay reporting time
claims, which are brought under Wage Order 9, would fall within the scope of *Dynamex*. *See id.*
(explaining that wage orders "impose obligations relating to the minimum wages, maximum
hours, and a limited number of very basic working conditions (such as minimally required meal
and rest breaks) of California employees"). In contrast, Plaintiffs' expense reimbursement claims
are brought under various provisions of the California Labor Code, not wage orders. *See* Sett.
Agmt., Exh. A ¶ 43. There is no definitive ruling that *Dynamex* would apply to these claims. *See*
*Garcia*, 28 Cal. App. 5th at 571 ("*Dynamex* applied the 'suffer or permit to work' standard
contained in the wage order without deciding what standard applied to *non*-wage-order claims,
such as claims for [expense] reimbursement.") (emphasis in original).

There is also the question of the retroactive effect of *Dynamex*. While "[g]enerally,
judicial decisions are given retroactive effect," courts have yet to address whether *Dynamex*
applies retroactively. *See Lawson v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2018 WL 6190316, at
\*7 (N.D. Cal. Nov. 28, 2018). As Judge Corley wrote in *Lawson*, "[t]here is some suggestion"
that California courts will follow the general rule favoring retroactivity as to *Dynamex*, but
*Dynamex* was "not definitive" on this point. *Id.*; *Garcia*, 28 Cal. App. 5th at 572 n.12 (same).

One final complication is that "there is now an ongoing and well-funded battle being
fought at the California legislature, in which a number of companies . . . are lobbying for a
legislative repeal or rollback of *Dynamex*." Mot. at 24; *see* A.B. 71, 2019–2020 Leg., Reg. Sess.
(Cal. 2018) ("This bill would, instead [of the ABC test], require a determination of whether a
person is an employee or an independent contractor to be based on a specific multifactor test,
including whether the person to whom service is rendered has the right to control the manner and
means of accomplishing the result desired, and other identified factors.").

On balance, Plaintiffs would still have to overcome significant hurdles were they to

1    proceed to trial, but the exclusion of drivers bound by arbitration agreements from the new

2    settlement class and the intervening *Dynamex* decision considerably lessens the risks they face

3    compared to when the First Proposed Settlement was reached in 2016.  This suggests that for the

4    Settlement Agreement to be fair, it must provide more consideration to Class Members than the

5    First Proposed Settlement did.  The Settlement Agreement does that.  In terms of monetary relief,

6    Uber will fund a $20 million non-reversionary payment to the settlement class.  Sett. Agmt. ¶ 95.

7    After administration costs, attorneys' fees, and incentive awards for the class representatives are

8    deducted, approximately $14,814,000 will be available to settlement class members who submit

9    valid claims.  *See id.* ¶¶ 79, 125, 126, 130.  Plaintiffs estimate that the total verdict value of the

10   claims being released under the Settlement is $54 million.  That total breaks down as follows:

11

|  | Vehicle Expense Reimbursements | Phone Expense Reimbursements | Gratuities (based on 20% of fare) | **TOTAL** |
|---|---|---|---|---|
| California Class | $39.8 million | $3 million | $5.6 million | $48.4 million |
| Massachusetts Class | $4.1 million | $556,710 | $902,729 | $5.6 million |
| **TOTAL** |  |  |  | $54 million |

16   Mot. at 26.  These figures were calculated[4] by Plaintiffs' counsel based on confidential data

17   provided by Uber," Liss-Riordan Decl. ¶ 37, which the Court reviewed *in camera* at the March 21,

18   2019 hearing.  Based on the underlying data, the Court agrees that $54 million is a reasonable

19   estimate of the total value of Plaintiffs' claims.[5]

20        This verdict value does not ascribe any value to the other wage and hour claims Plaintiffs

21   are releasing through this Settlement, because the Court agrees with Plaintiffs that the value of

22   those claims is minimal.  On this point, the Court finds instructive Judge Chhabria's analysis in

23

24   _____

     [4] The values of the vehicle expense reimbursement claims were calculated based on the IRS fixed
25   reimbursement rates.  Liss-Riordan Decl. ¶ 41.  The values of the gratuities claims were calculated
     based on the assumption that Uber, prior to separating tips from its fares in July 2017, set aside
26   20% of each fare as the tip.  *Id.* ¶¶ 48–49.

27   [5] It is important to note that the weightiest problem prompting the Court's to reject the First
     Proposed Settlement—the insufficient consideration afforded to Plaintiffs' release of their PAGA
28   claim—is no longer an issue here because "[t]his proposed settlement does not include any PAGA
     claims" and "does not release any PAGA claims."  Mot. at 2 n.2.

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016), another case in which the named plaintiffs sought to release, by means of settlement, a broader set of claims against the defendant than were originally pleaded in their complaint. *Cotter* was a misclassification lawsuit brought by drivers for the ride-share company Lyft. After the parties there reached a settlement agreement, but before the court could grant preliminary approval, another group of Lyft drivers filed a new lawsuit (*Zamora*) alleging similar claims based on a different theory of liability. *See id.* at 1033–34. Some of those new claims would have been released by the *Cotter* settlement, spurring the *Zamora* plaintiffs to object to the settlement. *Id.* at 1034. Judge Chhabria reasoned that a settlement proposal's failure to account for the value of particular released claims "does not automatically invalidate the settlement." *Id.* at 1038. Because what matters is that the settlement is fair "taken as a whole," "[i]f the unconsidered claims are not particularly strong or valuable, such that they're not likely to have materially influenced the overall settlement, counsel's failure to consider the claims would not be a basis for rejecting the agreement." *Id.* The court ultimately approved the *Cotter* settlement over the objections of the *Zamora* plaintiffs after deciding, based on evidence in the record, that "the new gratuity claims asserted by the *Zamora* plaintiffs do not seem very strong" or "very valuable." *Id.* at 1038–40.

This Court, having reviewed the record and supplemental briefing addressing the value of the claims released under this Settlement, *see* Docket No. 927, reaches a similar conclusion. The main claims being released that were not originally asserted in *O'Connor* and *Yucesoy* are those relating to minimum wage and overtime, meal and rest breaks, and Uber's obligation to carry workers' compensation for drivers. *See* Sett. Agmt. ¶ 29. The same release was previously included in the First Proposed Settlement. At that juncture, there was a litany of "substantial risks" jeopardizing Plaintiffs' prospects of recovering on the released claims. Denial Order at 23. For instance, to succeed on their minimum wage and overtime claims, Plaintiffs needed to show that they were entitled to compensation for time spent waiting for passengers, but had repeatedly "failed to plead specific facts" to that end. *Id.* at 19. Their meal and rest break claims were blunted by Uber's argument that its "entire system can be understood to constitute a policy of 'permitting' or 'authorizing' breaks whenever a driver wants." *Id.* And it was not clear that a

claim that Uber failed to obtain workers' compensation insurance could be enforced through California's Unfair Competition Law, "as the California Supreme Court has generally found that the UCL cannot be used to recover money in which the plaintiff does not have an ownership interest." *Id.* at 20 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1143–53 (2003)).[6] As a result of these risks, the Court found that it was "reasonable for Plaintiffs' counsel to assign no or little value to these claims when considering the overall full-verdict value." *Id.* at 23–24.

The same risks are still present as to the claims released under the current Settlement Agreement, and retain their full force even after *Dynamex*. Accordingly, the Court is satisfied that Plaintiffs' counsel can reasonably attribute minimal value to these claims.

Thus, the $20 million monetary settlement amounts to 37% of the $54 million verdict value of Plaintiffs' claims. By comparison, the guaranteed monetary relief under the First Proposed Settlement of $84 million was approximately 10% of the full verdict value of the non-PAGA claims being released. *See* Denial Order at 24. On a per-driver basis, the average recovery under the current Settlement is $2,206 (assuming a 50% claims rate). Mot. at 2. Plaintiffs estimate that California drivers who had opted out of arbitration would have received an average of $961 under the First Proposed Settlement. *Id.* at 3 n.5; Liss-Riordan Decl. ¶ 21 n.3. In other words, a driver not bound by the arbitration provision would receive 2.3 times the recovery under this Settlement compared to the previous one. The Court concludes that this multiplier represents a fair adjustment in light of Plaintiffs' greater chance of succeeding on the merits of its misclassification claims after *Dynamex* decision.[7]

---

[6] Several of the remaining claims required a finding of willfulness, and others faced problems of proof. Denial Order at 20 n.12 (citing claims under Cal. Lab. Code §§ 203, 226.8, 226(e)(1), 1174.5).

[7] Compared with other class action settlements generally, a 37% recovery of the verdict value is robust. *See, e.g.*, *Mego Fin. Corp.*, 213 F.3d at 459 (finding a settlement amount of one-sixth of the potential recovery to be fair and adequate under the circumstances); *Roe v. Frito-Lay, Inc.*, No. 14-CV-00751-HSG, 2016 WL 4154850, at *7 (N.D. Cal. Aug. 5, 2016) (finding a settlement amount on a claim constituting 32.4% of defendant's potential statutory damage exposure to be reasonable); *Greko v. Diesel U.S.A., Inc.*, No. 10–cv–02576 NC, 2013 WL 1789602, at *5 (N.D. Cal. Apr. 26, 2013) (finding settlement amount of 24% reasonable).

In concluding the consideration under the Proposed Settlement appears fair, adequate, and reasonable, the Court does not attribute substantial value to the non-monetary relief offered under the Settlement Agreement, which is essentially a subset of the non-monetary relief in the First Proposed Settlement. Like the previous proposal, this Settlement requires Uber to revamp its driver deactivation policy, including by maintaining an accessible written policy, removing low passenger acceptance rates as a basis for deactivation, and instituting a formal appeals process for deactivation decisions. *See* Sett. Agmt. ¶ 127. Other non-monetary components of the previous proposal—for example, Uber's agreement to provide drivers with more information about their star ratings—are absent from this Settlement. The Court found that much of the non-monetary relief under the First Proposed Settlement was "not as valuable as the parties suggest." Denial Order at 24. In particular, the Court pointed out that "while Uber will no longer deactivate drivers because of low acceptance rates, it will still exercise substantial control over a driver's ability to accept or decline ride requests, as the deactivation policy still permits Uber to 'temporarily log a driver out of the app for a limited period of time' based on low acceptance rates." *Id.* at 24–25 (citation and alterations omitted). Moreover, the modified policy still left out an important reason for deactivation—low star ratings. *Id.* at 25. These limitations continue to be present under the current Settlement Agreement. And the policy modifications will only remain in effect for at most two years. Sett. Agmt. ¶ 28. Thus, the value Class Members will receive from the non-monetary relief is insignificant.[8]

Nevertheless, the monetary relief is sufficiently robust to make the amount offered to Plaintiffs in settlement fair, adequate, and reasonable given the potential risks and expense of further litigation. This factor thus weighs in favor of approval.

          b.     Method of Distributing Relief to the Class

Notice of the Settlement will be distributed to settlement class members via email. Sett. Agmt. ¶¶ 146–49. In order to recover under the Settlement, class members must submit a claim

---

[8] Notably, the challenge to Uber's policy regarding tips is now moot. Since July 2017, the Uber App has given riders the option to enter a tip through a pop-up screen at the end of the ride, and no longer insinuates to passengers that tip is already included in the fare. *See* Docket No. 927 at 7.

form either by mail or online. *Id.* ¶ 130. The claim form is quite simple; it asks for the claimant's name, address, telephone number, email, and social security or tax identification (for claims over $600). *See* Sett. Agmt., Exh. C (Claim Form). The claim form is accompanied by a one-page form providing that by signing the claim form, the claimant is consenting to release his or her claims under the Settlement Agreement. *See id.*

Reminder emails will be sent to settlement class members who have not yet submitted claims, both before the final approval hearing and before the final distribution of settlement funds. *Id.* ¶¶ 137, 151. Follow-up notice by mail will be sent to any driver who does not submit a claim. *Id.* Settlement payments will be mailed by check to settlement class members who submit claims. *Id.* ¶¶ 132, 136. Any class member who disagrees with the Settlement Administrator's determination of his or her claim—either with respect to the calculation of the claim amount, the mileage records used for the calculation, or the determination that he or she is not an authorized claimant—he or she may challenge the determination. *Id.* ¶ 139. The Settlement Administrator will resolve the challenge with input from Plaintiffs' counsel and Uber. *Id.* Class members can opt out of the settlement class by submitting a written request via email or mail to the Settlement Administrator. *Id.* ¶ 182. They can also file objections with the Court. *Id.* ¶ 190.

Plaintiffs' counsel represents that it has used a "similar notice and distribution process in other cases bringing misclassification claims against 'gig economy' companies," which has led to high claim rates between 46% and 64%. Liss-Riordan Decl. ¶ 23. However, Plaintiffs' counsel acknowledges that one factor that may decrease the claim rates in this case is that those drivers who drove for Uber before Uber included an arbitration clause have not done so for as many as six years. Mot. at 12. "These drivers comprise approximately 75% of the settlement class, and [they] may be more difficult to locate and less engaged with the litigation." *Id.* The Settlement Agreement's robust follow-up and reminder procedures are designed to remedy this issue.

The Court concludes that the proposed method of distributing relief to the Class under the Settlement Agreement is reasonable. The notice procedure is designed to encourage a high claim rate, and it would take drivers minimal time to fill out and submit the straightforward claim form.

The Court also approves the *cy pres* provision in the Settlement Agreement. *Cy pres*

1   payments are permissible when funds are "non-distributable" or "where the proof of individual

2   claims would be burdensome or distribution of damages costly." *Nachshin v. AOL, LLC*, 663 F.3d

3   1034, 1038 (9th Cir. 2011) (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301,

4   1305 (9th Cir. 1990)).  A court should not approve a *cy pres* distribution "unless it bears a

5   substantial nexus to the interests of the class members" such that it accounts for the nature of the

6   lawsuit, the objectives of the underlying statutes, and the interests of the non-appearing class

7   members.  *Lane*, 696 F.3d at 821.

8           Here, the parties propose to send any funds remaining after the second distribution to two

9   *cy pres* beneficiaries: Legal Aid at Work, for unclaimed funds in the California settlement pool,

10  and Greater Boston Legal Services, for unclaimed funds in the Massachusetts settlement pool.

11  Sett. Agmt. ¶ 142.  By the time a second distribution has been made, the amount of unclaimed

12  funds is likely to be low, and it is reasonable to assume that it would be unduly "burdensome" or

13  "costly" to do a third round of distributions.  *Nachshin*, 663 F.3d at 1038.  Moreover, both of the

14  proposed *cy pres* recipients bear a substantial connection to the interests of the class members and

15  the nature of this lawsuit.  Legal Aid at Work provides a "Wage Protection" program that

16  "empower[s] workers in low-wage industries to attain economic security for themselves and their

17  families by enforcing wage protections through litigation, administrative representation, and other

18  advocacy."  Legal Aid At Work, *Combating Wage Theft*, https://legalaidatwork.org/our-

19  programs/combatting-wage-theft/.  The program offers "free advice and assistance in filing a wage

20  claim with the California Labor Commissioner," and encompasses workers' claims regarding "not

21  being paid the minimum wage for all hours worked, not receiving overtime pay, and not being

22  reimbursed for work-related expenses."  *Id.*  Greater Boston Legal Services similarly helps low-

23  income individuals resolve their civil legal issues, including "[w]age and hour theft."  Greater

24  Boston Legal Services, *What We Do*, https://www.gbls.org/what-we-do.  The geographic reach of

25  these non-profits is aligned with the location of members of the Class.

26          Accordingly, this factor weighs in favor of approval.

27              c.    Attorneys' Fees

28  "Where a settlement produces a common fund for the benefit of the entire class, courts

22

have discretion to employ either the lodestar method or the percentage-of-recovery method" in awarding attorneys' fees. *Bluetooth Headset*, 654 F.3d at 942 (citation omitted). "Because the benefit to the class is easily quantified in common-fund settlements," courts may "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* "Applying this calculation method, courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award." *Id.*

Here, Plaintiffs' counsel seeks $5 million in attorneys' fees plus expenses and costs, which currently total approximately $300,000. *See* Sett. Agmt. ¶ 126; Docket No. 927 at 11. This request appears to be reasonable. In determining whether an attorneys' fee award is justified, the Court must evaluate the results obtained on behalf of the class. *See Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1304 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th Cir. 2002); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (stating that the "most critical factor" to the reasonableness of an attorney fee award is "the degree of success obtained"). Plaintiffs' counsel has obtained favorable settlement terms in this case because, as discussed above, the monetary relief amounts to 37% of the total verdict value. The request also aligns with the Ninth Circuit's 25% benchmark. *See Paul Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

A lodestar cross-check affirms the reasonableness of the fee request. *See Vizcaino*, 142 F. Supp. 2d at 1305 ("District Courts often use the lodestar method as a cross-check on the percentage method in order to ensure a fair and reasonable result."). Based on rough numbers provided in the preliminary approval motion, Plaintiffs' counsel has accumulated a lodestar of over $5.9 million in the *O'Connor* and *Yucesoy* litigations. *See* Mot. at 31. Thus, the $5 million fee request represents a slightly negative multiplier, which courts have held "suggests that the percentage-based amount is reasonable and fair based on the time and effort expended by class counsel." *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007).

At this preliminary stage, this factor supports granting approval.

4.    Equitable Treatment of Class Members

The settlement funds will be distributed to class members based on the number of miles

they drove for Uber. This proportional distribution treats Class Members equitably. *See, e.g.*, *Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1334–35 (N.D. Cal. 2014) (finding no undue preferential treatment where settlement payment for minimum wage and overtime compensation claims was allocated pro rata among the claimants based upon the number of hours of overtime worked").

Plaintiffs also intend to apply for $7,500 service awards for "the named plaintiffs who have been part of this case since nearly the beginning and have participated most actively (Gurfinkel and Manahan in the *O'Connor* case and Talha and Sanchez in the *Yucesoy* case), as well as smaller enhancements of $5,000 for two Massachusetts named plaintiffs who were recently added to the case (Dulles and Oliveira)." Mot. at 32; Liss-Riordan Decl. ¶ 28. The Ninth Circuit has recognized that service awards to named plaintiffs in a class action are permissible and do not necessarily render a settlement unfair or unreasonable. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). However, the service award must be "reasonable," and the Court "must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Id.* (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)) (alterations in original). A "very large differential in the amount of damage awards between the named and unnamed class members" must be justified by the record. *Id.* at 978. An incentive award of $5,000 is considered "presumptively reasonable" in this District, but courts have approved higher awards where class representatives can make a strong showing on one or more of the *Staton* factors. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *7 (N.D. Cal. Nov. 21, 2012). When Named Plaintiffs formally apply for incentive awards in this case, they must provide evidence supporting their request for awards ranging from $5,000 to $7,500 under the *Staton* factors.

C.    Procedural Guidance for Class Action Settlements

Finally, the Court notes that the proposed Settlement sufficiently conforms to the standards articulated in this district's updated Procedural Guidance for Class Action Settlements. For example, the parties have provided the necessary information about the Settlement for the Court to

determine that its terms are sufficiently fair, reasonable, and adequate. *See* Proc. Guidance for Class Action Sett. ¶ 1. The parties have justified their choice of Epiq (formerly Garden City Group) as Settlement Administrator. *See id.* ¶ 2; Liss-Riordan Decl. ¶ 24. And the Court finds that the language of the class notices is appropriate and that the means of notice is the "best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also* Proc. Guidance for Class Action Sett. ¶¶ 3–5, 9.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that the Settlement Agreement is fair, adequate, and reasonable, and accordingly **GRANTS** Plaintiffs' motion for preliminary approval. It is further **ORDERED** that:

(1) Leave is granted for Plaintiffs to file the proposed Amended Complaints for Settlement attached as Exhibits A and B to the Settlement Agreement.

(2) Named Plaintiffs Matthew Manahan, Elie Gurfinkel, Mokhtar Talha, Pedro Sanchez, Aaron Dulles, and Antonio Oliveira are designated as representatives of the provisionally certified Settlement Class.

(3) Shannon Liss-Riordan and Adelaide Pagano of the law firm of Lichten & Liss-Riordan, P.C., whom the Court finds are experienced and adequate counsel for purposes of these settlement approval proceedings, are designated as Class Counsel.

(4) The form and content of the proposed Summary Notice, attached as Exhibit G to the Settlement Agreement, and the notice methodology described in the Settlement Agreement are hereby approved. The reminders described in Paragraph 137 of the Settlement Agreement will be sent to all settlement class members who have yet to submit claims, regardless of the size of their Settlement share. The form and content of the revised proposed Long Form Notice, filed by the parties at Docket No. 928-2, is hereby approved. The language on the first page describing the average and estimated amounts class members may receive shall be put in bold.

(5) The deadlines set by this Order are as follows:

      a. The Long Form Notice shall be disseminated within twenty-one (21) days after

the entry of this Order;

b.  The Summary Notice shall be disseminated within twenty-one (21) days after the entry of this Order;

c.  Motion in support of the Final Approval of the Settlement shall be filed on or before thirty-five (35) days before the Fairness Hearing;

d.  Class Counsel shall file their Fee Application on or before thirty-five (35) days before the Exclusion/Objection Deadline;

e.  Settlement Class members who desire to be excluded shall submit requests for exclusion postmarked (or the equivalent for e-mail) no later than sixty (60) days after the Notice Date (the "Exclusion/Objection Deadline");

f.  All written objections to the Settlement Agreement and the Fee and Service Application and written notices of the objecting class member's intention to appear at the Fairness Hearing shall be filed with the Court and postmarked and mailed to the Settlement Administrator no later than the Exclusion/Objection Deadline;

g.  Any opposition to the Motion in support of the Final Approval of the Settlement shall be filed with the Court on or before twenty-one (21) days before the Fairness Hearing;

h.  All documents in support of final approval of the Settlement Agreement, and in response to objections to the Settlement Agreement or the Fee and Service Application, shall be filed with the Court on or before fourteen (14) days before the Fairness Hearing; and

i.  The Fairness Hearing shall be held before this Court before the undersigned, Hon. Edward M. Chen, on July 18, 2019, at 1:30 p.m., in Courtroom 5 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, to determine whether the settlement of the Action pursuant to the terms and conditions of the Settlement Agreement should be approved as fair, reasonable, and adequate, and finally approved pursuant to Rule 23(e) of the

Federal Rules of Civil Procedure. The Court will rule on Class Counsel's application for an award of attorneys' fees, costs, and expenses and incentive awards for Plaintiffs (the "Fee and Service Application") at that time.

(6) Any party to this case, including Settlement Class Members, may appear at the Fairness Hearing in person or by counsel, and may be heard to the extent allowed by the Court, in support of or in opposition to, the Court's determination of the good faith, fairness, reasonableness, and adequacy of the proposed Settlement, the requested attorneys' fees and litigation expenses, the requested class representative enhancement award, and/or the Order of Final Approval and Judgment regarding such Settlement, provided however, that no person, except Class Counsel and Defense Counsel, shall be heard in opposition to such matters unless such person has complied with the conditions set forth in the Notice of Class Action Settlement.

(7) Pending the Fairness Hearing, all proceedings in the above-captioned Actions, other than proceedings necessary to carry out or enforce the terms and conditions of the Settlement Agreement and this Order, are hereby stayed.

(8) In consultation with and with the approval of Uber, Class Counsel is hereby authorized to establish the means necessary to administer the proposed settlement and implement the claim process, in accordance with the terms of the Settlement Agreement.

This order disposes of *O'Connor* Docket No. 915 and *Yucesoy* Docket No. 321.

**IT IS SO ORDERED**.

Dated: March 29, 2019

_____
EDWARD M. CHEN
United States District Judge